I6fWshu1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                      17 Cr. 350 (KBF)

RAZHDEN SHULAYA
a/k/a "Brother,"
a/k/a "Roma," and
AVTANDIL KHURTSIDZE,                        Trial
a/k/a "The Kickboxer,"

                    Defendants.
------------------------------x
                                            New York, N.Y.
                                            June 15, 2018
                                            9:10 a.m.
Before:
                    HON. KATHERINE B. FORREST,
                                            District Judge

                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
ANDREW C. ADAMS
ANDREW M. THOMAS
     Assistant United States Attorneys

ANTHONY CECUTTI
JENNIFER R. LOUIS-JEUNE
     Attorneys for Defendant Shulaya

KREINDLER & KREINDLER
     Attorneys for Defendant Khurtsidze
BY:  MEGAN W. BENETT
     -and-
ZEMAN & WOMBLE
BY:  KEN WOMBLE

Also Present:
Yana Agoureev, Interpreter (Russian)
Andrew Tarutz, Konstantin Garnov, Interpreters (Russian)
Nana Meyer, Katherine Stewart-Hilkert, Interpreters (Georgian)
Lasha T. Gegechkori, Interpreter (Georgian)
Rose Corrado, Paralegal Specialist
Special Agent Robert Hanratty, FBI
Special Agent Naushaun Richards, FBI

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I6fWshu1

(Trial resumed)

THE COURT:  Good morning.  Please be seated.

I note the defendants are present, as are their counsel, and we have the same representatives of the government, except for Ms. Corrado, the paralegal, who I assume will probably be joining us.

We have several matters to deal with this morning, so let's jump right into them.

I have considered the request for an instruction relating to Mr. Kutsenko, and I do not believe there is a sufficient factual basis for a *Brady* violation or anything even approximating any kind of conduct which would require anything special to be done here in this case.

I think the government's letter on this, actually, laid it out, so I'm not going to go through all of it.  I understand this has been a hot issue, but it's hard for me to understand why it has become so, because it's really, I think, a nonissue.  It's neither here nor there, from my perspective. Having reviewed the letters and thought a great deal about the issue and different ways that it could be cast, I just can't see anything with Kutsenko that wasn't able to be sufficiently explored, and I certainly can't see any prejudice that comes from what is being pointed to by the defense.

The defense objections and requests are preserved for posterity, but I am not going to provide any relief.

I6fWshu1

Ms. Benett.

MS. BENETT:  On the instruction that I submitted this morning, I spoke with Mr. Thomas briefly.  It's my understanding the government doesn't have a theoretical objection to what I proposed.  He thought it was already in the instructions.  I didn't see it, and I'm trying to look through right now.

THE COURT:  This is now a separate one, which is the coconspirator.

MS. BENETT:  Correct.

THE COURT:  Let's go through that.  I'm actually putting that into a different bucket from the Kutsenko issue.

MS. BENETT:  Yes.  Understood.  We've moved on from the Kutsenko.

THE COURT:  All right.  Terrific.

Let's go on to the other issues.

MR. CECUTTI:  Your Honor, may I make a record in terms of what we received in terms of 3500 material from the government.

THE COURT:  Not right now.  You can put in a letter afterwards.  We've got so much to do between now and 9:30, when we've got a jury, Mr. Cecutti.  Just put in a letter after the proceeding which sets forth the record.  I assume it is essentially, unless you think it's something that's going to change my mind, in which case I'll listen to it, what the

I6fWshu1

government has proffered and people have proffered now multiple times that's been received and not received.

MR. CECUTTI:  Your Honor, I'll just put in a letter. I'll just say that what was contained in the government's letter of what we received and when it was received is not accurate.

THE COURT:  All right.  Then you need to go ahead and say it, because if it is something that is possibly going to change my mind, then I need to understand what it is, but I had hopped to receive this all by letter, because we've got so much to do between now and 9:30, and we're starting at 9:20.

MR. CECUTTI:  Your Honor, I'll simply say that pretrial, before June 4, we received one page of handwritten notes related to Mr. Kutsenko's prior criminal history.  We did not receive any 302 reports related to that subject, and we did not receive any handwritten notes from any agent related to that subject.

Posttrial, or I should say during trial, we received, and this was after Mr. Kutsenko testified, handwritten notes related to a 302, which reflected a note, a brief note, related to Mr. Kutsenko's criminal history, which did not contain any detail.  It simply was a broad statement describing what Mr. Kutsenko had done in his past with respect to his criminal history.

THE COURT:  All right.  Just so that it's absolutely

I6fWshu1

clear, whatever was or was not provided pretrial, what is absolutely clear is that there has been ample opportunity during the trial to inquire into all of the details of Mr. Kutsenko's criminal history.  He has provided ample detail on that to defense counsel, who were cross-examining him at length on that, so there has been ultimately no prejudice that can be attributed to any of those alleged shortfalls.

Mr. Thomas, you were going to say something.

MR. THOMAS:  Your Honor, just to clarify one point on the 302 and the corresponding handwritten notes.  Mr. Cecutti is correct that the underlying handwritten notes were located immediately following the redirect that triggered these issues.  They were provided to the defense at the same time as we made the offer to hold Mr. Kutsenko for any additional cross-examination.

THE COURT:  All right.  Let's move on.

We have a revised verdict sheet.  If anyone has any issues with it, let me know immediately.  It simply does what I said yesterday, which is it changes one typographical error.  Otherwise, it's Count One, Count Two; rather than numbering the questions, the questions are now A and B, just so that it doesn't create confusion.

On the jury instructions, I'm looking now at the defense requests of June 14.  I have two requests from the defense, two letters from the defense, from Ms. Benett, along

I6fWshu1

with a transcript letter, I should say, so I've actually got a total of three letters.  And one of Ms. Benett's letters is dated the 15th.  There are two from the 14th, one related to the transcript, one related to the jury instructions and then one on the 15th related to jury instructions.

MS. BENETT:  Correct.

THE COURT:  All right.  And then I've got a letter from the government.

Here's what I think we should do.  Let's just take the "government informants cannot act as coconspirators, the request from June 15.  Here's what I would suggest we do.

I wouldn't do it in the place, Ms. Benett, where you have suggested it.  I think it would be better positioned on page 50 of the instructions, which is "membership in the conspiracy."  I think that what I would propose, based upon the case law in this area, which is the *Miranda-Ortiz* case, 926 F.2d 172, pin 175, which would suggest the following language could be inserted at the end of the instruction, as it currently stands, on page 50, it would say as follows:

"Finally, I instruct you that a person acting as a government agent cannot be a coconspirator, because he cannot truly agree to conspire.  However, the presence of a government agent does not destroy a conspiracy in which at least two other private individuals have agreed to engage in an unlawful venture."

I6fWshu1

That takes the language out of the *Miranda-Ortiz* case word for word.

Does the government have any objection to that?

MR. THOMAS:  No, your Honor.

THE COURT:  Ms. Benett.

MS. BENETT:  I had looked at *Miranda-Ortiz* last night. I'm just reviewing it.

THE COURT:  Let me hand over my copy, which has got the underlining of the additional language, so you can see it, which will make it easier.  You can see where I've underlined that piece.

MS. BENETT:  The proposed language is that --

THE COURT:  Let me read it again:

"Finally, I instruct you that a person acting as a government agent cannot be a coconspirator, because he cannot truly agree to conspire."

That, I think, is what you had asked for.  Then I would add the additional language that I have underlined in the case I just handed to you:

"However, the presence of a government agent does not destroy a conspiracy in which at least two other private individuals have agreed to engage in an unlawful venture."

MS. BENETT:  I recognize that this proposed instruction reflects the precise language from *Miranda-Ortiz*. We would prefer the language in the letter from this morning,

particularly given the nature of the individual acts that the government has elicited in their direct case.  I understand the Court's position.  I just wanted to note that.

THE COURT:  I understand.  You have an exception.

I'm going to include the language that I've suggested. I do think it is important to indicate to the jury that there still could be a conspiracy even when there is a government agent, and I think it would confuse the jury if we said that the presence of a government agent or someone acting as a government agent cannot be a coconspirator and not adding the rest.  I worry the jury would be unnecessarily confused as to where they are left with regard to understanding if there is sufficient agreement amongst them between two or more people to have a conspiracy.

Our positions are set, but that's what we'll do with that one.

Now, immunized witnesses.  Mr. Kutsenko, as I understand it, is an immunized witness of a sort.  Let me ask the government whether or not they believe that the charge as drafted on immunized witnesses appropriately reflects his position.  He's not a cooperating witness.  I'd ask the government for their input on page 20.

While you're thinking about that, let's go to the next one, a defendant's testimony, page 23, would say as follows:

The first part of it would remain, down to "a

defendant is never required to prove that he is innocent."  I would strike the bracketed portion, "if applicable," because it is applicable.  I would modify the following:

"The fact that," strike the word "a," "defendant," strike "testified or," insert "Khurtsidze" "presented evidence -- even if," strike the word "others," insert the word "Shulaya," "did not -- never shifts the burden of proof away from the government," end of bracket.  Take away "edit as applicable."

Again, this is what it read:

"That burden remains with the government throughout the entire trial and never shifts to a defendant.  A defendant is never required to prove that he is innocent.  The fact that defendant Khurtsidze presented evidence -- even if Shulaya did not -- never shifts the burden away from the government.  In this case, the defendants have chosen not to testify."

Any comments?

MR. THOMAS:  None from the government.

MS. BENETT:  Not from Mr. Khurtsidze.

MS. LOUIS-JEUNE:  Not from Mr. Shulaya.

THE COURT:  All right.  That takes care of that one. Let's move on.

There's a blank page at page 38 that we have to just remove, and let me just ask about immunized witnesses now.

Mr. Adams.

I6fWshu1

MR. ADAMS:  Your Honor, I apologize for overlooking it last night.  I don't think that instruction matches exactly what this defendant's situation is.  I'm going to get a draft non-pros instruction quickly to provide to the Court and parties.

THE COURT:  All right.  We are going to strike the immunized witness instruction altogether.  What I would ask you to do is to, when you get it, quickly hand it, in hard copy, if you can, to Mr. Cecutti, Ms. Louis-Jeune, Ms. Benett and Mr. Womble, to see if we can reach agreement on it.  We need to do that before we do the closings.

MR. ADAMS:  Yes.

THE COURT:  All right.  Let me just make sure that I've covered the various pieces that I had intended to cover.

Yes.  The testimony of experts.  It is singular.

MS. BENETT:  OK.

THE COURT:  We did have more than one expert.  We had translators that were qualified as experts.

MS. BENETT:  I think that it could mislead the jury insofar as the translators, while experts on linguistic matters, were not substantive.

MR. ADAMS:  Mr. Connolly was also qualified in cigarette trafficking.

THE COURT:  All right.  We'll keep it plural.

MS. BENETT:  OK.

I6fWshu1

THE COURT: And we've dealt with the "use of informants and undercover agents," on page 29.

We will also include the sentence requested in Ms. Benett's letter, "Of course, as with all witnesses, it is up to you to determine the credibility of any such witness." But we will also include, "It is therefore your decision, after reviewing all the evidence, whether to accept or reject the testimony of the law enforcement or government employee witness, as it is with every other type of witness, and to give that testimony the weight that you find it deserves."

I think that that is a fine addition.

Does the government disagree?

MR. THOMAS: No, your Honor.

THE COURT: Ms. Louis-Jeune, any disagreement?

MS. LOUIS-JEUNE: No, your Honor.

THE COURT: All right. That change will be made on page 29.

In terms of "evidence equally available," have there been any changes in the state of play?

MR. ADAMS: No. We haven't been offered any proposed draft translation or proposed stipulation, and even if we were, we think that instruction is required given that we cannot unring the bell on that point.

THE COURT: All right.

MS. BENETT: We received, late last night, from our

interpreter, our certified interpreter, line-for-line transcription. There is some distasteful language in it that would require -- not criminal but certainly prejudicial, I would say, not relevant and prejudicial. We would need to redact that. We would need to get the government's approval.

I thought in the interest of expediting matters to ask the Court if, even with a transcript of that, even if we reached an agreement with the government about the nature of that transcript, if the Court were still going to give the "equally available" instruction, then we would not --

THE COURT: Here's what I'm going to do. I'm not going to allow there to be an appeal point hanging out there based upon a hypothetical. What I'm going to say is now is the time to either offer that up or not. It hasn't been offered up. I understand there are tactical reasons why it's complicated to do it at this point in time, but I offered to keep the evidentiary record open only until the moment we bring the jury in this morning simply for the purpose of entering that; you're not prepared to do that, so we're going to take the hard step of saying that the evidentiary record is then closed, and we're going to keep the instruction as it stands.

MS. BENETT: That's fine, and with our exception noted to that instruction even given the question that I asked Mr. Kutsenko.

THE COURT: Understood. That is preserved.

I6fWshu1

OK.  Anything else that people would like to raise on the instructions?  OK.  Then the instructions shall be modified as we have indicated.

We've got the *nolle prosequi*.

MR. ADAMS:  It's not a *nolle*; it's non prosecution, and I'm close to having language.

THE COURT:  OK.  We have a draft instruction too.

Anything anybody else needs to raise?

MR. ADAMS:  Your Honor, one additional thing on the jury instruction.  There's a stray reference on page 2 to question 6 that, I think, needs to change to Count Five -- the verdict form.  Sorry.

THE COURT:  All right.  We'll take care of that.

MS. BENETT:  Your Honor, on the jury instructions but before the jury comes out, Mr. Pecorino had offered to let me hook up with the Court's technology so that I can pull exhibits up with Mr. Womble.

THE COURT:  Yes.  We'll do that.  I'm just trying to get the non-pros instruction.

MR. WOMBLE:  Your Honor, I believe we'll probably reach a break before it comes to my turn and we can possibly do it then to get things moving.

THE COURT:  We can, as soon as we get the non-pros instruction.

MR. WOMBLE:  No.  As far as setting up our equipment.

I6fWshu1

THE COURT:  OK.

MR. WOMBLE:  That's what I was referring to.

THE COURT:  We're going to have to go over this anyway, this instruction.

MR. THOMAS:  Your Honor, the government proposes to just omit any instruction on this point.  There is the "general credibility of witnesses" point.  We think that's sufficient.

THE COURT:  All right.  Is that acceptable to the defense?

We've taken out the immunized witnesses altogether.  The government is suggesting that there not be a separate non-pros instruction; that we just rely upon the general credibility of witnesses and the interest in the proceedings.  There's also language not only about credibility of witnesses, but as part of that, the jurors should assess carefully whether a witness has an interest that could impact credibility.

MS. BENETT:  Your Honor, I don't remember what page the "immunized witnesses" instruction is.

THE COURT:  The immunized witnesses, which I've just taken out, was on pages 20 to 21.  The entirety of it would be deleted.  All right?

MS. BENETT:  We think that it's important to have an instruction on this.  We think it's important to have the nature of this instruction with respect to the nonprosecution agreement.  If it's simpler to leave it as immunized witnesses

I6fWshu1

because we don't have the non pros --

THE COURT:  Let's get the non pros then, because that would be, I think, more accurate.

Mr. Adams, read us what you have.  Do it slowly.

MR. ADAMS:  This was proposed in *Deligatti*.  I think it was left out of the final charge, and it was included in a broader instruction about accomplice and cooperating witness testimony, as proposed by the government, and it reads as follows:

"You also heard testimony about cooperation agreements and nonprosecution agreements."

THE COURT:  So we would take out the "cooperation agreement" since they're getting that elsewhere.

"You also heard testimony about nonprosecution agreements."

MR. ADAMS:  "Between the government."

THE COURT:  "About a nonprosecution agreement."  OK.

MR. ADAMS:  "Between the government and," in this case, "one witness, Aleksandr Kutsenko."

THE COURT:  Yes.

MR. ADAMS:  "I caution you that it is no concern of yours why the government made an agreement with a witness.  The existence of such an agreement itself, and its effect on the witness, may be considered by you in determining credibility. Your sole concern is whether a witness has given truthful and

accurate testimony here in this courtroom before you.  As with any witness, let me emphasize that the issue of credibility need not be decided in an all-or-nothing fashion.  Even if you find that a witness testified falsely in one part, you may still accept his testimony in other parts, or may disregard all of it.  That is a determination entirely for you, the jury."

THE COURT:  OK.  Read it again, please.

MR. ADAMS:  Sure.

"You also heard testimony about a nonprosecution agreement between the government and Aleksandr Kutsenko.  I caution you that it is no concern of yours why the government made an agreement with a witness.  The existence of such an agreement itself, and its effect on the witness, may be considered by you in determining credibility.  Your sole concern is whether a witness has given truthful and accurate testimony here in this courtroom before you.  As with any witness, let me emphasize that the issue of credibility need not be decided in an all-or-nothing fashion.  Even if you find that a witness testified falsely in one part, you still may accept his testimony in other parts, or may disregard all of it.  That is a determination entirely for you, the jury."

THE COURT:  All right.  Thank you.

Ms. Benett.

MS. BENETT:  We don't think that that precise formulation would be appropriate here given that it is not

I6fWshu1

exactly -- I think that it would be coming after the "cooperating witness testimony."  It doesn't mirror the similar concepts included in the "cooperating witness testimony" instruction, which I think could tend to confuse the jury.

We would suggest just a very short one, given that it would come after the "cooperating witness testimony" instruction, which includes some of the same types of admonition to the jury regarding credibility and parsing out "some testimony can be credible while other parts may not be credible."  We think that an instruction following "cooperating witness testimony" that has to do with testimony from a witness who received a nonprosecution agreement that simply says, "You have heard testimony from Aleksandr Kutsenko that he received a nonprosecution agreement in this case and that may be considered by you in determining his credibility," full stop, or maybe with the follow-up sentence, "As with any witness, that ultimate decision as to credibility remains with you."

THE COURT:  Let me ask, Ms. Louis-Jeune or Mr. Cecutti, if you have anything to add to what Ms. Benett says?

MR. CECUTTI:  No.  That's what we jointly proposed.

THE COURT:  I am going to go with the government's version of the instruction.  I think it's an accurate recitation of the law.  I think it is balanced and appropriately indicates to the jury that there is such an

I6fWshu1                      Summation – Mr. Adams

agreement; that it should and can be considered by them, but also it's no concern to them as to why the government chose to enter into one; and that ultimately, all decisions shall be made by the jury as to how to weigh the testimony and credibility.  I'm not restating the language.  We're going to use the language as recited by Mr. Adams.  That will be typed up and included where the "immunized witness" instruction was previously.

All right.  I think that concludes our issues on the jury instructions.

Anything further?

All right.  Let's take a short break.  We're waiting on one juror.  We can maybe use this time to get Mr. Womble hooked into the system, because we're waiting on one juror.  As soon as that juror is here, we will then begin.

Thanks, folks.

(Recess)

THE COURT:  All right.  Ladies and gentlemen, we have the jury ready.  Let's go ahead and bring them out.

(Jury present)

THE COURT:  All right.  Ladies and gentlemen, when you reach your seats, let's all be seated, and everyone in the courtroom can also be seated.

We are ready to begin our closings.  So that you folks understand the order, the government will go first.  Then each

I6fWshu1                    Summation – Mr. Adams

defendant will have the opportunity to make a closing, and then the government, which bears the burden of proof here, will have an opportunity for a brief rebuttal.  So it's government, defense, defense, and then briefly the government again.

            With that said, Mr. Adams, why don't you please proceed, sir.

            MR. ADAMS:  Thank you.

            Good morning.

            First, encounters with the Shulaya enterprise.  You've heard about them from numerous witnesses over the course of the last two weeks.  You've heard about how new associates walk through doors and enter into a world of gambling, contraband, weapons, fraud, theft and brutal violence.

            From Sasha Kutsenko, you heard that Razhden Shulaya came to his poker club and began needling him about his profits.

            Mark Nektalov was brought to a strange apartment, his phone was taken, and he walked into a ring of men surrounding Shulaya standing over the bloody form of his friend.

            Slava, the confidential source, met Mr. Shulaya at a Manhattan nightclub, where he told Slava that he was a different kind of criminal.

            And Evgheni Melman, whose boss at a cell phone store, told Melman that Shulaya was a man that he should trust, that he should go with him.  He was uncomfortable saying no, but he

I6fWshu1                        Summation - Mr. Adams

went, and after that day, Shulaya told him, "You are with us now."

No one who you have heard from walked away from that enterprise unharmed, unscathed.  Everyone you heard from who touched this enterprise was either scared, intimidated or subjected to violence at the hands of these defendants.

These witnesses described an organization built on a corrupted loyalty to one man, Razhden Shulaya.  He was policed by men through brutal violence like that inflicted by his personal boxer, Avtandil Khurtsidze.

Now, I'm going to talk about the evidence overall in this case, and I'm going to talk about how it relates specifically to certain counts and certain elements of the crimes that you're going to be considering, but first I want to start with a handful of facts that I think are not seriously in dispute in this case.

First, Razhden Shulaya is and has long held himself out as being a *vor*, a thief-in-law, a high-ranking criminal authority.  He says it on recorded phone calls.  He says it in recorded conversations.  He proclaims it to witness after witness after witness:  Sasha, Slava, Mark Nektalov, Melman, Sam Sadov, Zurab Dzhanashvili.  He revels in that title.  He revels in the repeated use of its symbols, its imagery, its lore, its rules.  You've seen it over and over again, in that eight-pointed star; on his cell phone case; on his Hollywood

I6fWshu1                    Summation - Mr. Adams

Walk of Fame picture; on his money-laundering vehicle, the fake vodka company, Tropport LLC.

It's not in serious dispute that under the authority of that title, he inflicts violence on people who insult or underpay them.  You heard about that first from Mark Nektalov, whose description of the beating of Zurab Natchkepia was confirmed by both Kutsenko and by Dzhanashvili.  You saw and read that in the assault of Sasha Kutsenko, by Khurtsidze, sitting at Shulaya's side in the poker house.  And you saw that in disturbing photographs of Mamuka Chaganava, whose battered face Shulaya saved on his phone and used as bragging rights in recorded conversations with Slava.

It's not in serious dispute that in an illegal gambling business operated in an apartment above 125 Brighton Beach Avenue; or that that gambling-business poker house operated for almost a year before shutting down in a panic following the arrests of Shulaya's associates and underlings, including the man who gifted him this crossbow in tribute, Pelmin.

It's not in serious dispute that Avtandil Khurtsidze assaulted at least two people inside that poker house, both incidents being captured on videotape.

It's not in serious dispute that on September 7, 2016, Khurtsidze committed one of those assaults inside the poker house; immediately went to go collect a debt from a poker

I6fWshu1                    Summation - Mr. Adams

player from the poker house, a meeting also captured on video,

by the way; and immediately returned to the poker house where

his original victim stood, head down, hands held behind his

back, in subservience to Khurtsidze's boss, Shulaya.

It's not in serious dispute that Shulaya, Khurtsidze,

Melman and others used the poker house and Nazo

Gaprindashvili's -- Anna -- apartment on Cropsey Avenue, in

Brooklyn, to store that slot machine, sitting over there; or

that Khurtsidze's on video twice assisting in the movement of

that slot machine from one place to another, including on the

very same day that he went to shake down yet another victim

from the Shulaya poker house.

It is not in serious dispute the phones of both of

these defendants contained the raw materials for executing the

casino scheme to defeat that slot machine, videos of the

specific slot machines that they were targeting.

It's not in serious dispute that the casino scheme was

real and that it worked.

There's no dispute that Melman, from his school here

in Manhattan or from the bus, would log on to Shulaya's

laptops, to Shulaya's devices, to troubleshoot the scheme.

There's no dispute that Diego Gabisonia demonstrated

that the scheme worked twice while being filmed by security at

Harrah's Casino in Pennsylvania.

There is no real dispute here that Melman was able to

I6fWshu1                    Summation - Mr. Adams

make the scam work because Shulaya gave him the code necessary to do it and the connections to Russian servers that powered the fraud.  You've seen the photographs and the records that show you step by step how some of those servers were obtained, transported from New York to New Jersey and back and ultimately shipped to Russia at Razhden Shulaya's direction.

And there can be no serious dispute that the various devices seized from Shulaya's hotel room in Las Vegas, including this laptop and this SanDisk that he was ready to chew into pieces to avoid capture by law enforcement, contained every stitch of code necessary for executing the casino scheme, the reason for him being in Vegas when he was arrested.  And you even have Melman's step-by-step tutorial disk to walk you through every piece of code on that device, if you care to watch the demonstration.

Finally, it's not in serious dispute that Shulaya and his underlings conspired to flout the tax laws of the state and the city by trafficking in millions of cigarettes that they believed to be not only untaxed but stolen.

So why are you here?  What is actually in dispute?

Let me turn to that now, and in doing so, I'm going to refer to a few points raised by defense counsel in their opening statements and through cross-examination.

Let me say at the outset the defendants have no burden in this case.  That burden rests with the government at all

I6fWshu1                         Summation - Mr. Adams

times.  It's one that we embrace, and it is one that we have plainly met in this case.  But if the defense chooses to make an opening statement, if they choose to cross-examine witnesses, then you can, and you should, ask yourself if their statements and their arguments make sense.  Do they match what's in the record?  Do they match the evidence that's come before you?

So what is in dispute, in light of all of those undisputed issues?  Was there an enterprise in this case?  Were Shulaya and Khurtsidze's members of it, and did Khurtsidze know about the casino scam that he helped to further?

The answer is yes on all points and the evidence on each of them overwhelming.

Now, I expect that Judge Forrest will instruct you further on the definition of an enterprise as it applies in this case.  I expect that you're going to learn that enterprise can mean a number of different things, including a group of people who informally associate together for some common purpose, for engaging in a common course of conduct.

Now, you know from the evidence here that there was such a group, a criminal business, and it centered around Shulaya, its CEO, or in his world, its *vor*.  For context about what I'm going to be talking about next, you're going to be asked by us -- by the government -- to find that each of these defendants joined that conspiracy and did so to further two

I6fWshu1                         Summation - Mr. Adams

types of what we're going to call racketeering activity, two kinds of crimes that the judge will instruct you on further.

For Shulaya, you have a buffet to choose from. You have receiving stolen goods. You have trafficking in stolen goods. You have contraband cigarettes. You have wire fraud, identity theft. You have assaults. You have extortions. The list goes on.

For Khurtsidze, a similarly long list, although his role was more narrow, extortion, assault, the wire fraud involving the casino scam.

With that as background, who were the members of the enterprise, and how was this enterprise structured?

At the top, plainly, was Razhden Shulaya, a leader sitting on top of the different positions, overlapping personnel, policies and procedures, much like those of any growing business. You learned that before arriving in the United States, Shulaya was crowned a *vor*, instilling him with the status, the power and the authority necessary to organize and direct lower level criminals.

You've heard the testimony of Zurab Dzhanashvili, for a time, Shulaya's No. 2; about Shulaya's crowning in Italy by another group of *vor*s. You've heard from Evgheni Melman, who along with Diego Gabisonia, was essentially the IT department for this business. You've heard how they'd recount Shulaya's stories of his time in Europe with Dmitri Zernov, and you've

seen the transcript of the very first meeting between Slava and Shulaya in which Shulaya makes clear that he had already established himself in the role of criminal authority, with the power to protect his partners and associates.  He is a different kind of criminal.

You've heard from Special Agent Penza as well as from Kutsenko and Dzhanashvili, two men who lived the life under the vor, about the rules, the structures, the financial arrangements that govern the operation of a *vor*'s business, and you've seen documents and audio recordings and videos that bring those rules to life.

Take the concept of *obshchak* for a moment.  You've heard about that from a couple of different witnesses.  It's a financial idea.  Money flows up to the *vor* from tributes from lower level criminals.  Think about that financial arrangement and ask yourself, for example, what does common sense tell you about that stash of Western Union and wire transfer receipts found in Shulaya's apartment?  We went through some of this, while Kutsenko was on the stand, previously after he had explained that Shulaya had sent him a MoneyGram in order to wire money overseas to people he did not know.

These are just some of those receipts.  They have the names of people that you've seen over and over again in this conspiracy.  This is money sent by Shulaya's associates, and in one case by Zurab Natchkepia, his victim, the painter.

What does common sense tell you about what these documents are?  Would you keep a trove of receipts detailing money transfers, just by your friends, to people and places that you don't know, sitting around your house?  No.  Why would you need to?  But you would do it if these receipts were just part of your business, and that's what they were to Shulaya, the daily paperwork that accumulated in his growing criminal enterprise.  And this last receipt is particularly telling, because it highlights another pair of rules that defined the enterprise, defined its structure and defined how it was governed, a rule of respect and a rule of violent enforcement.

Mark Nektalov, Sasha Kutsenko and Zurab Dzhanashvili each described how Natchkepia, here, the painter, disrespected Shulaya and was as a result beaten into submission, bloodied, broken, under Shulaya's assault.  And they described how the painter begged forgiveness and apologized to his leader.  He did that while a circle of men looked on, and that circle of men, according to Kutsenko and Nektalov, included the defendant Avtandil Khurtsidze.

In that wire receipt, you see the fruits of that submission.  In the form of that receipt, you see the painter paying tribute to Shulaya, stored among the books and records of Shulaya's criminal corporation.

As, tellingly, you have seen the videos of Shulaya's victims, Kutsenko in one case and a startled young man in

another, standing, again, with their arms behind their backs, after being assaulted by Shulaya's chief enforcer, Khurtsidze, you know that Khurtsidze was a key member in, and a stabilizing force for, the Shulaya enterprise.  As makes sense in any business, Khurtsidze's job description was tailored to his skill set.  Not everyone can be a *vor* or a computer whiz.

What was Khurtsidze's role?  Mostly to beat people at Shulaya's direction, or to scare them into believing that they would be beaten if they didn't pay up or if they didn't respect Shulaya's business operations.  As Melman told you, Khurtsidze was Shulaya's personal boxer, who would beat anyone at Shulaya's command.

Government Exhibit 496A is a video that you've seen several times.  It's the video of Khurtsidze striking Sasha Kutsenko.  It's undeniable proof of that role.  Kutsenko, alone on one side of the table, is berated by Shulaya for an error in the poker house chop.  He's accused of stealing from the enterprise, and you know because the meeting is on video and on a separate audio recording what happens to Sasha on that day.

He takes a huge risk.  He plays a gambit.  He throws a knife on the table.  He offers Shulaya to cut him if he believes he's stolen.  And what is this defendant's reaction? He isn't scared of the knife.  And Sasha is plainly not attacking anybody in that video, despite the suggestion on cross-examination to the contrary.

Shulaya is furious.  He feels disrespected by the mere fact that someone was allowed to be in the same room as a *vor* with a weapon.  And Shulaya makes his anger known not only to Sasha but to his employees Khurtsidze and Dzhanashvili, they messed up.  And like any gung-ho employee, Khurtsidze tries to fix his mistake by striking Kutsenko so hard that it sends him stumbling into the back wall of the room.  He's the hammer.  That was his job.

Your common sense, resting on that video and the audio that goes with it, tells you exactly what happened in this clip.  Khurtsidze assaulted Kutsenko because Khurtsidze was Shulaya's enforcer, because Kutsenko had disrespected the enterprise, and so Shulaya gave him the green light, as Sadov told you on the stand.

Now, on cross-examination of Kutsenko, Khurtsidze's counsel focused on the roughly ten seconds between the time that Kutsenko leans forward on the table and the time that Khurtsidze strikes Sasha, and you can see what happens during that ten seconds.  Nothing.  He's not beaten because Khurtsidze was afraid or nervous.  There's no question about who is in control in that room or what Kutsenko had just done.  Your common sense, the video and the audio recording tell you what happened on July 25, 2016.  Khurtsidze clocked in for his job at the Shulaya enterprise, and a person was hurt as a result.

Exhibit 496B is the second assault on the same night.

Khurtsidze waits, and while everyone in the room rises for the *vor*, Shulaya approaches Sasha, his hands now held behind his back.  Shulaya raises one hand as a feint and then punches Kutsenko in the face.  Why?  Because the enterprise has rules.  Dzhanashvili even called them laws, and Kutsenko had committed a violation by disrespecting the *vor*.  What's the rule when that happens?  You heard it from Dzhanashvili.  You hang your head, you put your hands behind your back and you wait for your punishment at Shulaya's hands.

You also heard from Sam Sadov about Khurtsidze's role in securing Shulaya's physical safety and enforcing shows of deference.  Khurtsidze makes Sadov place his hands behind his back when addressing Shulaya.  Khurtsidze beats a much smaller man in Shulaya's poker house, and then he and Shulaya count cash while that man stands with his hands behind his back and his head down.  Khurtsidze shakes down poker players while Sasha's recording device picks up Khurtsidze's threats.  "Don't try to run.  You cannot hide."

Khurtsidze is a member of the Shulaya enterprise, its chief enforcer.

But beyond Shulaya, beyond Khurtsidze and others, the IT specialists, Melman and Mr. Gabisonia, the enterprise had a large roster of additional associates.  Here are just a few that you heard about during the course of this trial:

Mamuka Chaganava, the former No. 2, who fell out of

I6fWshu1                       Summation - Mr. Adams

favor and was beaten severely for his infractions;

Zurab Dzhanashvili, the new No. 2, who told you about Shulaya's steady stream of vicious assaults in defense of his own status;

Mikheil Toradze, Artur Vinokurov, Avtandil Kanadashvili and Hamlet Uglava, who surrounded Shulaya at various times, including acts of violence, and who were Shulaya's delivery crew for these purportedly stolen and untaxed cigarettes;

Sam Sadov, a dealer, and just one of the many employees, masseuses, dealers, caterers;

Khurtsidze, at the enterprise's poker house;

And Nazo Gaprindashvili, known as Anna, who financed Shulaya's enterprise through the theft of money from her stroke-bound employer. Here's Shulaya's new car, with the same license plate that Agent Hanratty observed during a stolen-goods meeting with Slava, parked in front of 300 Winston Drive, right next door to where Gaprindashvili's victim resided, at 200 Winston Drive, as you heard through his stipulated testimony. That man was relying on Gaprindashvili and her assistance to survive but was being robbed in slow motion by Anna and her real employer, Razhden Shulaya;

Azer Arslanouk, an up-and-coming business partner for Shulaya's enterprise, a man who could expand the business to after-hours clubs, offering drugs to its patrons and to

brothels that would benefit from Shulaya's *krisha*, another term that you've heard a couple of times through the course of this trial, meaning protection, the protection offered by *vors* to criminal ventures under their umbrella, an expansive and organized set of lower level associates, each with a role to play in support of Shulaya's overall enterprise, and all subject to rules of behavior enforced through violence.

Now, at this point I've mentioned each of the three cooperating witnesses, Dzhanashvili, Sadov and Melman. They were the people who operated this enterprise with the defendants.

In the case of Dzhanashvili, he worked with them for years. Dzhanashvili was at Shulaya's side for five different acts of brutal violence. Sadov was a dealer at the poker house who made extra money for Shulaya by scamming players at their own games. And Melman was the whiz kid, plucked by the back room of a cell phone repair shop by Razhden Shulaya, who drove him to Anna's apartment where the Pelican Pete was waiting, delivered, you'll remember, by Khurtsidze and Akaki Ubilava, who later on the same day, went to shake down a poker player. Melman was plugging away at a casino-scamming technology that Shulaya obtained through violence.

You've heard these witnesses tell you how they were arrested, prosecuted and pled guilty. You've heard them tell you about their past crimes, and you know that Dzhanashvili is

I6fWshu1                    Summation - Mr. Adams

in prison as we speak.

From their openings and cross-examinations, the defense has suggested that the cooperators are all liars; they're criminals; you can't trust them.  But let's be clear.  The defense had to take that tack, because if you believe that Dzhanashvili or Sadov or Melman, or any one of them, if you believe them, then these defendants are guilty.  That's it.  It's the end of the case.  So of course they have to go after their credibility.

And my job would be much easier if *vors* hired choir boys, but that's not how it works with the underlings in a criminal enterprise.  If you want a beating administered, if you want a slot machine compromised, if you want a dealer for an underground poker game, one willing to cheat the very players that you're hosting, you go to the people who know how to get those jobs done, and that's exactly what these defendants did.  It is because of their involvement in the defendants' crimes that those witnesses have important testimony to offer.  Your common sense tells you that in a case like this, in a tightly controlled world of violence, theft and fraud, who the potential witnesses are going to be.  Only insiders are going to have information about these defendants' crimes.

You've been paying attention through this trial.  You've seen the cooperating witnesses' testimony.  They each

I6fWshu1                    Summation - Mr. Adams

took the stand.  They answered every question of them. Dzhanashvili and Sadov were as blunt on direct as they were on cross.  Melman was just as particular about the details, just as ready to tell me that I had asked too broad a question as he was on cross.  You can evaluate for yourselves what they said and you can compare how their stories matched up:  Dzhanashvili with Mark Nektalov and Kutsenko about the beating of Natchkepia; Melman with Slava about the execution of the casino scheme; Sadov with the video evidence that shows Khurtsidze assaulting Kutsenko at the end of the big game.

You can evaluate their testimony against a mountain of corroboration.  They are backed up by overwhelming evidence that has nothing to do with them, and beyond the fact that each of the cooperators tells you the same story about Shulaya as the criminal authority and Khurtsidze as his violent enforcer, each cooperator is corroborated by documents, data and damning testimony apart from that.

I'll get to plenty of this in a moment, but consider this as one example for right now.

Evgheni Melman and Zurab Dzhanashvili both recount, from their own perspectives, how Shulaya obtained the technology necessary to execute the casino scheme.  Melman hears it from his boss, from Shulaya, that Shulaya kidnapped and extorted his way into the program and that he kept the fruits of that extortion on these thumb drives.  Then he gave

I6fWshu1                     Summation - Mr. Adams

these thumb drives to Melman in order to let Melman work out how the scam was supposed to work.

Dzhanashvili lived through the same incident.  He was there for the kidnapping.  He was there for that extortion, for the bag over the victim's head and for Shulaya's wife being shuttled in and out of the bathroom over the course of a ten-hour kidnapping.  But beyond those two witnesses, you also have Chris Coverstone, the very last witness that you heard from, a highway patrolman in Ohio, who just happened to stop Shulaya speeding and sees these, the set of thumb drives, just after that kidnapping occurred.

You have records from the Bellagio Hotel and Casino showing Shulaya and his wife in Vegas in April of 2014.  Those records corroborate Coverstone.  They're dated three years before Dzhanashvili was even arrested, four years before he signed his cooperation agreement.  Those records reflect Shulaya and his wife of the Hollywood Walk of Fame photo in Vegas at the time of the kidnapping, and you have the dates on the files taken from that set of thumb drives containing the software that Melman used to conduct the scam, with dates reflecting final modifications in April of 2014, eight months before Slava meets Shulaya; documents, data, damning testimony, all corroborating two witnesses, Melman and Dzhanashvili, who are at the extreme ends of the spectrum of witnesses that you've seen in this trial.

The question is not whether you like these witnesses. It's not whether you would choose to surround yourself with men like them, to hire them as employees of your own business. The question is whether you believe what they told you about the nature and activity of this enterprise and about these defendants' roles within it. Your common sense tells you that they told the truth, because their testimony made sense and it's corroborated by independent evidence.

Let's get back to that evidence.

Now that we've discussed the structure and the membership of the enterprise, let's talk a bit about what its goals were. What did it do as a business, and how did it go about achieving those goals?

Shulaya thought big. When he started working with Slava, he asked Slava to provide him with stolen cigarettes and other stolen items, watches, apparently. With those purportedly stolen Rolexes, Shulaya took those items, provided them to his then No. 2, Mamuka, before he was beaten, who tried to fence those items through Dzhanashvili, and that's all reflected in the phone contacts from Dzhanashvili's phone.

Shulaya's focus settled on what he believed were stolen, untaxed cigarettes, and he agreed with others to traffic in those stolen and contraband items. He agreed with Mamuka, Vinokurov, Toradze, Zurab, Kanadashvili. The sales of stolen jewelry and cigarettes were not the first crimes that

I6fWshu1                      Summation - Mr. Adams

the enterprise engaged in.  You know that because Shulaya was engaged in the enterprise's business before he encountered Slava.  He told that to Slava on the first tape that Slava made:  "Do you know who you are talking to?  Have they told you who I am?"

Shulaya followed that up by requesting specific kinds of stolen goods:  "What things do they sell?  Do you have any cigarettes?"  And with that he was off and running on cigarettes, not because the FBI somehow forced him or coerced him or tempted him, but because he and his crew raised that opportunity for themselves for a lucrative crime, and the FBI caught them in the act.

Slava met Shulaya in December of 2014.  By that time he had already assaulted Natchkepia twice.  He had already assaulted Timur and given him as a gift to Zurab Dzhanashvili, who had to take that man to the hospital after Shulaya had beaten him.  And he had already instigated a melee during which he pistol-whipped his own nephew.  You also know that Shulaya did not become some accidental *vor* through Slava's meetings, because he had also already begun to plot what would be a far more ambitious crime, the casino scheme, as we just discussed.

So at this point, you know that what Shulaya's counsel suggested at the beginning of this trial is not remotely supported by the actual evidence.  This enterprise, its money, its rivalries, its structure, its violence preceded both Slava

and Kutsenko's encounters with the enterprise.  Just like the other witnesses, Slava and Kutsenko were not here to perjure themselves for the possibility of getting some immigration benefit that they may not even need.  They were here to tell you what they saw and to walk you through the recordings of these defendants' words.

Kutsenko, when he met Shulaya, was not a confidential source.  He was running an illegal poker game, and he told you how these two men would come to enjoy their privilege at that business; about how he witnessed brutal violence, staged to impress Shulaya's subjects; and about how Shulaya came to him to sell cigarettes and for advice on running a poker game.  Shulaya recruited Sasha because Sasha had an extensive criminal history.  Sasha was an acquisition for this business, a hardened criminal with connections to other criminals that Shulaya could exploit to expand his power.

Slava met Shulaya when Shulaya was already running the contraband-trafficking conspiracy with Mamuka, Dzhanashvili and others.  Slava was wearing a recorder when Shulaya first offered to focus on cigarettes.  There's no question that the FBI did not invent that crime.

Those facts about the confidential sources, when considering the goals and objectives of the enterprise, place two of Shulaya's points at the outset of this trial deeply at odds with the actual evidence that you heard.

First, the poker house was founded, funded, protected and ultimately shuttered by Shulaya. He did that with the easy violence of Khurtsidze by his side. The money went to Shulaya. Every witness who walked into the poker house -- Slava, Sasha, Khurtsidze, Sadov, Melman, even -- told you who the boss was, Shulaya, not Kutsenko. And Sam Sadov, who was introduced to Shulaya not by Sasha but by Lasha, who you saw on an earlier recording discussing how Lasha had already found a place for the enterprise to work. Lasha introduced Sadov to Shulaya, and he made it clear, Sadov did, that many of the games hosted at the poker house had nothing to do with Kutsenko. The Wednesday night game was not Sasha's game, and yet they were still Shulaya's games.

Finally, when the poker house collapsed, it was because Shulaya's associates, not Kutsenko's, were arrested and hauled to court on November 9, 2016.

Another fact that has been offered by the defense in openings and completely fallen apart, the stolen-goods conspiracy was at its inception and throughout its life an operation directed by Shulaya. There's a photo of Shulaya overseeing the loading of cigarettes by his personal drug dealer and credit card thief, Artur Vinokurov, also known as Rizhy, who you also see hanging out with Khurtsidze while Khurtsidze beats that young man on September 7, 2016, on video.

You have heard, and I have talked about, more

cigarette transactions than anyone wants to hear me talk about today, so let me just take one example. You've seen two photos of cash earlier in this case. One is from Shulaya's car. It's pulled off of Shulaya's phone. The other is the same cash, lined up, same rubber bands, same day, provided to Slava as payment for the cigarettes. And here's a fact I'm certain has not escaped your attention throughout the course of this trial. Approximately 10 cases of cigarettes were sold by the FBI, sold to Sasha. That's 10 cases out of 500 purchased by Shulaya's enterprise.

Now, Shulaya's counsel has been forceful. They've been effective. They have fought hard for their client, but they are not magicians and they cannot make a mountain of evidence just disappear. This line about the stolen-goods business is a desperate attempt to distract you from the evidence in this case. Of 10 out of 500 cases of untaxed cigarettes, the defense is asking you to focus on 2 percent of the evidence.

Through guns, through pool sticks, through pistol-whippings, through beat downs, Shulaya established this business, dealing in stolen goods, stealing credit cards out of the mail and at this point even the start-up phase of the casino scam. This crime business at this point goes through a phase much like any business, one of expansion and then one of consolidation. The expansion was the poker house. He set it

I6fWshu1                    Summation - Mr. Adams

up at 125 Brighton Beach Avenue, where he hosted lucrative poker games, rigged in favor of the host, but he made a critical mistake in hiring Aleksandr Kutsenko to participate in that operation.

He made a bigger mistake in giving Kutsenko access to the internal surveillance system, and then he made a huge mistake in having Khurtsidze assault Kutsenko in front of not one but two different testifying witnesses, an audio recording device and that same video surveillance system. And because of those mistakes, you have seen literally reams of evidence, papers reflecting the gambling fraud, the gambling, the violence and the fraud happening inside the poker house.

You've seen accounting sheets calculating the running tab for poker players, debtors, employees; reflecting payments for waitresses, dealers, other employees. You've seen surveillance video of poker games operating at full throttle while Zurab Dzhanashvili walks around shaking hands, greeting the patrons. You've seen photos of the aftermath of Mamuka's brutal assault, his punishment, taken from Sasha's perspective, after he had to clean up Mamuka's face following Shulaya's unhinged assault, an assault aided, by the way, by Khurtsidze, who stepped outside the door as Shulaya went to work on Mamuka's face.

And remember, that bad photograph of Mamuka is not the only one that captures an assault by Shulaya or on Shulaya's

phone.  This picture, remember, is not inside the poker house. It's just another time that Shulaya beat this disloyal subordinate.  You've seen stacks and stacks of cash accumulated through this booming criminal enterprise, earned through the crime, through the fraud and collected through the promise of violence.

After the assault of Sasha, Khurtsidze and Shulaya received the Pelican Pete slot machine requested by Shulaya from Slava.  Here is a photograph just before Khurtsidze and Akaki Ubilava move the machine into Anna's apartment on September 1, where later Melman would tinker with it, before the machine moved again to the poker house, and then finally to New Jersey, before going back to the confidential source.

After they received it, on this day, Khurtsidze and Ubilava went to work on other lines of the business.  Here they are again, same day, same shirts, same men, walking, on the clock, to meet with Sergei Demidenko, a debtor from the Shulaya poker house.  And you have the tape.  You have Khurtsidze's words as he spoke to Demidenko on that day.  And after that meeting, after Khurtsidze delivers the threat, Demidenko pays up, not to Sasha but to Khurtsidze, who kicks it up to Shulaya.

Now, Khurtsidze's counsel, on cross-examination of certain witnesses, has noted that the first part of the meeting between Sasha and Khurtsidze was about driving to the area of the Lotus Café and that Khurtsidze didn't know how to get

there.  Your common sense should tell you that knowing where to commit extortion is not the crime here; it's committing the extortion.  That's the point, and there's no question that on that point, Khurtsidze was a consummate professional.  He might not have known where to go, but he knew exactly what to do when he got there.

You can do the same exercise with respect to the September 7, 2016, video that shows Khurtsidze assault, suddenly, without provocation, that smaller man in the black T-shirt.  You can put that video in order with the surveillance video from the same day, again showing Khurtsidze going with Sasha to shake down Sergei Demidenko.  And then you see him walk back to the poker house, where his victim is still standing, hands behind the back, while Shulaya and Khurtsidze comfortably count their cash.  He was on the clock, working for Shulaya.  And what do you see at the very end of that sequence? Khurtsidze taking his money off the poker house table, clocking out for the day.

But apparently you cannot just assault your way into long-term business success, thank goodness, and by operating a criminal business, catering to a criminal clientele, Shulaya exposed the poker house to the risk of raid by law enforcement. And so after a big buildup, the Shulaya enterprise had to consolidate, and they had to do that in a hurry.  Thanks to the FBI's surveillance system and access to the poker house

I6fWshu1                    Summation - Mr. Adams

surveillance, you have some insight into how that process unfolded so quickly.

On November 9, 2016, the pressure became too great. Shulaya's underling, Pelmin, the cocaine dealer, crossbow giver, was arrested in a case in a court across the river, in Brooklyn, and Shulaya immediately ordered Sasha to clear the poker house and destroy the surveillance system. Bad luck that on that day his would-be henchman was working for the FBI. He should have called Khurtsidze.

So what happened to the enterprise after the poker house shut down? It got focused, consolidated. Shulaya continued to direct his underlings, mostly Hamlet Uglava at this point, to finance the operations through the same conspiracy to commit tax evasion on the cigarettes and theft, and the enterprise got serious about the slot machine scam.

You heard from Tracy Elkerton, who came here from Sidney, Australia, for Aristocrat, about the nature of the vulnerability that made it possible to predict the outcomes on the Mark VI machines. You heard her explanation of a few key concepts, minimum return to player and that intentional appearance of randomness that the machines are designed for. You know that slot machines are not like a game of poker or blackjack.

What the Shulaya enterprise worked so hard to obtain and conceal was not simply a way of being a better gambler. It

was a way of completely defeating the point of those games, the understanding of how those games were supposed to be played and how everyone who acts in good faith knows they're supposed to be played. You spin a slot machine for the thrill of a chance to win. The casinos charge you a certain amount. They aren't expecting that people who walk into their business will have secretly upended the entire game; that they will have in their pockets the power of 16 servers running a complicated algorithm designed to negate all of the value in the machine.

This repeated refrain from the defense that this scam was like counting cards is absurd. It's not counting cards. It's like bribing the dealer. It's not counting cards. It's fraud.

And these defendants knew it was fraud. That's why they hauled the sample machine from apartment to apartment, under blankets, through Manhattan, to Brooklyn. They did it in other people's cars. That's why Shulaya sent data across international wires to coconspirators in Russia. That's why they trained so hard to develop the right rhythm that would get them as close as possible, as close to 100 percent to guaranteeing a win.

This call on January 27 between Khurtsidze and Shulaya is the end of the case with respect to Khurtsidze and the wire fraud. It's a conversation explicitly about how the casino scheme works; about developing that rhythm; about how the

boxers who were inside the tire shop on the same day were scared to do the scam.

It's also been stipulated that Khurtsidze is not there on that day. You heard that he was in California training for a fight. Why is that important? Because you're going to be asked to find the use of interstate wires in connection with this conspiracy. Here you go. A call between Khurtsidze, in California, and Shulaya, in New York, discussing the money laundering, drug dealing and casino fraud.

Now, Khurtsidze and the other boxers involved in this scam knew the value of the fraud. That's why they needed to practice, practice, practice. That's why they did those swipe patterns, the meaning of which Mr. Melman explained to you. You move up for fish. You move left for bird. Over for ace, down for king. This is the pattern that corresponds to, in this case, the Miss Kitty version of the same Mark VI slot machine. That's found in Shulaya's apartment. It has Melman's handwriting and Shulaya's handwriting on it.

The defendants knew this was a fraud, and that's why Shulaya was careful not to give anyone, including his chief of enforcement, Khurtsidze, information about where Melman lived or his phone number or his address. He was worried that his underlings would try to snap up Melman for themselves. Why? Why would you be worried about that if your underlings didn't know what was going on?

Shulaya was worried because Khurtsidze and the others knew what Shulaya knew when he first kidnapped his own software engineer. They knew the opportunity that Melman represented. How do you know that Khurtsidze knew? Because he was well versed on the fraud. He knew about the need for the rhythm and accuracy to increase of chance to defeat the machines. You see that on the same day that the machine is being demonstrated to the confidential source and the undercover officer that you heard from in this trial. He himself had traveled to casinos with Melman to collect data from the fraud, and having found their targets, he kept a bit of that data on his own phones, like the pay lines that Melman used to further the casino fraud, found on Khurtsidze's phone.

You have in evidence nearly three dozen videos taken off of various phones seized from coconspirators in this case. Where each phone came from you can find in the testimony of the agents and the stipulations. These videos show reel after reel, video after video of slot machines just spinning, Sun and Moon, Buffalo, Pelican Pete. There are 27 such videos on Shulaya's phone alone.

Now, Khurtsidze's phone has the short clips that you've seen, and they are sent to him by someone named Merab. The clips are right below another text that reads, "Harrah's Resort Atlantic City." And you've heard how those pay lines that appear on your screen here were used by Melman to make the

scam more efficient.  Both of those messages are marked as "read" in Khurtsidze's phone, and on cross-examination, I took Khurtsidze's counsel to be suggesting that because Khurtsidze received the text, he's somehow less likely to be guilty of conspiring in connection with the racketeering enterprise.

Does that make any sense?  Why would Merab send photos like this to someone who had no use for them?  Why would Merab send these to someone who was driving Melman for hours in silence to casinos in other states?  Why would Merab send these to a man who hauled the Pelican Pete machine from Anna's apartment to the poker house?  Why would Merab send these to a man, who days later is discussing not only money laundering and drug dealing but the skill needed to conduct the casino scheme?

There's one reason that fits with the evidence in this case, and it fits with common sense.  Merab sends these to Khurtsidze because Khurtsidze knew what they would be.  He was expecting them.  He was actively assisting in the casino scheme with Shulaya.

Now, you've heard one bit of testimony from Melman that you may recall.  I just mentioned Khurtsidze, the man that Melman knew as Chuqucha -- and other people knew him as Chuqucha as well -- drove in silence to those casinos where they collected data for the scam, but I expect that Judge Forrest will instruct you on the concept of conscious avoidance.  I expect you're going to learn that you can find

I6fWshu1                        Summation - Mr. Adams

that Khurtsidze had knowledge of a fact if he was aware of a high probability of that fact but then intentionally avoided confirming the fact. So even if you just completely ignore that phone call in Government Exhibit 231-T, where they expressed and discussed the scheme -- completely ignore it -- you can and you should still find Khurtsidze guilty for his participation in the casino scheme.

Now, the casino scheme, like a lot of the enterprise's activities, was financed in a very particular way. At this point I'm going to cover things that are relevant not only to Count One, the racketeering conspiracy, but also Count Five, which is the wire fraud conspiracy covering the casino scheme, and also to one other count, Count Four, which has to do with identity documents and identity theft. It's charged only against Shulaya.

It requires looking closely at a few documents and pieces of evidence that you've seen throughout the trial that I want to highlight now.

How did the enterprise finance itself, finance the casino scheme? They did it through theft. They did it through fraud, and they did it through fraud designed to conceal Shulaya's hand in these transactions. And you already know that Shulaya was willing to provide the casino technology to Slava, the confidential source, in exchange for free stolen cigarettes; that he was going to convert contraband into

I6fWshu1                       Summation - Mr. Adams

currency that way.  He was going to franchise the technology, as it were.  But the enterprise also funded itself through a different kind of crime.

Melman told you what some of these credit cards found on his phone were about.  These cards are cards that Shulaya had his minions steal from mailboxes, minions like Artur Vinokurov, who did so with a knife, captured on video that we didn't play yesterday, but if you ask for it, you'll get it. These are cards set up by the conspirators and then used to purchase processing space on Amazon's cloud-computing service. Why?  Because processing power means speed and speed means money.  It made it faster to generate those seed files that Melman described in his testimony.  And these credit cards, stolen from the mail, used in the fraud, are one way that you can find Shulaya guilty on Count Four.  They are one of various means of identification that he used to commit other crimes, namely, the casino fraud, but they are not the only way that you can find him guilty on that count.

Jerome Gauthier.  You didn't see him at this trial. His testimony is entered through stipulation.  He suffered a stroke and he hired Nazo Gaprindashvili, Anna, as his home health aide.  She was trusted to handle his daily care.  She was trusted with his bank account.  But Gaprindashvili was a member of the Shulaya enterprise, and she hosted the casino scheme.  She allowed Shulaya and Khurtsidze to use her

I6fWshu1                      Summation - Mr. Adams

employer's cars to conduct cigarette transactions or move the Pelican Pete machine, and she siphoned money from his bank account for use by Shulaya.  Government Exhibit 800 is a set of bank account statements.  It's for Tropport LLC.  You've seen this business before.  It's the fake vodka importation company with the *vor* star on the bottom.  This was a money-laundering business.

Take a look at Government Exhibit 800.  At page 1, it shows Razhden Shulaya and Nazo Gaprindashvili were the people that initially set up this shell.  If you go to page 20 and look at the deposits for July 20, it shows the deposit of $35,000, stolen from Jerome Gauthier, by the check and the documents.  That money was stolen from his bank account. Listen to what I expect Judge Forrest will instruct you on what counts as a means of identification under Count Four.  It's also in the racketeering acts that I mentioned earlier for the racketeering conspiracy in Count One.  The use of the name, that bank account, that's sufficient as a basis for convicting Shulaya of identity theft.

How was this money used?  Let's go to page 23.  You can follow it, follow that money through the bank statement.  A few weeks later, the only additional deposit being yet another stolen $5,000 from this stroke victim, goes into the account, and then Shulaya makes a purchase totaling just under $3,000 at a company here in Manhattan called Acme Safe Company.

I6fWshu1                    Summation - Mr. Adams

What was that purchase?  The Premium Firesafe walnut door/handle, Model DBAUM 800, purchased by Razhden Shulaya for just under $3,000 in August of 2016.  It's Government Exhibit 801.

What was that safe used for?  Storing the cash that Melman used to purchase servers as well as the critical hardware and software for the scheme.  Those thumb drives, these were found in that safe.  That safe is found in Razhden Shulaya's apartment.  On Count Four, we're going to ask you to find that Shulaya conspired to use a means of identification of another person -- credit cards, Gauthier's checks -- to obtain something worth more than $1,000.  Remember this safe when you come to that count.

How else was this victim exploited?  How else was Mr. Gauthier exploited by these defendants?  His cars were used over and over and over again to conduct the business that these defendants did not want tied back to their own names.  You heard Agent Hanratty and Agent Richards lay this out over and over again.

April 15, Mamuka Chaganava picks up cases of untaxed cigarettes in a silver Audi with Florida plates, ANNIEG -- that's Anna Gaprindashvili, who went in her own Audi, gifted by Gauthier, her victim, to Shulaya and Vinokurov for the purpose of trafficking in contraband.

October 8, 2015, after another cigarette deal, this

time for receiving cash from Crooked Nose Mike, Shulaya shows up in a car with a license plate reading BUSY 11 on yet another Gauthier car.

October 16, 2015, just after the first cigarette deal where the FBI was able to see that Shulaya was directly involved both in buying and selling, Shulaya rolls up for a meeting with Slava in a car registered to Jerome and his wife Patricia. And that van that Khurtsidze used to carry the slot machine to Gaprindashvili's house, another Gauthier license plate.

Please don't forget about Jerome Gauthier when you consider the evidence in this case. For all of the cigarettes, for all of the gambling, for all of the fraud on big casinos, for all of the beatings and beatings of its own criminal associates, the Shulaya enterprise also hurt average citizens. It hurt people who had nothing to do with this crime. It hurt a badly ailing man in need of care. It did not matter that Jerome Gauthier was relying for his life and health on Anna Gaprindashvili, or that she was actually invading that man's home to finance a criminal enterprise. For Shulaya and Khurtsidze, it's just business. That's the motto.

So what else was the enterprise focused on after the poker house shut down?

For one, Shulaya went back to the *vor*'s bread and butter, protection; *krisha*, as you heard it called. Just as he

I6fWshu1                        Summation - Mr. Adams

explained to Slava at the very beginning of this investigation, Shulaya is a different kind of criminal.  His most important function is to provide protection and collect tribute, and from there to fund the *obshchak*.  After the poker house went bust, he met with Azer Arslanouk, the man who he had agreed to invest in that after-hours club where drugs were on offer.  This time he met with them -- it's a recorded conversation -- and he offered to lend his name and his authority, all of the fear that he had instilled through his career of violence, in furtherance of a prostitution business.

You've seen the transcript of this meeting.  You've seen Shulaya's explanation that he and his men would visit or associate with that brothel as a way of ensuring that other criminals would leave it be.  You saw Shulaya's description of that plan as not a protection racket, but here's a quick rule of thumb.  When Razhden Shulaya explains that what he is doing is not a protection racket, you can be certain that it is.

What else was the enterprise focusing on in the final moments of its existence?  It had this emerging rivalry with another criminal group based in Los Angeles.  You heard from multiple witnesses about this, about this rivalry with an L.A. *vor*, and you heard about this trip to L.A. to squash that rivalry between the *vor* named Pzo, or Armen Kazarian, based out of L.A.  You heard about this from witnesses as diverse as Dzhanashvili, Kutsenko and even Melman, who Shulaya made rent a

house for him in L.A., using another fighter's ID, by the way.

What was that rivalry about?  It was about money.  It was about tribute.  It was about the proper respect for a *vor* and a *vor* seeking control of New York.

Beyond these witnesses you've seen photos and you've seen Shulaya's own words describing his entitlement and his anger in connection with his rivalry.  148-T, berating his underling, Roma, on the waterfront in New Jersey, about Roma's failure to pay proper tribute:

"Do I get a cut?  What do you think?  Will I get a cut or not?"

Paragraph 40:  "Because of this row, I will go there where my brother is, we'll have an argument and if he doesn't come to his senses right away, it's going to get pretty fucking bad there."

44:  "It looks like he got used to the suckers here and he forgot what it is with the *vor*."

What's Shulaya's plan for dealing with this failure to kick up to him, this failure to pay into his *obshchak*?  He's going to resolve all of these rat issues, and you already know how Shulaya resolves his rat issues.  He beats people until their faces are unrecognizable.  He pistol-whips his own family members.  He sics this professional boxer after a man half his size, and you know because you've seen that on video and you've heard it from witness after witness.

I6fWshu1                    Summation - Mr. Adams

So Shulaya, Dzhanashvili and others went to L.A.  They met with the *vor*, Armen Kazarian, Pzo.  And before he goes, he makes a call to someone who hands the phone to Armen; you've got the call, got the transcript.  Shulaya greets him warmly. There's a time zone difference, and the man's worried it's too late for Shulaya, that thieves don't still asleep.  Shulaya didn't either.  He went west to L.A.  He's caught on video meeting with the L.A. *vor*, Kazarian, just as Kutsenko, Melman and Dzhanashvili each described.  And then Shulaya went to Vegas with this man, Dmitri Zernov.

Who is Dmitri Zernov?  He's in Las Vegas with Shulaya following the meeting with the L.A. *vor*.  He's one of the recipients of money sent by Shulaya through MoneyGrams, as Shulaya had directed so many of his other underlings to do.

Shulaya told Dzhanashvili that they were doing crimes together back in Russia.  Shulaya told Kutsenko something similar, his best friend from Russia; they had met in prison. Shulaya told Melman, whom he was treating as his personal assistant at this point, to book a room for Zernov at a Manhattan hotel just so Zernov could lie to immigration while he was coming into the country.  Shulaya then told Melman that Zernov was his partner in some illegal business in the past. So how fitting it is that it's Zernov, Shulaya's old prison buddy, with him at the collapse of the Shulaya enterprise.

When Shulaya's caught redhanded, with every piece of

technology necessary to conduct the casino scheme; when he's caught with a phone that you have now seen side by side with Melman's phone, displaying their Viber conversation, exchanging information about specific slot machines and specific videos of a particular Sun and Moon in the Harrah's Casino in Vegas. He's there with Shulaya when his hotel room, complete with that same *vor* shirt from 2016, is raided and found to contain thousands and thousands of dollars in cash along with credit cards in the name of his money-laundering front, Tropport LLC.

It's fitting that Shulaya's criminal connection has come full circle in this moment. He previously had reached out to his old underworld partners in Russia. You have this in a call too. You have this transcript. He's asking to bribe or cajole his way out of some pending charges there. "Here in America, he says, I've got everything on the thieves' way, so I would not come there. I beg you. My sole desire is to be taken off the wanted list and get back there ever since." He tells his partners in Russia: "I haven't changed and I never will. I'm the one you've always known."

And he didn't change until his enterprise collapsed and he was arrested.

This enterprise started with contraband. It expanded to cards and it came crashing down at a casino in Las Vegas. That's the history of the Shulaya enterprise as it existed, thrived and died in New York. The evidence is overwhelming as

I6fWshu1

to every count before you.  These defendants are guilty as charged.

Thank you.

THE COURT:  Ladies and gentlemen, what we'll do now is we will take a short break.  It won't be a full 15 minutes.  We'll just take five to seven minutes, so you can just sort of stretch your legs.  We'll come back and then we'll hear from each of the defendants.  Thank you.

(Jury not present)

THE COURT:  All right.  We have one thing to deal with, which is the "conscious avoidance" charge, I just realized, with respect to Mr. Shulaya before his closing occurs.  I want to make sure that we have closed the loop on that entirely.  Yesterday I had made a ruling with regard to Mr. Khurtsidze but had not finalized the ruling with regard to Mr. Shulaya, and I am inclined at this point in time to --

Mr. Adams, tell me.  Based upon your closing, I don't see any reason why that should be necessary for Mr. Shulaya.

MR. ADAMS:  I tailored the closing just now with respect to conscious avoidance specifically to Khurtsidze, but as we discussed yesterday, I think it depends entirely on how Shulaya presents the case.

THE COURT:  I think that we can't wait until a closing has occurred in order to resolve all charge issues.  What I'm going to do is introduce the "conscious avoidance" charge as,

"This charge relates solely to Mr. Khurtsidze.  This charge does not relate to Mr. Shulaya."

MR. ADAMS:  Totally understood, as it stands now, your Honor.  If Mr. Shulaya stands up with a defense that I don't anticipate, then I may ask to reconsider.

THE COURT:  All right.  But that's the way we'll proceed now.  It will be preceded then by a new sentence.

Ms. Benett.

MS. BENETT:  On a different topic, two issues that I flagged with respect to the closing right now.

Mr. Adams argued that Evgheni Melman told you Avtandil Khurtsidze was Razhden Shulaya's personal boxer.

His testimony was not that Khurtsidze was Shulaya's personal boxer.  It was that Shulaya said that.  I think that was a mischaracterization of the evidence presented to the jury, which brings me to the second issue.

THE COURT:  What you can do is, it will be up to the jury to resolve these.  It's very difficult at this point in time, without a contemporaneous objection, to do anything right now with that.  What I would suggest is if you want to put on the screen the testimony and make an argument that is different, you can do that, but the jury will ultimately resolve the differences as to them.

I didn't see it as the type of issue that would require the Court to jump in and correct anything.

I6fWshu1

MS. BENETT:  The second issue is, I believe, a factual error that was presented to the jury during summation.  I didn't object because it's not a major point in the case, but I do think it requires an instruction to correct the representation.

Mr. Adams said, with respect to Mr. Khurtsidze as well as Mr. Shulaya, these defendants, they hauled sample machines from apartment to apartment, under blankets, through Manhattan and Brooklyn.

There's no evidence or testimony that I can recall that Mr. Khurtsidze hauled any machines through Manhattan.  I think that was a mischaracterization of the trial evidence.  I didn't want to interrupt on when the overall picture was not a major point, but I do think it was erroneous.

THE COURT:  I think you can just build that into your summation, and then the jury will be instructed that any differences as to the way in which evidence is characterized will be up to them to weigh and determine.

MS. BENETT:  I understand the Court's position, and we would ask for an instruction specifically on that point given that Mr. Adams did rely on it in his summation.  If the Court disagrees with us, we'll just note our objection.

THE COURT:  All right.  Let me hear from Mr. Adams.

MR. ADAMS:  On the first point, as to Mr. Melman hearing it from Shulaya is irrelevant.  It came in for the

truth as a coconspirator statement, but even if parsing the difference between him being the personal boxer versus Shulaya said he was the personal boxer, there's no "there" there.

With respect to the movement of the machine, it is true that Shulaya and Khurtsidze moved the machine from apartment to apartment. They are coconspirators in this scam. The machine moved through Manhattan to Shulaya's apartment in Brooklyn. Whether Mr. Khurtsidze's behind the wheel is neither here nor there.

THE COURT: All right. I'm not going to --

MS. BENETT: Obviously he thinks it's here or there, or he wouldn't have said it, just making my record.

THE COURT: I don't find any reason to instruct the jury in any particular way on this. People can do what they'd like with their summations, but there's no need for Court intervention on this point.

Let's go ahead and take a very short break, like three minutes, and come back out.

Which order are you folks going to go?

MR. CECUTTI: Your Honor, I will go first.

THE COURT: All right. Mr. Cecutti will go first.

(Recess)

THE COURT:  All right, ladies and gentlemen.  We have the jury ready.  Go ahead and bring them out.

(Jury present)

THE COURT:  Ladies and gentlemen, as you reach your seats, let's all be seated.

Mr. Cecutti, you may proceed, sir, when you're ready.

MR. CECUTTI:  Thank you.

Good morning, ladies and gentlemen.

Contraband cigarettes.  Cards and casinos.  These were the words that the government told you in its opening statement about what this case was going to be about.  And this case, ladies and gentlemen, was so much more than those three things.

And in pulling back the curtain, this case was about several other things:  500 cases of contraband cigarettes supplied by the government through a confidential informant; a Pelican Pete slot machine supplied by the government; a failed investment by the government into a casino scam; computers, electronics; money seized from Mr. Shulaya's hotel room in Las Vegas, money unrelated to slot machine scamming, and from his residence; fruits of the government's failed investment; confidential informants, not fully investigated or debriefed, yet fully dependent on the United States Government; desperate and scared cooperators in need of the government; and Mr. Shulaya; and the unsuccessful effort by the government to prove the existence of this so-called Shulaya enterprise.

The government called many witnesses, including cooperating witnesses and confidential informants and law enforcement agents, and presented hundreds of exhibits to try and prove the existence of this so-called Shulaya enterprise; but in doing so, if the government proved any enterprise at all, it was not the Shulaya enterprise.  It was the Slava/Kutsenko enterprise, engineered and operated by federal agents.

When the government began this investigation, the only proof they supposedly had was that Mr. Shulaya was dabbling in criminal activity.  However, through their informants at work with the agents and the spending of hundreds of thousands of dollars of taxpayer money, cards, contraband and casinos emerged.  In their investigation and prosecution of Mr. Shulaya, the government way overreached and created and constructed a case against him through the use of untrustworthy and unreliable informants, and then relied on desperate and scared cooperators with powerful motives to tell stories and to lie to try and prove the charges against Mr. Shulaya.

Count One charges Mr. Shulaya with conspiracy to participate in a racketeering enterprise through a pattern of racketeering activity.  A key question for you in your deliberations is whether the government proved beyond a reasonable doubt that an enterprise existed.  Judge Forrest will instruct you that an enterprise may be a group of people

I6FQSHU2                    Summation - Mr. Cecutti

informally associated together for a common purpose of engaging in a course of conduct.

The government must further show beyond a reasonable doubt that there existed a core personnel who functioned as a continuing unit, and that the enterprise continued to exist in substantially similar form through the period charged.  In other words, there must be a recognizable core and an ongoing organization and structure to carry out its objectives.

So a group of people, a group of men, associated together is insufficient to establish an enterprise. Friendships and relationships based in common origin and ethnicity is insufficient to establish an enterprise.  The government did not prove beyond a reasonable doubt that Mr. Shulaya acted as part of or as the head of any enterprise in this case.

Now, simply engaging in certain conduct, even illegal or wrong conduct, does not in and of itself make you a member of an enterprise or, for that matter, a *vor*.  Buying untaxed cigarettes, gambling or offering to help open or promote a nightclub doesn't make you part of an enterprise.  Knowing and associating with people who commit crimes doesn't prove the existence of an enterprise or membership in one.  Neither does going to the Georgian House for lunch or dinner, the guest house in sharing a meal or even getting into fights with other people.

Simply put, the government has failed to prove beyond a reasonable doubt the existence of this so-called Shulaya enterprise.  There was not an organized set of low-level associates.  There was no core personnel who functioned as a continuing unit.  There was no organization or structure with which to carry out criminal objectives or goals.  There was no reliable, reliable or credible evidence presented by the government that Mr. Shulaya was crowned somewhere in Europe or was a *vor*.

Regarding the other charges, the government failed to prove beyond a reasonable doubt that Mr. Shulaya conspired with others to commit fraud relating to identity documents or that he conspired to commit wire fraud.  The wire fraud charge relates to the casino or the slot machine scams.  And while you heard evidence of such scam, the government failed to prove it was wire fraud.  It's just like stock market algorithms.  And while there was evidence of some gaining of advantage, the program and software made it far from a guarantee.  Once the agents learned of this slot machine scam through their investigation, they kept supplying Mr. Shulaya with cigarettes, one hundred free cases, discounted cases, gifted cases to help pay for all the technology and equipment, specifically the servers.

The agents thought Mr. Shulaya and this scam was much greater than it was.  In listening to recordings and hearing

from Mr. Shulaya and his own mouth, he promised millions and billions, and that became law enforcement's dream. But it was a dream that never came close to happening. So were other things that Mr. Shulaya said to other people. He puffed and he bluffed.

The government told you also in its opening statement that Mr. Shulaya is a *vor*, some kind of criminal mastermind who has the final word on crime in his supposed territory; and as you will hear when Judge Forrest instructs you later this afternoon on the law, whether or not Mr. Shulaya is a *vor* is not an element of any of the crimes that he's been charged with. But let's talk about *vor* for a moment.

You heard Mr. Shulaya telling others that he was a *vor* or implying it to other people. But that alone based upon his word doesn't make him one. You heard that he drove nice cars, hung out with women, didn't pay his bill at restaurants and bars. That doesn't make him a *vor* either. Receiving birthday gifts at your birthday, that doesn't make you a *vor* either. Neither does wearing a shirt with stars on it. And about that shirt, if it was so important, so important to these federal agents, when they searched his hotel room in Las Vegas, they would certainly have grabbed that shirt. It was there. That shirt was there amongst everything else in that room that they took.

Now, mediating disputes among people who share your

culture, background and language in a foreign country, that doesn't make you a *vor* either. Not even speaking on the phone with other reputed *vors*; that doesn't make you one. So don't get stuck on that. Don't get caught up in the lure, the myth of the *vor*. It's nothing more than fantasy, something seen in movies, and Mark Nektalov told you that.

The government's expert, Special Agent Penza, told you about a term called *obshchak*, a supposed fund of money from everyone's criminal activities. The only people in this case, in this case that testified about actually paying *obshchak*, or tribute, were the government's informants, Slava and Kutsenko. The government showed you receipts of many money orders showing money going from the United States to Russia and Georgia, but that's all it was, sending money overseas to family and friends. Special Agent Penza told you that there are sanctions, specific sanctions if a person doesn't pay *obshchak*. But you heard from Zurab Dzhanashvili that there was no *obshchak* in New York. And Dzhanashvili didn't pay any money to Shulaya and nothing ever happened to him. He didn't get beat up or slapped around by ten or 15 men in tennis courts near a Toys R Us.

The government presented evidence of violence, *vors*, cigarettes, poker houses and casinos related to the so-called Shulaya enterprise. Ladies and gentlemen, you need to pull back the curtain. Ms. Louis-Jeune in her opening statement

told you that this case is like the *Wizard of Oz*.  When the *Wizard of Oz* is exposed, you see a different picture.  There is only an old man behind that curtain.  The government doesn't want you to pay attention to the man behind the curtain and what the man was doing behind the curtain.  And as was true in the *Wizard of Oz*, in this case, the government pulled the strings of this operation.

To the extent again that any enterprise existed, it was the Slava/Kutsenko enterprise.  The government funded it, the government maintained it, and over time blew up Mr. Shulaya into something through their unsavory and disturbing informants.

In this trial the government accused Mr. Shulaya of purchasing and selling stolen untaxed cigarettes.  Again, the government through its own informants was both the supplier and the purchaser of the cigarettes that Mr. Shulaya is charged with in this case, and it is undisputed that these cigarettes were never stolen.  Federal agents supplied one informant, Slava, with cigarettes which he sold to Mr. Shulaya who in turn sold those cigarettes to other people, including the other government informant, Kutsenko.

We do not have a burden.  We do not have a burden to present any evidence in this case.  We don't have a burden to call witnesses.  We don't have an obligation like the government to present documents to you, videos, photographs, or

recordings, to prove to you anything, to prove to you that Mr. Shulaya is not guilty. We do not have that obligation, responsibility or burden. That responsibility falls squarely on the government.

And while you heard from informants and while you heard from cooperators and federal agents, there was no other reliable credible evidence directly implicating Mr. Shulaya. The government in desperate fashion cast a shadow of criminal activities occurring in Russia that was somehow connected to Mr. Shulaya. There was no evidence of that. No witnesses. No documents. No photos or videos. There was no proof that any of the money that was sent overseas went to criminals or criminal communal funds. There was no evidence; only a shadow leaving you to speculate. But you, ladies and gentlemen, are not to base your verdict on speculation or guesswork, but on the evidence.

That goes for Jerome Gauthier as well who relied on Anna for his needs because he suffered from a stroke. Anna stole from Mr. Gauthier. There's insufficient evidence that Mr. Shulaya was involved in stealing anything from Mr. Gauthier.

The government also created a fictitious rivalry with a criminal group and nature of friendships of Mr. Shulaya in Los Angeles. Again, another attempt to invite you into speculation. Now, you've seen and you've heard from numerous

witnesses in this case.  However, the government only called one witness, one witness who was not a cooperator or an informant, to testify directly about an act of violence, and that witness was Mark Nektalov.  Let's talk about him for a moment.  This was the man who watched, observed the supposed beating of Mr. Natchkepia by Mr. Shulaya, a story that was also testified to by other witnesses in this case with several inconsistencies.

Ladies and gentlemen, first impressions are everything.  Mr. Nektalov was the government's first witness.  On direct examination, the government never asked him about his prior federal fraud conviction, forgery convictions or other fraudulent acts, such as ripping off a client a couple years back of approximately $450,000.  However, when we pulled back the curtain, you saw who the government was relying on in this case:  Someone who deceived, someone who cheated and manipulated others for years for his own interest, someone who told his story about Mr. Natchkepia to avoid problems with the government, as he is not a citizen and could be picked up by immigration and deported.

The government did not call any other witnesses in support of the other stories of violence told by the cooperators and informants; not one so-called victim.  No other witnesses or evidence such as cameras, or photos to corroborate Dzhanashvili's stories of the kidnapping of the hacker, then

opened a casino where he pretended to be a security guard, or the assault of Jikia in the tennis courts near the Toys R Us in Sheepshead Bay, or the assault involving the incident with the Armenians.

Yesterday you heard about the theft of a mailbox and video of that theft. That was important. It tells you that the federal agents were able to track down that video to corroborate that there was a theft of a mailbox. Federal law enforcement with all of its power and resources investigating this case for over four years, even flipping Dzhanashvili during this trial, could not locate a single witness or evidence to corroborate some of Dzhanashvili's stories. That lack of evidence can only mean one thing. They are just that: They're stories.

The government may argue later today as to why such evidence doesn't exist. Those, ladies and gentlemen, are excuses, and excuses are simply not substitutes for evidence. Let's turn to the cooperators and informants. The government needs both of them. The government needs the cooperators and they need their informants.

While you were shown many exhibits and heard over and over again Mr. Shulaya's words from his mouth, his big mouth, the government needs Slava, Kutsenko, Dzhanashvili, Melman and Sadov to attempt to prove the existence of the Shulaya enterprise and the other crimes that he is charged with. The

government needs you to trust them.  These are criminals who the government previously prosecuted and has now argued that despite years of living as deceivers and liars, you, ladies and gentlemen, can trust them.  You should not.  They also want you and they need you, the government needs you to rely on Mr. Shulaya's own words, and you cannot and should not do that either.

Now, let's talk about Sasha, Alexander Kutsenko.  The government asked Mr. Kutsenko very few questions about his criminal history.  However, there is no question you had a different view of Mr. Kutsenko during and after cross-examination.  Kutsenko is a violent criminal who is also deceptive and manipulative.  He kidnapped people.  He abducted people.  He took people hostage.  He beat them up and extorted them.  And he testified about these events and admitted to extremely scary and serious crimes without any emotion.  This was telling as it revealed that his conscience is seared.

The government paid him over $100,000 for his efforts in this case.  They gave him a non-prosecution agreement.  He is dependent on the government for everything.  The government pays for his housing and living expenses and is helping him stay in the country.  He does as the agents ask him to do.  He interprets and understands according to what they want.  He is deceptive and conniving.

What role did he play in this case?  Special Agent

Hanratty, he told you what role. He directed Kutsenko to help set up a poker house and collect debts, and he was also tasked to do something else -- to assure that no violence would occur. The kidnapper, the abductor, the hostage-taker who carried a four-inch knife on him without the agents' knowledge had the job of keeping the peace. You cannot trust and rely on the agent's actions based on their decision to have Kutsenko play the role of the peacemaker in their plot.

The first informant that testified was Slava. He testified about his participation in cigarettes and casino scams, and he's been a confidential source since 2005 and has testified multiple times. This was after his prior federal fraud conviction and firearms conviction. He faced years in prison but received probation, and he cooperated. He has been a cooperator and later graduated to working as an informant. He works cases for the government. His allegiance is only to the government so that he can remain here in the United States.

Now, let's turn to the cooperators. Zurab Dzhanashvili; he's facing 112 years in prison, 112 years. He committed an assortment of crimes, including using stolen credit cards, running his own poker games, firearms offenses, burglaries and assaults. He is entirely unreliable, and although he testified that Mr. Shulaya was supposedly his boss, he did so many crimes separate from him and with other guys and never gave Mr. Shulaya a cut. He told you that yesterday.

When he testified yesterday that he didn't give Mr. Shulaya a cut, there were no consequences ever given to him.  He never got a punishment.  Never was summoned anywhere to put his hands behind his back for his punishment.  That never happened.

Sam Sadov, a cheater and scammer with a tremendous amount on the line, 51 years old with two young children, however, he never had any problems with Mr. Shulaya.

Let's turn to the computer mastermind -- Melman. There is more to the story with Melman.  He minimized his involvement when he testified.  He's a computer genius and a hacker.  He testified that he came to the United States as a tourist and stayed here to learn English, but, again, there's more to the story.  He showed you his secret app on the phone, on his phone where he hid his stupid folder.  Why would he need to hide the folder if it wasn't doing anything wrong?

The story Melman told you was that he came to a foreign country, was working, met a man through his employer at the cell phone store, went in a car alone with this man to an unknown location, and when he arrived he was able to figure out parts of a sophisticated slot machine hack in about two hours. Fair to say he's a computer mastermind.  Mr. Shulaya, is not even close to being a computer master mind.  Melman is a hacker who worked on the program related to the slot machine business for months.

Eventually the program worked three to four times.  He

testified that the software only increased chances.  It was not guaranteed to win a hundred percent of the time.  The program never worked until Melman got involved.  He was the one running this scheme.  He made decisions about what servers to buy, how many servers to buy and where to get them.  He had the technical knowledge and ability to program the computers.  He created a program to run on multiple phones and iPads.  He testified about calculating seeds for programs and pay lines and bonus games.  There is no way he was self-taught or figured all this out by way of trial and error.  He wasn't just along for the ride.  He came back willingly over and over again.  He enjoyed the cars and the women and the casinos.  Thousands of dollars were spent on servers.  Melman ordered them.  Melman shipped them to Russia.  Only Melman knew what kind were needed.  He took numerous trips to casinos, and they got almost no return.  And the government didn't get a return either because they supplied free and discounted cigarettes to be able to fund this casino scam.

Now, Melman wants to come to you, present himself as a young and scared man, but the best way out of his situation he's already calculated, and he had a big hand in creating, and what he calculated was to point the finger at Razhden Shulaya.  This didn't take a sophisticated algorithm to figure out.  But he stole money from Mr. Shulaya, and he testified that he lied about the cost of servers to Mr. Shulaya while Mr. Shulaya was

treating him like a son.  Melman had no problem lying to Mr. Shulaya while he was spending time in Mr. Shulaya's apartment, riding in his car, taking trips with him and talking on the phone with him several times per day.

These cooperators and informants are the government's key witnesses in this case against Mr. Shulaya.  They told you false and incorrect stories about Mr. Shulaya to curry favor with the government and try and get from underneath their massive problems.  They had no respect for following the law or authority or taking an oath.  If Dzhanashvili did not tell you his wild stories of assaults and the hacker kidnapping involving Mr. Shulaya, he would face decades in prison.

Melman and Sadov also faced decades in prison.  For Slava and Kutsenko, working for the government allows them to stay in this country and survive.  There is no other way for them.  For all of them it means a permanent alteration of their lives.  It means permanent loss, and not being able to enjoy their lives again in any meaningful way.  It means they are staring at the end of their lives with desperation.

Now, you may have thought that since they told you about their own lies and their own crimes and did not deny them, either on direct examination or cross-examination, that they're likely telling the truth about Mr. Shulaya.  That would be a huge assumption and a huge mistake, and here is why:  The process of becoming a cooperator is not about coming clean.

It's not about having times of confession with any agent or any prosecutor. It's about getting what you want from the government, getting a benefit that you can't get without the government's help. Benefits like getting out of prison, avoiding deportation. So just because a cooperator takes the witness stand and admits to their crimes doesn't equate with honesty. Meeting after meeting and confession after confession does not clean the souls of Dzhanashvili, Sadov or Melman. You must look at their motives and character.

Being a cooperator is strategic and calculating. Talking about prior crimes and giving information is totally worthless and doesn't help you at all unless you can provide substantial assistance. That's the term in the agreement -- substantial assistance in the prosecution of other people. Nowhere is this truer than in the case of Dzhanashvili. He can be open about all of his lies and crimes. He can discuss guns and shootings, stolen credit cards and plans to poison other people, and he can do that meeting after meeting after meeting; but the only way he gets value, the only way that he gets meaning in the eyes of the government is if he does one thing, and that is testifying against Mr. Shulaya, pointing the finger at him. He has no value and no meaning to the government unless he does that.

Dzhanashvili learned that. Melman learned that. Sadov learned that. They had to give information about

Mr. Shulaya in order to receive enormous benefits.  There is no way, no way they are getting their cooperation agreements if they turned on Crooked Nose Mike.  There is no way they're getting their cooperation agreement if they turn on Mamuka or Diego.  They know that the only way that they have value and meaning to this government is if they turn on this man, and only that man, our client.

MR. ADAMS:  Objection.

THE COURT:  Ladies and gentlemen, you will understand that counsel's arguments here in the summation relating to the cooperation agreement are based upon the inferences that he is asking you to draw from the cooperation agreement itself.

The agreement is actually in evidence, and you will be able to review it.  There is nothing in the agreement on its terms that requires solely one thing or solely another with regard to any particular witness or evidence, but what counsel is doing is he is making an argument to you as to what he believes substantial assistance would require.  And so you should take that as his argument.  And if you have any question at all about what the terms of the document are or what the agreement is, you will have that in evidence, and you will be able to look at what the document itself says.  All right?

You may proceed, Mr. Cecutti.

MR. CECUTTI:  Thank you, your Honor.

They need Mr. Shulaya to save themselves.  So this is

the calculation that they made.  What information about Razhden Shulaya can I create to help me?  What stories can I tell? What exaggerations can I make?  How can I sink Razhden Shulaya so that I can swim?  Lying and deceiving goes into this calculation.  Razhden Shulaya is an easy target for cooperators.  He is also of incredible and life-altering value to them, for Dzhanashvili, Melman and Sadov giving information about Mr. Shulaya gave them the chance to help themselves, and this is crystal clear from Mr. Dzhanashvili.

Only two weeks ago, on May 31, he began trying to get a cooperation agreement, and he got it just in time.  He pleaded guilty on June 8 during this trial.  For Dzhanashvili, Mr. Shulaya didn't have an eight pointed star on his chest; he had a bull's eye on his back.

We cannot look into the heads of the cooperators and read their minds to reveal their true motives, but we don't have to.  The task at hand is for you to decide whether you are convinced beyond a reasonable doubt that Mr. Shulaya is guilty. There are many possible motives for these cooperators.  But what we do know that is not in the dispute is that they have histories of lying, of cheating, stealing, and hurting others for their own personal gain.  Dzhanashvili, Melman and Sadov pleaded guilty to cooperation agreements, and these agreements are not about telling the truth.  They are about convincing the government what the truth is, and that they are telling it.

Now, not one person seated at the government's table or any of their agents or investigators were present at any of the incidents or events discussed at this trial. They must rely on their cooperators.

The government will argue maybe later today that the cooperators had to plead guilty to serious charges as part of their cooperation agreement. This may seem to be against their interests, but it's not. If it were, they wouldn't have done it. It's actually in their interest to plead guilty to serious charges exposing them to years in prison because if they do, they get a cooperation agreement. Dzhanashvili, Melman and Sadov are all hoping that their cooperation agreement will get them their 5K letter; and with their 5K letter, they have a chance to get out of jail or stay out of jail and remain in the United States.

The government will argue, I'm sure later, that the degree of detail and corroboration given by the cooperators tells you that they are being honest. Details and corroboration do not mean that someone is telling the truth. Remember the lies of deceit and dishonesty they led for years. They are quite capable of lying and coming up with details. You should not trust what these cooperators have told you. They are entirely motivated with convincing the government to believe what they have said. And you know they are convincing. They got away with a lot over many years. The details and

corroboration in their lies made them who they are -- masterminds and successful criminals.

The cooperators and informants are not like other witnesses who testified in this trial.  Judge Forrest will instruct you that you should scrutinize their testimony with special care and caution.  After years of deceit and lies, violence, cheating and crimes, none have a conscience.  When they want to avoid trouble or get from underneath their problems, they lie and they tell stories.  They have no regard for life and truth, and you should tell the government by your verdict that you refuse, you refuse to convict Razhden Shulaya on the words of Dzhanashvili, Melman, Sadov, Slava and Kutsenko, individuals who have powerful motives to lie.

The government has called, as you know, witness after witness, introduced exhibit after exhibit to paint a picture of Razhden Shulaya:  He's a criminal, a thief-in-law involved in various crimes and violent acts.  Again, however, whether you believe he's a thief-in-law, or a *vor*, is entirely irrelevant in this case.  It doesn't make him guilty.  It's not an element of any of the crimes that he's charged with to be a thief-in-law or a *vor*.  Also, whether you like him or not is entirely irrelevant.  That should not factor in your assessment or analysis of the evidence.  Neither should Mr. Shulaya's decision not to testify or present any evidence.

You cannot hold that against him in any way.  You may

have wanted to hear from him or other witnesses, but Mr. Shulaya did not testify or call any witnesses because under our system, the government must prove a person's guilt beyond a reasonable doubt. We could have elected not to cross-examine a single witness. And that important constitutional principle remains true. A person on trial is not required to prove their innocence. This makes sense as the burden does not fall on an individual, an individual person who is being charged with serious crimes by the government. It falls on the accuser. It falls on the government.

In your deliberations, you will ultimately have to decide whether the government has proven each charge and each element of each charge beyond a reasonable doubt. The burden of proof always remains with the government. It never ever switches to us. It is not, and it never is, our responsibility to prove that Mr. Shulaya is innocent or that he is not guilty.

Also, you will hear an instruction from Judge Forrest that states that all witnesses were equally available to both sides. However, she will also remind you that the burden of proof always remains, always, with the government. And in this case they chose to call some witnesses and not others. It is telling that in their attempt to prove that Mr. Shulaya was involved in violence, including a kidnapping, not a single victim came into this courtroom and testified. All of the central witnesses that the government called in this case have

powerful interests in the outcome of this case against Mr. Shulaya. Every federal agent who testified does. There is no question that Dzhanashvili, Melman and Sadov do, who are scared and desperate about what their futures hold. The same with Slava and Kutsenko who are entirely dependent on the government to remain and survive here in the United States.

Judge Forrest will instruct you that a reasonable doubt is a doubt based in reason and arising out of the evidence in the case, or the lack of evidence, and that proof beyond a reasonable doubt must therefore be proof of such a convincing nature that a reasonable person would not hesitate to rely and act upon it in the most important of his or her affairs.

When you begin your deliberations, you will be faced with some of these questions: Can I trust the cooperators? How about the informants? Would I hesitate to rely and act upon their word in making an important life decision?

THE COURT: Ladies and gentlemen, what I want to do is make sure that you understand that I will be instructing you on the legal standards here, including reasonable doubt. I would ask counsel to move beyond the comments that he's making on reasonable doubt, and I strike the last comments that counsel has made relating to reasonable doubt.

That is an issue for the Court to instruct you on. You will be reviewing the totality of the evidence in this

case, and you will be making your decision based upon how you weigh the totality of the evidence in this case and giving it whatever weight you think it deserves.

Move on to your next point, Mr. Cecutti.

MR. CECUTTI:  Ladies and gentlemen, you rely all the time on information to make important life decisions.  Are Dzhanashvili, Melman, Sadov the type of people you would trust and rely on?  Absolutely not.  Can you rely on the words of Razhden Shulaya that you heard throughout this trial?  Words according to Dzhanashvili that came from Mr. Shulaya who spoke with exaggerations and bragged and boasted?  No way.  And as you ask these questions, also consider the lack of evidence and the gaps in the government's case.  Don't fill those gaps with speculation or guesswork.

You will soon go into deliberations and will need to make one of the most important decisions that you will ever make in each of your lives -- a decision about another person. As you now are fully aware, this is a serious case, and you have an awesome responsibility.  Your decision will determine the course and direction of Mr. Shulaya's life.  You cannot trust and rely on the words of the cooperators and the informants in making such an important decision, and you can't rely on Mr. Shulaya's descriptions and characterizations either.  He was a talker.  He had a big mouth who proclaimed millions and billions, when there was only hundreds and

hundreds and no guarantees; someone who made himself and things much bigger than what they appeared. And so you cannot rely on his words in the transcripts or what was testified to by others as real.

You were selected because we believed that you would accept the challenge of this great responsibility with seriousness, with focus and would not just accept what the government and its cooperators and informants would tell you.

Each of you took an oath, an oath to be fair in assessing the evidence. Pull back the curtain. Analyze the evidence. Go beneath the surface. Go back stage. Hold the government to what our Constitution demands: Proof beyond a reasonable doubt, and apply Mr. Shulaya's presumption of innocence.

In doing so, we believe that in examining what was presented to you by the government you will conclude that the government financed an operation and if any enterprise existed, it was one of their own creation, the Slava/Kutsenko enterprise, and through their cooperators and informants and other witnesses, they did not present sufficient, trustworthy, credible, reliable evidence that Mr. Shulaya was a boss, a *vor* of any kind of criminal enterprise. And at the end of your deliberations, we ask that you return a verdict of not guilty against Mr. Shulaya.

Thank you.

THE COURT:  Thank you.

Mr. Womble.

MR. WOMBLE:  Thank you, your Honor.

MR. WOMBLE:  Good afternoon, ladies and gentlemen.

It's been a long two weeks.  We've been working throughout the day for two solid weeks here.

Mr. Cecutti is right, this is an important case.  I want to begin with a point, and I think it kind of threads through the entire matter for Aftandil Khurtsidze here. Aftandil Khurtsidze and Razhden Shulaya were friends.  The reason I bring that up is because that's why Aftandil Khurtsidze is here.  Not because he was part of a criminal enterprise.  Not because he was part of a casino scam, but because he wandered through this massive investigation infrequently over the course of three years.

Now, the government has to prove that Aftandil Khurtsidze knowingly and willfully participated in a conspiracy, and was aware of its illegal objectives, intending to further those objectives.  The government must prove that beyond a reasonable doubt.  They must prove beyond a reasonable doubt that Avtandil Khurtsidze was connected to the enterprise in some meaningful way.  It's not enough that he was there. It's not enough that he associated with Razhden Shulaya or with some of the other people that the government brought in here.

Now, the fact that Avtandil associated with Razhden

Shulaya or was friends with him, again, is not a crime, and when the Judge reads her instructions to you, she will make that point.  I want you, and I invite you to judge him for being friends with these people.  It's relevant, and I'm not going to say that it is not.  It is something for which Aftandil Khurtsidze should be judged.  Truthfully, he should pick better friends.  He should pick friends like Ms. Weiss, like Mr. Rozier, but again, we're not here to determine whether or not Avtandil Khurtsidze has picked good friends.  And I think it requires a bit of context as well.

We all live our lives in this huge City, and this huge City has pockets and different cultures within those pockets and different cultures within those cultures.  Mr. Khurtsidze immigrated here from the Republic of Georgia, and it is a subculture of Brighton Beach, Brooklyn.  Any of you who have been to Brighton Beach Brooklyn understand that it is a different world.  The men are a bit more crass than I think most of us would prefer.  Their views are probably not as progressive as I think most New Yorkers would prefer that they be.  I'm not saying that to let him off the hook, but it is context, and context in this case, in Mr. Khurtsidze's case is everything.

Now, at the beginning of this case, Mr. Thomas opened, and it seemed like he was attempting to induct Mr. Khurtsidze into the mafia enforcer hall of fame.  He called him his hand,

a human weapon, Razhden Shulaya's sword.  But then you sat here and the evidence came in, and the evidence came in, and the same evidence came in, and you were left with incredibly two slaps and one punch.

Now, I am not suggesting that assault should not happen -- or that it should happen.  I apologize.  It was wrong, but we are going to review those two incidents.  Specifically because in Mr. Khurtsidze's case, the deeper you go into each incident that's alleged in this trial, the more you find out that the context is what tells you that he was not part of a criminal enterprise.  He was friends with some bad people.

So let's start with -- and Ms. Benett, if we could pull up 496-A.  This is the poker room video.  If we could hit play.

(Videotape played)

MR. WOMBLE:  You could pause, Ms. Benett.

Now, Sasha Kutsenko described that as a slap.  It is admittedly a very hard slap.  Classify it as you will.

But what we saw in that video was Sasha Kutsenko, who laid out for you in lurid detail on cross-examination his criminal history.  He is a violent individual, a violent individual who pulled a knife out, threw it on the table.  Again, context.  What was going through Avtandil Khurtsidze's mind is what's important at that point.  Then what does

Kutsenko do?  He leans over the table closest to Mr. Khurtsidze, and then Mr. Khurtsidze slaps him very hard. And then what did the government not elicit, which I think is the most relevant and most important fact of that video. Mr. Khurtsidze takes the knife off the table, hands it behind him away from Sasha Kutsenko, and that is the only time that he ever touched him in this case.  That's slap number one.

If we could pull up 141-T and go to page 32.  So there were witnesses who came in and spoke about that event, and they wanted to color that event in favor of the government.  So what's missing here?  If Avtandil Khurtsidze is sitting there, a knife is put on the table by a violent individual, and that violent individual leans over the table -- and, by the way, I invite you to watch that video.  Back it up a little bit further.  You'll see right before we started playing, Sasha Kutsenko takes a glass, slugs it, slams it down.  You can infer that that's not water.  So what the witnesses came in and said was that he was ordered by Razhden Shulaya to hit him.  And there were a number of different stories.  I believe Sam Sadov said, "Why did your body guards let this guy in here with a knife?"  Some of the other witnesses said that he said, Avtandil said, "Can I hit him?"  And Razhden said "Yes."

More importantly, you heard from the government's own interpreters, experts.  They translated what they heard.  That is their job.  They translated what they heard.  By the way,

the testimony was all of that conversation where apparently Mr. Khurtsidze was ordered to hit Mr. Kutsenko was in Georgia. It does not exist in the transcript. So what you have is you have the government, they watched that video. They know what that video shows, and they know it's not enough. So their witnesses came in and told you something that is clearly not true from the transcript. You have two different incidents -- one supported by the best evidence, the transcript.

Again, you don't have to choose between those two incidents. This transcript and that video creates sufficient reasonable doubt, more than enough reasonable doubt for you to conclude that that slap was because after Aftandil Khurtsidze didn't like Sasha putting a knife in front of him and leaning over, and that's why he moved the knife. If it had been a beat-down for retribution, a beat-down on order, it would have continued. It would have been a punch. It would have been a series of punches.

But that, mind you, that's not Razhden's style. They told you at the beginning of this case, the government did, that Mr. Khurtsidze is the enforcer. Did it seem like Razhden Shulaya needed an enforcer during this trial? Time and time and time and time and time again the testimony came in that Razhden used his own hands to inflict retribution on subjects, not Aftandil Khurtsidze.

So I want to move to I think what's an even clearer instance of the government taking what seems to have a very simple answer and pulling it towards their narrative.  They wanted -- it was too juicy.  They knew that these two were friends, and they knew that Aftandil Khurtsidze was a world champion boxer; a world champion boxer and enforcer for a mob boss *vor*.  It's just too good a narrative to give up.  So they couldn't do it.

I want to talk to you about the Mamuka Chaganava beating, and I will not put the gruesome beating on the screen. Although I think it does have evidentiary value, that is not why I bring it up.  But I don't think we need to see it again. I don't think we need to see it again because Avtandil Khurtsidze had absolutely nothing to do with that assault.  The first you heard of it from one of the supposed witnesses was from, again, Sasha Kutsenko.  Sasha Kutsenko said that he was standing outside the office, and he saw Avtandil and Razhden in the office with Mamuka Chaganava.  And then he heard beating, and then when they exited the office that Shulaya said to Khurtsidze, "Why did you hit him so hard?"  Well, the government was perfectly fine allowing that narrative to continue.

But the problem is we now know, because Ms. Benett crossed Agent Richards, that Sasha Kutsenko spoke to the government, spoke to the FBI five days after that happened, and

what did he say?  He didn't say that Aftandil Khurtsidze was there.  He already knew Aftandil Khurtsidze.  They were at the February 3 party two weeks prior at Razhden's birthday party together.  He had already identified him to the government.  He knew who he was, but he didn't say "Aftandil Khurtsidze."  He didn't say "The Boxer."  He didn't say "The Kickboxer."  What did he say?  He said "unknown Georgian male."

That's not the government being straight with you, ladies and gentlemen.  That's them putting what they want before you to pull you to where they want you to go.  That's not what you are here for.  You are here to receive the evidence and determine what it means and to determine if they have met their burden of proving this case beyond a reasonable doubt.  So there is witness credibility, but they also have their own credibility to contend with; and if they can't maintain either, then they should not get your verdict.  Proof beyond a reasonable doubt, the Judge will explain to you, is a high burden, and I will allow the Judge to read her instructions.  Please listen carefully to what she says.

But we also heard about the Mamuka Chaganava beating from Zurab Dzhanashvili.  Mr. Dzhanashvili, who Mr. Kutsenko says, was at the poker table in another room the entire time, said, "No, I was standing next to Aftandil Khurtsidze right outside the door the entire time."  Kutsenko said nothing about Dzhanashvili being there.  He said that "We were standing

outside, we heard beating, and then Razhden exited the room."

Here's the problem. Mr. Dzhanashvili also testified that he did about nine months to a year in immigration custody beginning in August of 2015. The Mamuka Chaganava beating happened in February of 2016. He was in immigration custody. He wasn't even there. That's his testimony. But I think I can clear this up, ladies and gentlemen.

Could we go to 903-XX. The words I want you to remember are "unknown Georgian male." The guy in the mirror is clearly the unknown Georgian male. He's there. That's the beating. We heard testimony. Nobody knows who that guy is. He's unknown. Ladies and gentlemen, that seems to be the clear answer to me, and I don't even work for the FBI. But, the government wanted to pull you away from what is clearly the answer here, but that doesn't matter for Avtandil Khurtsidze. What does matter is we have just discussed a mountain of reasonable doubt on this incident.

So let's talk about Mr. Natchkepia. The very first witness we heard from was Mark Nektalov. Now, he has his issues with fraud. Mr. Nektalov came in. He testified that he was at the Avenue X apartment when Mr. Natchkepia was beaten. He says that the photo that he was shown of Aftandil Khurtsidze, he said "That guy was there." But you remember what happened:

"Do you see him in the courtroom?"

"No."

Ladies and gentlemen, that doesn't normally happen in trial and it's important.  It's important because Mr. Nektalov didn't see the person that he was supposed to come in here and say was there, there.

Now, for whatever reason, Mr. Nektalov says he was there, but he also said that there was a UFC fighter.  Well, we know Mr. Khurtsidze is not a UFC fighter.  We know there are UFC fighters that were involved in this case, but Mr. Nektalov also testified on cross that at this point he's already seen a lot of news articles surrounding this case.  Now, news articles are probably going to indicate the more famous individuals involved in the case, so we would argue that his judgment is clouded or his memory is clouded by that.  But again, he didn't even identify Mr. Khurtsidze in court.

Sasha Kutsenko said that Mr. Khurtsidze was there.  Zurab Dzhanashvili said that Mr. Khurtsidze was not there.  Reasonable doubt right there.  But even if you assume, and even if you agree with the allegation that Mr. Khurtsidze was there, listen again to the Judge's instructions when she reads them.  Listen carefully.  Mere presence.  Mere presence is not enough.  Mere association is not enough.

They have given you scant evidence, and they want you to do their work for them.  They want you to fill in the gaps.  They want you to make assumptions.  So they have not been

straight with you about Mr. Natchkepia, they have not been straight with you about Mr. Chaganava, and they were not straight with you about the Kutsenko slap, as we could see from the transcript, their own transcript. So, ladies and gentlemen, I urge you to demand more, demand more from them. They tried to pull the wool over your eyes on those matters. They have not produced proof beyond a reasonable doubt that Mr. Khurtsidze had anything to do with any of those things.

Now, I want to talk about the September 7 assaults, and this is the slap and the punch. And, again, it is a hard slap and it is a very hard punch. The government tried to argue, Mr. Adams tried to argue in his summation that we know perfectly well why that happened. We absolutely do not. Nobody told us who that guy is. And, again, I am not suggesting that that assault was warranted or proper, but what I am saying is you will not hear Judge Forrest tell you that he is charged with assault. He is not. They have to prove beyond a reasonable doubt that that was in furtherance -- that Mr. Khurtsidze's mindset was furthering the enterprise with that assault. They have to prove it beyond a reasonable doubt. How can they do that if none of us know who that guy was or why that happened? You cannot speculate. The Judge will tell you that. You can infer from the evidence, but you cannot speculate. This is too important.

So I want to bring up just another point. The Judge

is also going to --

          THE COURT:  I want to actually -- let's have a sidebar

for one moment.  I want to make sure we are all clear on one

piece.

          (Continued on next page)

(At the side bar)

THE COURT:  I'm concerned about the statement that your client is not charged with assault, which may suggest to the jury that the assaults are irrelevant in this case.

MR. WOMBLE:  I understand.

THE COURT:  The racketeering acts involve extortion and the use of threats and violence in connection with that. Also, the enforcement of various acts leading to the racketeering conspiracy with assaults renders the assaults relevant, and so, therefore, one need not charge separately as a crime under New York Penal Law assault in order to have them relevant.

So that is my concern.  There are two ways to fix this.  One way is to have you work it in, which is to say, the way the assaults become relevant according to the government's theory, ladies and gentlemen, is that they are in furtherance of this racketeering enterprise overall or something like that. Or I could fix it.

MR. WOMBLE:  No, I would prefer to.  I understand, your Honor.

THE COURT:  You don't disagree.

MR. WOMBLE:  I do not.

THE COURT:  Does the government or anybody else have any views?

MR. ADAMS:  Either suggestion works for us.

I6FQSHU2                        Summation - Mr. Womble

          MR. WOMBLE:  I'll attempt to clarify.

          THE COURT:  Thank you.

          (Continued on next page)

(In open court)

MR. WOMBLE:  Ladies and gentlemen, I want to clarify assaults under the government's theory.  Assaults, threats of violence and violence itself in the aid of racketeering to move the enterprise forward, that is what this case is about; but if the underlying assaults that they are attempting to put before you have not been proven beyond a reasonable doubt to have anything to do with Aftandil Khurtsidze, then they haven't proven their case.

Now, the racketeering matter, they have to prove beyond a reasonable doubt.  The government has to prove beyond a reasonable doubt that Aftandil Khurtsidze agreed to participate in the enterprise with the intent that member or members of the conspiracy would commit two or more acts of racketeering of the types specified in the indictment.

Now, again, you must be unanimous as to the types of racketeering acts that the defendant intended someone would commit.  Now, I think it's fantastic that the judge will give you a copy -- am I correct your, Honor, you will give them a copy of the charge?

THE COURT:  Yes, you will all have a copy of the charge.

MR. WOMBLE:  They are complex.  This case is complex. I urge you to hold each other accountable to dig into these charges because once you dig into the Judge's instructions on

these charges, you will find that Aftandil Khurtsidze is not guilty of being part of this racketeering enterprise.

Now, there is a transcript involving Mr. Khurtsidze, and I imagine that it is quite possible that Mr. Thomas may bring it up on rebuttal this afternoon.  But on September 1 of 2016 Mr. Khurtsidze went with Sasha Kutsenko to the Lotus Cafe and spoke to a guy named Sergei Demidenko.

I want to pause for a moment and again remind you, this was a three-year investigation.  At that point two years of investigation, the eyes and ears of the FBI were all over this organization.  They had Slava and Sasha, two walking tape-recorders.  They had phone taps.  They had surveillance.  They had access to the poker house entire surveillance system.  Their witnesses have testified that Mr. Khurtsidze was basically going around Brooklyn beating gambling debts out of people.  But they don't have the evidence to support that.  Those are just words.  If that had happened, then it would have come up.

So I would argue to you that it is a bit coincidental that on September 1, when Mr. Khurtsidze is shown in the green shirt video and the van -- I want to talk about the van for a second.  Because the government has attempted to tie Jerome Gauthier and his very, very sad circumstances to Mr. Khurtsidze.  The only thing that they have is video that Mr. Khurtsidze was driving a van, and that he got out of that

van, and he took this heavy object, Pelican Pete, into Cropsey Avenue. Ladies and gentlemen, if I had something that I needed carried, I would look for a strong person. I would look for my strongest friend. I would argue to you he was there to carry something; nothing more. Nothing more.

But the government wanted to slip Jerome Gauthier into that circumstance because apparently that was his van, but there is no evidence connecting -- that Mr. Khurtsidze had any idea who Jerome Gauthier even was. So on 9/1 we have the video. We know the FBI surveilled Mr. Khurtsidze when he was wearing the green shirt, and he was carrying Pelican Pete.

Now, Mr. Kutsenko that same day, he testified, and Mr. Hanratty or Agent Hanratty testified that basically they sent Kutsenko as kind of a ride-along to Mr. Khurtsidze's debt collection with Sergei Demidenko. The problem with that is on cross, Mr. Kutsenko said, "Well, actually, I picked the place. That was where I met Demidenko before." It was Kutsenko's debt collection. Kutsenko was the debt collector.

Mr. Hanratty also said repeatedly, "We sent him to prevent violence." They sent Mr. Kutsenko of the non-housecleaning rubber gloves to prevent violence. That's like sending Keith Richards to prevent drug abuse. It doesn't make any sense. He had his own thing, but what the government did is they saw an opportunity to pull Aftandil Khurtsidze into this web, so they had Kutsenko reach out directly and ask for

Khurtsidze to come with him.

Now, the intent is important.  Mr. Khurtsidze's intent at that meeting is vital.  Now, the government wants to use the things that were said on the witness stand by their witnesses and their story, their narrative to provide context.  Ladies and gentlemen, the context is the evidence.  This long-term investigation which pulled up prior to that zero evidence of Mr. Khurtsidze being involved in any kind of shakedown in any kind of -- and I'll say credibly here, because I know the government is suggesting that he was involved in the Chaganava beating the night before.  Was present for the Chaganava beating, present for the Natchkepia beating, and we'll admit that he slapped Sasha Kutsenko very hard.  Other than that, maybe the bar fight that Mr. Cecutti's client, the talker, told Zurab Dzhanashvili about, there's nothing there.  So they saw an opportunity to pull him in.  But it's his intent.  The context provides evidence.  The context of his intent, it was not there.

And, ladies and gentlemen, there was apparently another meeting on 9/7 with Mr. Khurtsidze, Mr. Kutsenko, Mr. Demidenko, and I believe Mr. Ubilava was there as well. Mr. Hanratty testified that prior to that meeting, he placed a recording device on Sasha Kutsenko.  You can look through the evidence all you want, ladies and gentlemen.  You will not have a transcript.  You will not have that record for 9/7.  It's the

government's burden to present evidence to you to remove reasonable doubt. The fact that that transcript was not given to you, that's reasonable doubt about 9/7 and the events that they're claiming occurred. So the government has attempted also to kind of paper over and patch some of the holes and cracks in their case.

If we could pull up, Ms. Benett, 405.

Mr. Khurtsidze's credit card that was found in the nightstand drawer at Mr. Shulaya's apartment. It's an old, worn credit card that is attached to a receipt for a regular credit card payment that was made in May 12. We know early June he was arrested coming back into the country. So, ladies and gentlemen, the relevance of this credit card, it is not relevant. It is a credit card that was at a friend's house.

If we could pull up 485. Now, there has been talk of the receipts that were allegedly found at Shulaya's apartment or his residence. I kind of piggyback on what Mr. Cecutti's said. It was important enough for them to bring in a person to show that Artur Vinokurov stole a mailbox. It was important for them to bring someone in from Ohio about an incident years ago involving some electronic devices. It was important enough for them to bring someone from Australia to talk about old Pelican Pete here. But, this is the only thing we have indicating anything that has Mr. Khurtsidze's name on it, but this is in Brooklyn. This is in Brighton Beach. No one was

brought from RIA to say who did this, what this was for.  But if you look down, you'll see that it was sent to Tbilisi, Georgia.  Mr. Khurtsidze's home country and home city. Actually, I think he lives just outside, but -- and again, the recipient, Sophia Parlova, we have no idea who that is.

Ladies and gentlemen, they put this before you so that you would speculate, so that you would draw these speculations from this, but again, I remind you of the breadth of this investigation.  It was massive, three years.  You've got an old credit card and a receipt.

There were also tricks that the government played.  If we could pull up 905-G, please.

(Continued on next page)

MR. WOMBLE:  This is the two- to three-second video that was allegedly extracted from Mr. Khurtsidze's phone.

And if we could go to page 836 of the transcript, and if you could just, Ms. Benett, scroll down.  It's a little bit small, but if you don't mind, I'll read it.

Ms. Elkerton was on the stand.  She was talking about her company, Aristocrat.  She had never met Mr. Khurtsidze.  There was no connection between them.  But what did the government do?  They had to use every opportunity they could to make sure Mr. Khurtsidze's name came up during this trial.  I don't know if you recall, there was literally an entire day where Mr. Khurtsidze was not even mentioned.

Mr. Adams brought her attention to the Tiki Torch game, using 905G, and then he read what is in evidence as a stipulation, but it's the timing that I want you to focus on that we should take issue with:

"As it relates to 905G, this is an excerpt of a report containing a true and accurate copy of data contained on an Apple iPhone device that was seized from the person of Avtandil Khurtsidze."

We can take that down.

We heard from Mr. Melman that there were photos sent by Merab Dzhanashvili to Mr. Khurtsidze's phone.  Four photos.  That's it.  But the government put in the video, and they wanted you to think that these were poker-machine videos.

If we could look at -- and I apologize; I'm not nearly as organized as the government -- 903L, this is the slot-machine video. These, and they will be in evidence, this is the slot-machine videos that Mr. Melman was referring to. This is what gives them the information. Mr. Melman testified, We can't do anything with photos. So again, at this point we have Merab sending four photos to Avtandil Khurtsidze's phone. That's it. We have Mr. Khurtsidze carrying that slot machine, and we have Mr. Melman also trying to put him at the Galaxy Tire Shop, but we now know that that wasn't true.

So this takes us to what I believe Mr. Adams said should basically end the case for Count Five in favor of the government. This should seal the deal. I believe it's 232-T. This is a transcript on January 27 between Avtandil Khurtsidze and Razhden Shulaya.

During this conversation, Razhden Shulaya said 530 words. Avtandil Khurtsidze said 37, and I'm going to go through them. In fact, there's only two parts of this conversation where Avtandil Khurtsidze engages in the conversation with Razhden Shulaya, and they have nothing to do with this casino scam slot machine business. If you look right here, seven and eight, and again, we're dealing with crass language here, but again, context.

This is two guys complaining about American roads. Everything else:

"Khurtsidze:  Hello.

"Khurtsidze:  Hello.

"Khurtsidze:  Yeah.

"Khurtsidze:  OK."

If you go to page 4, "Khurtsidze (unintelligible)."

Page 5, "Khurtsidze:  Anyway."

Now, 19 and 20, that's again where he decides to engage because Shulaya is talking about somebody and he ends by saying, "He is literally such a fucking dick, brother."

Khurtsidze says, "He is, brother.  He is."  He's agreeing that whoever that person is is what Shulaya represented him as.

As we go further, 22, Khurtsidze says, "Yes, brother."

Before we go to page 6, there's crass language, but then there's also the flip side of that, where it's language that an interpretation probably seems a bit weird considering the figures.

If we could go to page 6, 24:  "Kisses and," Shulaya says:  "Take care.  All right, brother.  A kiss on your heart, brother.

"Khurtsidze:  Bye, brother.  Take care.  Take care. Kisses.

"Shulaya:  Kisses.  Take care.

"Khurtsidze:  Take care, brother."

The use of the word "brother" is not just in this

conversation. Look at conversations that don't even involve Razhden Shulaya. They call brother, brother, brother, brother, brother. Everybody is brother, but it is a different culture, which is clearly exhibited by that transcript.

The judge will also instruct you that what we say, when we're questioning a witness, we can ask a question, but it's what the witness says, that's what matters. That same principle, when you understand the principle, that same principle makes this transcript meaningless for the government's position. It certainly does not seal the fate on Count Five. It is Razhden Shulaya doing what Razhden Shulaya does, talking and talking and talking and talking and talking and talking, and Avtandil Khurtsidze is letting him talk. He doesn't engage on any point related to the casino business.

Ladies and gentlemen, you have that for Count Five. For Count Five, you have the government telling you that carrying a machine, having four photos sent to your phone and being supposedly present on the phone while someone else is talking is enough to convict you for a federal offense of conspiracy to commit wire fraud.

Ladies and gentlemen, it is not enough. Listen to the judge's instructions on that charge. Look at the evidence and especially look at the lack of evidence, and you will see, it's not nearly enough. They went all in on Mr. Khurtsidze, and it is up to you, to borrow a poker phrase, to "call their bluff."

Now, Mr. Melman had spoken about trips he took to the casino with Mr. Khurtsidze. That fell apart the more he testified. When he began testifying, it was initially a trip to Harrah's and also a trip to Caesars Palace. By the end of his testimony, once he had been confronted with the fact that he had met with the government four times, discussing the casino scheme, he had told them, "Akaki Ubilava drove me to casinos. He told them he went with Shulaya to casinos. He told them about numerous trips to casinos, but he never mentioned Avtandil Khurtsidze.

Do I think that Mr. Melman was lying? No. Did he make a mistake? To him -- look, the people who are involved in this case have a distinct look, I think we should say. And I think that probably for Mr. Melman, it's easy to get them confused just as it would be for Mr. Khurtsidze to confuse computer guys. But what he testified to was that he met with the government hours on end, that he never said that Mr. Khurtsidze was involved in this casino scheme. That's credible, but that's not what the government put before you.

The fifth time, when he finally told them what they wanted to hear, that became what they told you. That's witness credibility, and again, I'm not suggesting that Mr. Melman lied. I legitimately think that he was mistaken, but by the end of his testimony, he looked right at the judge and he said, "No, I only went with him one time to a casino." His testimony

wasn't even consistent with itself.  So ladies and gentlemen, you don't have proof beyond a reasonable doubt that Mr. Khurtsidze was involved in Count Five, the wire fraud casino scheme.  He definitely did not have the intent, and he did not -- they haven't produced the evidence to show that he was there for anything of substance.

Listen to the judge's charges.

Ladies and gentlemen, I don't have much more, and I appreciate the attentiveness that you've given to me and, to be perfectly honest, to everyone.  This is not an easy task, but it has been clear to everyone who has watched this trial -- I think you've seen us working our tails off over there, but everyone one of you has been engaged in this trial since day 1.  We need that.  Mr. Khurtsidze needs that.  He needs you to focus on the evidence.  He needs you to not take this massive charge, this complex racketeering charge and say, Oh, he was friends with a bad guy, so whatever, we'll give it to the government.

That's not what you're here to do.  You did not just take two weeks out of your lives to do that.  It is a job that you have ahead of you, but you are why we are here.  He may have come from the Republic of Georgia, but it is the American laws and the American protections that ensure that the government cannot convict you without you, and they don't have the evidence.

Again, I keep coming back to this, ladies and gentlemen, but do not forget.  When you are looking at a piece of evidence, ask yourself, is there anything else that would go to say that Mr. Khurtsidze had the mind-set that the law requires, had the intent that the law requires?

Three years, watching this organization like a hawk, and they came up with very little.  Two slaps, one punch.  Violent, obviously.  But it is up to you to hold the government to their burden.

If I could just have one second.

Just to put a pin in Mr. Melman, he was obviously mistaken when he said Mr. Khurtsidze was in the Galaxy Tire Shop on January 27, 2017.  Again, we had to clarify that.  The government was perfectly fine letting that remain out there.  He was wrong.  He was mistaken.  He seemed like he believed it, and that's fine, but it's not credible evidence, and it's not anything that you should factor in considering Count Five and the lack of evidence that the government has provided to you.

The judge is going to also instruct you on defendant's reputation.  Yesterday you heard from Sherri Weis, and she gave a credible explanation as to the nickname that you have heard throughout this entire trial, Chuqucha, the hammer.  That's his boxing name.  The government wanted to take that on and give it violent undertones and say it was his criminal name.  But it's not; it's his boxing name.  She'd worked out with him at the

gym before, and she credibly said, Yeah, Razhden Shulaya came by the gym once.

You also heard from his trainer, Mr. Rozier. Mr. Rozier testified and testified, I would submit, very credibly. He told you who Avtandil Khurtsidze really is. He didn't give you snapshots, little pieces from this massive, three-year investigation to paint the picture that they wanted to. He told you about a fighter that he has been training for three years. He told you about how he's good with kids. He's a funny guy. He's dedicated to his craft.

That is the person who is here before you. And that is the person that we are asking you to see through the government's smoke screen, to see through this mountain of evidence that has almost nothing to do with Avtandil Khurtsidze and send him back to his life and to his family and to his career. And the judge will instruct you, and I ask you to listen carefully to the judge's instructions on the defendant's reputation:

"Such character evidence alone may indicate to you that it is improbable that a person of good reputation would commit the offense charged. In fact, character evidence, when considered with all other evidence in the case, may create a reasonable doubt. Accordingly, if after considering the question of the defendant's good reputation you find that a reasonable doubt has been created, you must acquit the

I6fWshu3

defendant of all charges."

Ladies and gentlemen, if there is an issue, Mr. Rozier cleared it up. He told you Avtandil Khurtsidze is not what the government has told you he is. He told you that credibly and he told you that firmly. Now, if the government chooses to get up here on their rebuttal and suggest that Mr. Rozier has some sort of financial interest, isn't that the pot calling the kettle black?

$110,000 to Sasha Kutsenko; massive amounts of money, $700,000 in cigarettes provided and funded; this Pelican Pete, honestly, a cockamamie scheme. But again, your consideration in this case is whether or not the government has proven beyond a reasonable doubt that Avtandil Khurtsidze was involved in a criminal enterprise, a racketeering enterprise in Count One. And listen, again, to the judge's charges very carefully. Look at the evidence. Look at the lack of evidence. Look at the contradictions, and again, hold the government accountable for bringing you the story that they wanted you to hear, not the story that actually existed.

Ladies and gentlemen, again, I thank you for your time. That's it.

Thank you.

THE COURT: Thank you.

Ladies and gentlemen, we're going to break for lunch right now. We're going to come back and then hear the rebuttal

I6fWshu3

from the government.  I will then give you the jury charge and talk to you about going and deliberating.

I want to remind you that even though you've heard some of the summations at this point, you're not yet able to talk to each other or anybody else about the case, because you haven't heard the rebuttal from the government and you have not heard the jury charge.  I will let you know in words of one syllable when you can talk to each other about this case.  In fact, you'll hear me encouraging you to do so, instructing you to do so, but we're not at that point yet.

Let's have lunch.  We'll come back at 2:00 and continue.

Thank you.

(Jury not present)

THE COURT:  All right.  A couple of logistical points. Why don't we be seated for just a moment.  I want to make sure we've got a couple of things in order, because as soon as the government's rebuttal is done, I will be going directly into the charge.

The exhibits that have been received into evidence, not the physical evidence but the documentary evidence, photographs, etc., are they in a form where they can be provided to the jury immediately?

MR. THOMAS:  Ms. Corrado is working on that presently and they will be available at 2 p.m.

I6fWshu3

THE COURT:  Make sure you've conferred with defense counsel and that everybody's in agreement as to what it is, that it's the right stuff and make sure there's nothing in there that shouldn't be in there, etc.

Hopefully there's an index.

MR. THOMAS:  Yes, your Honor.

THE COURT:  Make sure that the defense has seen the index as well so that there isn't wording on the index that could be a problem.

My preference is to try to have that after the charge, which will take almost two hours to give, but at the time that the jury goes into the jury room, to actually have the exhibits and the index go in with them, so you folks coordinate that.

The second thing is the indictment.  We hadn't talked about whether or not the indictment would go into the jury room.  Typically I do.  We have an S9 here, which is the one that had been effectively what I'm going to call cleaned up for purposes of trial.  It had just the two defendants on it, and so I assume that people are OK with me sending it back to the jury, but I want to confirm that.  We hadn't discussed it out loud here.

MR. WOMBLE:  We have no problem with that, your Honor.

THE COURT:  No problem, Mr. Cecutti?

MR. CECUTTI:  That's correct.

THE COURT:  Mr. Adams, Mr. Thomas.

I6fWshu3

MR. THOMAS:  Our preference is to send the indictment back.

THE COURT:  OK.  I'll have my clerk give me a copy of the S9.  We'll show it to counsel, and one copy of it, at the appropriate time, when the jury goes back to deliberate, will be in there as well.

OK.  Let's take our own lunch break.  Let's come back at 2:00.  I do have a criminal matter in here between one and two.  You folks are going to need to push over at the first two tables, but at least one of you is necessary for the first one.

(Luncheon recess)

I6FQSHU4

AFTERNOON SESSION

2:20 P.M.

(Jury not present)

THE COURT:  We had started our discussion but then realized that a court reporter wasn't here, so we have to summarize.

The bottom line is that there has been an email request from Ms. Benett for a particular instruction to the jury for Mr. Nektalov.  I have said that I am denying the request.  I think that it is not at all clear what his testimony, frankly, was going to be, and that it was going to be backward-looking versus lying on the stand.

It sounds to me based upon what the record had already been that Mr. Nektalov had said two different things to two different sets of people; that he was going to have to lie to somebody and may have been in a position where he would be either conceding a lie to the federal government, which would have been immunity backwards-looking or would have been prepared to lie on the witness stand, and therefore -- or wasn't going to lie on the witness stand.

In any event, this is not the kind of situation where the Court believes that it is late-breaking, because the Natchkepia issue has been all over the place it's been all over the record the last two days.  So that's where we are.

Mr. Adams.

MR. ADAMS:  Just to clarify, I think the Court said Mr. Nektalov earlier.  We are talking about Mr. Natchkepia.

THE COURT:  I meant Natchkepia.  All of my remarks since starting after the lunch break just now are Natchkepia.

Ms. Benett, you wanted to make the remainder of your record.

MS. BENETT:  If I could make a brief record.  The reason for the late-breaking nature of the request was that we did not expect the government, given that the only witness to testify to two incidents was Mr. Kutsenko, whose credibility we believed had been seriously undermined, and in light of the fact that Mr. Nektalov, who purportedly had witnessed the incident, looked at Mr. Khurtsidze and did not identify him as being at that incident, and given that Zurab Dzhanashvili said in his testimony said Mr. Khurtsidze was not at the Natchkepia -- I'm going to point out trial transcript page 1403, which is when Mr. Dzhanashvili is asked if Mr. Khurtsidze was present and he answers:

"A.  I don't remember him being there."

So in light of that -- and we called Mr. Natchkepia, we subpoenaed him.  He went to the stand.  He asserted his Fifth Amendment right not to testify.  We asked the government if they would grant him immunity.  The government refused to do so.  That is a decision uniquely within the government's power. He is unavailable to us, so we believe we are entitled to a

missing witness charge.

THE COURT:  I hear what you are saying, although I think, just to be clear, the immunity is backwards-looking.  It is not at all clear what his testimony or what questions he was going to be asked, and whether or not it was about a current lie that he was about to make or would have made on the stand, which I don't think -- you can't immunize future not yet -- well, you folks will argue immunity on appeal if this is ever an issue.

MS. BENETT:  I will say the 3500 that had been produced from the two prior meetings with him suggested that there was some credit card formed which may have formed the basis of his exercise.

THE COURT:  In any event, I think we have this issue sort of aired out.  It's not, from my perspective, a particularly new issue.  We are coming at the heels of the summations.

Joe, let's bring the jury out.  We will get the rebuttal done, and then we will move on to the charge.

I will say that I see a lot of physical evidence here laid out.  Just don't go on too long, Mr. Thomas.  The charge is going to take two hours, and I will cut you off at 3:00 because I want to get this jury charged before Monday.  It is now 2:25.  So you need to be done by 3:00.

MR. THOMAS:  You won't have to cut me off, your Honor.

I6FQSHU4

MR. ADAMS:  Your Honor, just for when the charge begins, if we can have one counsel for each defendant go with either me or Mr. Thomas to look at the exhibits outside the courtroom then we will get this.

THE COURT:  That will be terrific.  You folks can hopefully work something out.

MS. BENETT:  No problem.

(Continued on next page)

MR. THOMAS:  The facts of the case:

There was a crime business in New York City.  This crime business sold contraband.  It negotiated for stolen goods.  It offered counterfeit jewelry.  It set up an underground poker house.  It collected debts.  It collected debts from games of the poker house it rigged in its favor.

This crime business was in New York, and it was led by this man, Razhden Shulaya, and when he led it, he claimed a title for himself as a *vor, vor v zakone*, thief-in-law, the principal criminal authority, in his mind, in all of New York City.  And in order to do it, he relied on the help of that man, Avtandil Khurtsidze, and you saw Mr. Khurtsidze on video punching people at the headquarters, the poker spot of this crime empire.

Ladies and gentlemen, that's what the proof in this trial has shown, and it has shown it beyond a reasonable doubt.

Now, this is our opportunity to come back to you and address a few of the points that the defendants have made, and I want to say a couple of things up front.

First, I assure you I'm not going to touch on every single thing they've said.

Second, they didn't have to put on a case.  They didn't have to question witnesses.  The defendants didn't have to make a single argument at all.  But as my colleague, Mr. Adams, said, even though the government bears the burden,

and we do, when the defendants come forward with arguments, when they tell you things, when they characterize the evidence, you're entitled to think about it.  You're entitled to match what they said against the record; to match what they claim was in evidence with what actually happened on the witness stand, with the physical evidence, with the audio recordings, with all of it.

That's what we're going to do now.  We're going to take a look at what the evidence was.

First, I want to be clear about what enterprise we're talking about.  Was there a common group of people that committed a common set of crimes?  Of course.  This common group used the same cars.  They used the same spaces, like the poker house or the apartment on Cropsey Avenue.  They had the same personnel.  The guys that are picking up cigarettes in one criminal episode are the same guys that were standing with Shulaya as he beat people.  It's the same crew in different crimes in the same places over and over again.

Now, this crew, they have roles.  Not every person performs the same function.  There's a leader.  It's this guy. And there's an enforcer.  It's that guy.  Just because they have different roles doesn't mean they're not part of the same crime business.  They were.  There are guys that pick up cigarettes.  There are guys who sit down and negotiate for stolen products, and there are guys who beat people when they

don't obey.  There are different roles in the same business for one common purpose, crime in New York City.

Now, you heard on closing from Mr. Cecutti that this was really the government enterprise, the Slava-Kutsenko enterprise.  Let's talk about that for a second.

Think for yourselves.  Has there ever been a single piece of evidence that showed Slava and Kutsenko in the same place at the same time?  Do they ever talk?  Do they know each other exists?

Look at the record.  What you have is compartmentalized criminal activity.  On the one hand, you've got Slava, stolen goods and contraband, interacting with Shulaya and with the minions he sends to pick up the cigarettes and to deliver the cash.  Separately, you have Kutsenko, hired by Shulaya to consult on an underground poker business.  And before that, Shulaya went to his poker place and asked him how much money he was making to see if he could get a cut of the profits.  These are different parts of this business with one common link.  That common link is this man, Razhden Shulaya.

Now, in the supposed Slava-Kutsenko empire, you'll notice what's missing.  The casino fraud, Melman.  Where is Slava?  Where is Kutsenko?  In the back of that cell phone repair store, Melman helped Mr. Shulaya cook up, execute and perfect this cheat.

Now, I want to focus on the enterprise that was proven

to you.  Think about these questions.

Who calls the shots, and where does the money go?  Time and again, you've heard that the person who makes decisions about how much, about what goods will be purchased, about what kinds of activities will be pursued, about who gets what money from the poker house, are decisions made by this man, right here.

Now, you're going to hear, and you have heard, that in this enterprise, Mr. Khurtsidze performed a different function.  He didn't make decisions; he executed orders.

We heard from Mr. Dzhanashvili that when people violated rules, a number of things would happen in this organization.  First, to protect yourself, you need to put your head down and put your hands behind your back.  That's what you heard, but it's not just what you heard; it's what you saw on videos.

Remember the video where Mr. Kutsenko is at the table and he gets struck by Mr. Khurtsidze?  Immediately after he puts his hands behind his back.  He looks down.  In the other video, where Mr. Khurtsidze strikes Anton -- that's the person Mr. Dzhanashvili told us works with Rizhy, Mr. Shulaya's drug dealer -- Anton, after he's struck, stands in the corner and puts his head down and his hands behind his back.  In this organization, there was a person who called the shots and there was a person who delivered the blows.

To focus a little bit on the money, the second question, you heard from my colleague, Mr. Adams, about the Gauthiers, Mr. Jerome Gauthier. It's not just that Shulaya drives his cars. It's not just that Mr. Khurtsidze is in his car, working his fan. It's that the money from the Gauthiers comes in and funds the empire.

Now I want to focus you just briefly on a portion of the transcript, GX211-T, paragraph 24. And to focus you here, it's a conversation between Roma and Shulaya. If you look at this transcript, you'll see that they're talking about approval for the bottles and that the star didn't cause anybody a hang-up. If you think about the evidence, you know where you've seen bottles and you've seen a star, and it's on Tropport. It's the company Mr. Shulaya created as a money-laundering front.

In this transcript, Roma says, "It is the cover," as you can see in paragraph 24, because the money wasn't coming into the business from lawful places. It's coming from the Gauthiers. It's coming from cigarettes. It's coming from the criminal activity.

I want to turn now and talk about the bigger point that Mr. Cecutti made over and over again, that some of the government's witnesses were criminals; that they were distasteful, people of low morals, or I think he said they don't have a soul. Your question here is not do you like them;

are they good people?  The question is do you believe them?

Look at the evidence compared to what they said.  Ask yourselves, does it make any sense for Melman to tell the same type of story that Zura Dzhanashvili is telling?  Does it make sense for them to invent stories when there are transcripts and recordings of huge portions of this case?

The two sources that Mr. Cecutti attacked repeatedly, Mr. Womble called them walking tape recorders, because they were.  They had tape recorders.  Many of those tape recordings got transcribed.  And that brings me to another point.

You didn't hear much about the transcripts.  Now, again, it's the government's burden, and we're carrying that burden here today, but think for yourselves what's in the transcripts that they didn't want to focus on?  And the answer is proof.

There's proof in the transcripts.  What you have, whether you believe the person who turned on the tape recorder or not, is words that come out of these men's mouths speaking about the crimes that they were committing and committing together.  You can believe or disbelieve the person who turned on the recorder, but the transcript doesn't lie.  The transcript doesn't have an agreement with the government.  The transcript isn't being paid.  The transcript is the cold hard truth of what happened.

In addition to the transcripts, we have the video.

I6fWshu5                        Rebuttal - Mr. Thomas

There is video of multiple incidents involving both of these men.  Again, the video doesn't lie.  The video doesn't get paid.  The video doesn't have agreements.  Match that evidence up against the witnesses.

Now to turn to the cooperators more specifically, I'm going to invite you to look at their testimony against one another.  OK?  And then to look at it in a light Mr. Cecutti and Mr. Womble invited you to, because one of things that they said is, Believe them when they tell you they're bad people, but don't believe them when they tell you my guy is a bad guy.  It doesn't work like that.  You can't throw out the bad and keep the good.  These guys that got on the stand and told you that they were criminals.  They told you what they had done and they told you what they saw.

To focus on some specific arguments here, Mr. Cecutti invited you to look behind the curtain, so I'm going to do that for just a moment.  I want to start first by focusing on Mr. Khurtsidze.

Now, you heard that Mr. Khurtsidze is a professional fighter, and you heard from his trainer, one guy who said "he's my fighter" on the stand here.  And we heard from Melman, who said he's also Mr. Shulaya's fighter.  But we heard from the trainer that Mr. Khurtsidze fights in a specific weight class.  He's a trained fighter.  When they practice they use pads.  Mr. Khurtsidze knows that fighting is dangerous.  He knows that he

I6fWshu5                      Rebuttal - Mr. Thomas

is trained to injure people.  Mr. Khurtsidze goes into these rooms, some of which he's recorded at a poker house, a poker house he visits while there are games going on, and he punches people.  Most of those incidents are also on audio and videotape.

I'm going to focus for one moment on 141-T, which is a transcript, if you'll bear with me as I flip through.  This is the transcript of what's going on at the time that Mr. Kutsenko is struck.  There's been a lot of focus on this transcript, but what you didn't hear Mr. Womble focus on in his closing is what's being said in the room.  There's a knife on the table, and Mr. Kutsenko is a criminal.  Maybe he was hitting him out of some sort of protection.  Maybe it was just because there was a knife.  But look at the transcript.

What happens after that incident is that Mr. Shulaya says what the cooperators told you he said, which is he's upset that someone brought a knife to a thief-in-law, not because it's dangerous but because it violates the rules.  And after he said, that that's when Mr. Khurtsidze hit him and Mr. Shulaya berated his bodyguards for failing to do their jobs.  And after that they sat around for hours trying to calculate the proper chop from the illegal gambling business.  Mr. Khurtsidze is present all the time when criminal activity is being discussed, and he hits people for that activity when Shulaya invites him to do so.

I want to focus on another incident involving Mr. Khurtsidze and Mr. Shulaya, and that's Mamuka Chaganava, the former No. 2. You heard that Mr. Chaganava got into a dispute with Mr. Shulaya. Mr. Chaganava was the original pickup guy for the cigarettes, but he came to owe Mr. Shulaya thousands of dollars, as Mr. Dzhanashvili told us. And we heard and saw in the transcript what Mr. Shulaya did to him, because he bragged about it to Slava. He told Slava, Look what I did to this guy, and he showed him a photograph. And we presented that photograph to you, which came from Mr. Shulaya's cell phone.

Who saw Mr. Shulaya take a photo of Mamuka after he had administered a beating? That was Mr. Dzhanashvili. The evidence lines up, and it points in one direction, which is that Mr. Shulaya beat Mr. Chaganava for the cigarette money, and while he did it, Mr. Khurtsidze and Mr. Dzhanashvili, the lieutenants, waited outside for minutes, listening to the sounds of a beating, and then they sat there while Mr. Shulaya made a phone call to, perhaps, another *vor*, bragging about what he had done.

Mr. Khurtsidze kept coming back to that enterprise, to that poker house, to that role for Mr. Shulaya.

One of the other things we focused on in the case is that this enterprise is akin to nontraditional organized crime groups, the way Special Agent Penza described it; that they don't have particular names for every single role that is

performed.  There is a head honcho, a *vor*, and there are people that assisted him, but there are characteristics or hallmarks of this type of activity, and that is that the money goes up. And we heard that that's what happened here.

Mr. Dzhanashvili told you that he provided money to whomever Mr. Shulaya directed him to on a at least one occasion.  We see here Government Exhibit 634.  These are Western Union receipts, and we showed you a number of them in PDF form, of various people who would pick up cigarettes, who attend meetings about slot machines, who were present for meetings, wiring money overseas.  These receipts are from his house.  The money is going to Shulaya, and then it's going overseas.

Now, among the roles that Mr. Khurtsidze played in this enterprise is Mr. Khurtsidze invited other fighters to join them.  We heard from Mr. Dzhanashvili that there were people he ran with, when there was a confrontation of who owed, Mr. Dzhanashvili brought his close associates.  Similarly, over time, what Mr. Khurtsidze is he invited other fighters, Akaki Ubilava, Levan Makashvili.  These are people that Mr. Khurtsidze introduced into the enterprise, and those are people who show up on surveillance at times when the undercover and Mr. Melman and Slava are all present for a demonstration of the slot machine.

And that's important because if the focus for Mr.

I6fWshu5                    Rebuttal - Mr. Thomas

Khurtsidze is on the idea that he didn't know, why is he bringing people into the organization?  Why is he staying, when beating after beating occurs?  And why, on January 27, 2017, is he on the phone in a transcript, which we showed you, talking about, with Mr. Shulaya, the concept of having rhythm in touching the button?  It's the button of the slot machine. That's the same day that his fighter friends are at the tire shop in Brooklyn evaluating whether or not it will work.

At some point, Mr. Khurtsidze's claim, his idea here that he was just there, doesn't make any sense in light of the evidence.  What the evidence shows is not that he slapped one guy and punched another.  It shows that he's on video beating one guy, who was not armed, who was not in his weight class, who was not wearing pads.  It shows him striking a man who had disrespected Shulaya and then sitting in a room while they discussed whether or not the chop from the illegal gambling business was correct.

There's audiotape of him going to collect debts, telling somebody that he'll have a big problem if he runs. There's Mr. Khurtsidze, through the testimony, driving with Melman in silence to casinos, or at least one casino, in a different state, and Mr. Khurtsidze's phone, which has those videos, those snippets of the pay lines, which Melman told you is one of the things that you need in addition to the reels to make this scheme work.

Now, he got sent those by somebody else.  Mr. Khurtsidze is not at the bottom of the food chain.  Mr. Khurtsidze is on top of the corps of fighters who formed bodyguard portion of this criminal enterprise.

Ladies and gentlemen, where that leaves us is with a criminal enterprise that engages in all kinds of activities, stolen goods, contraband, gambling, debt collection, assaults and an idea to cheat at casino slot machines.  And that casino slot-machine scheme, to pause on that for a moment, is a fraud.

We heard the argument that it just increases your odds of winning.  Mr. Melman told us that it increases your odds of winning to theoretically 100 percent.  It's sort of like going into the grocery store and saying, This increases my odds of getting this item for free to 100 percent and walking out.

The casinos here expect that the players will get 85 cents and they will 15 cents; over time 85 percent is what the machine makes.  This cheat makes it so that they get nothing.  It takes that money from the casinos and puts it in their pockets.

Ladies and gentlemen, that is the enterprise, and let me leave you with just a few thoughts.

This enterprise was born in violence.  Mr. Shulaya, Mr. Dzhanashvili and the original crew of persons went to Las Vegas.  They took a guy, they kept him in a hotel room for almost ten hours, or more, and they extracted from him the

origins, the seed files for this fraud at that very beginning point in time, well before they were sources, well before they were cooperating witnesses, well before this was even a case.

Mr. Shulaya then took that information, and he hit the road, and we know that because he was stopped on that road, and the thumb drives were seen by the law enforcement agent who stopped him. We know that he was there because the Bellagio casino tickets show that he had a room in Las Vegas. And we know, just like Mr. Dzhanashvili said, that prior to leaving town he made a side trip to L.A., where he met with another *vor* and we know he was in L.A. then because he and his wife were at the Hollywood Walk of Fame with a *vor* star between them.

From that initial violent birth, the enterprise grew. It beat people, Mr. Natchkepia. It beat people who disrespected Mr. Shulaya. It knocked out guys in bars. It settled scores in a pool hall, where someone was whacked with a pool stick and his shirt was torn off. It continued with Mr. Shulaya pistol-whipping his own nephew, and it became more than its origins with the contraband and the casinos and with everything else. But it was always an enterprise. It was always Mr. Shulaya's enterprise, and it was always a crime.

Ladies and gentlemen, at this point, what the government asks you to do is to look at the facts, focus on the evidence, on the recordings, on the videos, and follow the judge's instructions.

I6fWshu5

Now, at the end, when I'm all done, when she's instructed you, we expect that you will find that these defendants are guilty as charged; that Mr. Shulaya is a *vor*, he was the boss; that Mr. Khurtsidze was his hammer, and together they ran a crime empire right here in New York City.

THE COURT: All right. Ladies and gentlemen, what I'm going to do now is go directly into the jury charge and ask my clerk to hand each of you the following two documents. You're going to get the jury instructions. Don't be intimidated by the size, because many of the pages are not full. Every time we start a new instruction, we start a new page, so there are several instructions which are only a couple of lines along, but it takes up a whole page. And I don't do it double-sided, even though I should, because it's just easier to read single-sided. They're heavy, they're big, but we'll be able to proceed through them smoothly.

The second document you're going to be receiving is a copy of the verdict form. Now, there will be a copy of the verdict form for each of you and then there will be a blank copy in the jury room itself. The reason for that is because I find that, or have found over the years, sometimes jurors write on their own copy and then when it comes times to fill out one copy which represents the unanimous verdict of the jury, they actually have to ask for a clean copy, so we've given you each your own copy of the verdict form, and a blank copy will be in

I6fWshu5

there on the table.

Let's see what we've got.  The court reporter needs to have a copy of the jury instructions.

Let's start with the verdict form first, and then we're going to go through what we're going to have in the jury room.

The verdict form is actually relatively straightforward.  Remember that you have to consider each defendant himself and with regard to each count individually.

As you may recall from the very beginning and also what you've heard throughout the case, both defendants are charged in Count One.  Both defendants are charged in the fifth count, but only Mr. Shulaya is charged in Counts Two, Three and Four.  That is reflected and we can just follow through, but each defendant is entitled to separate consideration for each count.  All right?  And all you'll do is you have to agree unanimously.

When you're filling out the form, after you have reached unanimous agreement, you'll check one of the boxes for each of the counts, and everybody will then sign.  I think I've only got it signed by the foreperson, but everybody should sign, so we'll have all 12 names -- we'll talk about the alternates in a few moments -- and then date it.

At the end, when this verdict form is done, you will not send it out of the room.  It will accompany whoever the

foreperson is.  You'll just fold it up, however you want, hold on to it, send out a little note saying "we've reached a verdict," but you hold on to the form.  You come out into the courtroom holding the form.  Then at that point Joe will ask you, or whomever will ask you, Have you reached a verdict, because we'll have received the note that you've reached a verdict.  You'll then hand over the form at that time.  All right?

You'll be able to take these jury instructions with you into the room.  These are for you.  You're also going to have copies of the exhibits that have been received into evidence.  Those will be also indexed, and those will be rolled into the room, but not the physical evidence.  If you need to see the physical evidence again -- the cigarettes and other materials here on this table right now -- you can ask to have those provided to you, but you'll have all of the exhibits, the various documents and things.

Now, you're also going to have a copy of the indictment, and there will be one copy that will be in the room.

What you're not going to have is the transcript.  All right?  As you see, the court reporter's been taking down everything, but of course, they take down things and it's volumes and volumes and volumes, so if you at some point in time feel like you need to have some testimony reread to you,

you'll be very specific about what it is you need, and we then have to talk and agree with counsel as to what it is.  We have to then isolate it, and I'll talk about that with you at the end.

Let's go ahead and get started.  I'm going to go through this, I hope very smoothly.  I want to remind you, as I said yesterday, that it's what I say that controls, so if I make a change in the jury instructions, then it's what I say that controls.  We are going to start on page 4.

You have now heard all the evidence in the case.  My duty is to instruct you on the law.  It is your duty to accept these instructions of law and apply them to the facts as you determine them.

On these legal matters, you must take the law as I give it to you.  Regardless of any opinion that you may have as to what the law may be -- or ought to be -- it would violate your sworn duty to base a verdict upon any other view of the law than that which I give to you.  If an attorney or anyone else at trial has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

You should not single out any instruction alone as stating the law, but you should consider my instructions as a whole when you retire to deliberate in the jury room, and you may take a copy of these instructions with you.

I6fWshu5                    Charge

Your role is to pass upon and decide the fact issues that are in the case.  You, the members of the jury, are the sole and exclusive judges of the facts.  You pass upon the weight of the evidence or lack of evidence; you determine the credibility of the witnesses; you resolve such conflicts as there may be in the testimony; and you draw whatever reasonable inferences you decide to draw from the facts as you have determined them.

The evidence before you consists of the answers given by witnesses and the exhibits and stipulations that were received into evidence.  In determining the facts, you must rely upon your own recollection of the evidence.  I will instruct you at the end of these charges about your ability to request to have testimony read back and your access to other evidence admitted during the trial.

What the lawyers have said in their opening statements, in their objections, in their questions and in their closing arguments, is not evidence.  You should bear in mind particularly that a question put to a witness is never evidence, only the answer is evidence.  If a witness affirms a particular fact in a question by answering "yes," you may consider that fact as agreed on by the witness; the weight that you give to that fact is up to you.

You are not to substitute anything that I may have said with respect to the facts during the trial or during these

instructions for your own independent recollection.  What I say is not evidence.  If I have sustained an objection to a question or stricken testimony, any stricken answers given by a witness are no longer part of the evidence in the case, and you may not consider them.

You should draw no inference or conclusion for or against any party because of lawyers' objections.  Counsel have not only the right but the duty to make legal objections when they think that such objections are appropriate.

Also, do not draw any inference from any of my rulings.  The rulings I have made during trial are not any indication of my views of what your decision should be as to whether or not the government has proven a defendant guilty of any crime with which he is charged beyond a reasonable doubt.

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence.  It would be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings that you may have about a defendant's race, religion, national origin, sex, age, or political views. Similarly, it would be improper for you to consider any personal feelings you may have about the race, religion, national origin, sex, age, or political views of any witness or anyone else involved in the case.  Both the defendants and the government are entitled to a trial free from prejudice, and our

I6fWshu5                       Charge

judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

I also want to remind you that before each of you was accepted and sworn to act as a juror, you were asked questions concerning competency, qualifications, fairness, and freedom from prejudice and bias. On the faith of those answers, you were accepted as jurors by the parties. Therefore, those answers are as binding on each of you now as they were then, and should remain so, until the jury is discharged from its consideration of the case.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that given to any other party to a litigation. By the same token, the government is entitled to no less consideration.

The defendants have both pled not guilty to the charges in the indictment.

The defendants have both pled not guilty to the charges in the indictment.

(Continued on next page)

THE COURT:  (Continued) The law presumes a defendant to be innocent of the charges.  Each defendant is entitled to independent consideration of you by the evidence and of the question as to whether the government has carried its burden of proof with respect to him as to any crime with which he has been charged.  The burden is on the government to prove each element of each crime charged beyond a reasonable doubt.  This burden never shifts to a defendant.  The law never imposes upon a defendant in a criminal case the burden or duty of testifying or calling any witness or locating or producing any evidence.  Thus, the fact that the government called more witnesses or introduced more evidence than either or both defendants does not mean that you should necessarily find the facts in favor of the government.  It is for you to weigh all of the evidence and determine whether the government has carried its burden of proof.

The question naturally arises, "What is reasonable doubt?"  What does that phrase mean?  The words almost define themselves.  A reasonable doubt is a doubt based in reason and arising out of the evidence in the case, or the lack of evidence.  It is a doubt that a reasonable person has after carefully weighing all of the evidence in the case.  It is not beyond all possible doubt.

Reasonable doubt is a doubt that appeals to your reason, your judgment, your experience and your common sense.

Reasonable doubt is not whim or speculation. It is not an excuse to avoid the performance of an unpleasant duty, nor is it sympathy for a defendant.

Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs. In other words, if you have such a doubt as would reasonably cause a prudent person to hesitate in acting in important matters in his or her own affairs, then you have a reasonable doubt and in that circumstance it is your duty to find the defendant not guilty.

"Beyond a reasonable doubt" does not mean a positive certainty or beyond all possible doubt. After all, it is virtually impossible for a person to be absolutely and completely convinced of any contested fact that by its nature is not subject to mathematical proof or certainty. As a result, the law in a criminal case is that it is sufficient if the guilt of a defendant is established beyond a reasonable doubt, not beyond all possible doubt.

The defendants herein have been formally charged in an indictment. As I instructed you in the outset of this trial, an indictment is simply an accusation. It is no more than the means by which a criminal case is started. It is not evidence. It is not proof of a defendant's guilt. It creates no presumption and permits no inference that a defendant is guilty

of any of the crimes charged.  You are to give no weight to the fact that an indictment had been returned against either defendant.

Rather than read the entire indictment to you, in a moment I will summarize the charges in the indictment and then explain in detail the elements of the crimes that are charged.

Now, there are two types of evidence that you may use in reaching your verdict.  One type of evidence is direct evidence, and the other is called circumstantial evidence.  It is a general rule that the law makes no distinction between direct and circumstantial evidence.  Circumstantial evidence is of no less value than direct evidence.

One kind of direct evidence is a witness' testimony about something that he or she knows by virtue of his or her own senses -- something that the witness has seen, smelled, touched, or heard.  Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence that tends to prove one fact by proof of other facts.  You infer based upon reason, experience, and common sense from an established fact the existence or the non-existence of some other fact.  Please note, however, that circumstantial evidence is not a matter of speculation or guess.  It is a logical inference.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that

I6FQSHU6                      Charge

it rained during the night.  However, other evidence such as a turned on garden hose may explain the water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

That's all there is to circumstantial evidence.  Many facts such as a person's state of mind can rarely be proven by direct evidence.

Now, during the trial, and as I give you these instructions, you have heard and will hear the term "inference."  In their closing arguments, the attorneys have asked you to infer based on your reason, experience, and common sense from one or more established facts the existence of some other fact.  I have instructed you on circumstantial evidence and that it involves inferring a fact based on other facts, your reason and common sense.

So what is an "inference"?  What does it mean to "infer" something?  An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists based on another fact that you know exists.

There are times when different inferences may be drawn from facts, whether proven by direct or circumstantial evidence.  The government asks you to draw one set of inferences, while the defense asks you to draw another.  It is for you, and you alone, to decide what inferences you will

draw.

The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion that you, the jury, are permitted, but not required, to draw from the facts that have been established by either direct or circumstantial evidence or lack of evidence. In drawing inferences, you should exercise your common sense in light of your experience.

Some inferences, however, are impermissible. You may not infer that a defendant is guilty of participating in criminal conduct merely from the fact that he was present at the time a crime was being committed, and had knowledge that it was being committed. Nor may you use evidence that I have instructed you was admitted for a limited purpose for any inference beyond that limited purpose.

So how do you evaluate the credibility or believability of witnesses? The answer is that you use your plain common sense. Common sense is your greatest asset as a juror. You should ask yourselves, did the witness impress you as honest, open and candid? Or did the witness appear evasive or as though the witness were trying to hide something? How responsive was the witness to the questions asked on direct examination and on cross-examination? How did the way the witness testified on direct examination compare with how the witness testified on cross-examination?

If you find that a witness intentionally told a falsehood, that is always a matter of importance that you should weigh carefully. If you find that any witness has lied under oath at this trial, you should view the testimony of such witness cautiously and weigh it with great care. It is, however, for you to decide how much of the witness' testimony, if any, you wish to believe. Few people recall every detail of every event precisely the same way. A witness may be inaccurate, contradictory or even untruthful in some respects and yet entirely believable and truthful in other respects. There may be inconsistencies in the witness' testimony. It is for you to determine whether inconsistencies in the witness' testimony are significant or inconsequential, and whether to accept or reject all or to accept some and reject the balance of the testimony of any witness.

In evaluating the credibility of the witnesses, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case. Such an interest in the outcome creates a motive to testify falsely, and may sway the witness to testify in a way that advances his or her own interests. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care. This is not to

suggest that any witness who has an interest in the outcome of a case would necessarily testify falsely.  It is for you to decide to what extent, if at all, the witness' interest has affected or colored his or her testimony.

You are not required to accept any testimony, even if the testimony is uncontradicted and the witness' testimony is not challenged.  You may decide because of the witness' bearing or demeanor, or because of the inherent improbability of the testimony, or for other reasons sufficient to yourselves, that the testimony is not worthy of belief.  On the other hand, you may find, because of a witness' bearing and demeanor and based upon your consideration of all of the other evidence in the case, that the witness is truthful.

Now you've heard from witnesses who have testified that they committed crimes, including charges arising out of the same facts as this case.  I want to remind you of the instruction I gave you during the trial that you are to draw no conclusions or inferences of any kind about the guilt of either defendant from the fact that certain prosecution witnesses pled guilty to similar charges.  The decision of those witnesses to plead guilty was a personal decision those witnesses made about their own guilt.  It may not be used by you in any way as evidence against or unfavorable to either defendant on trial here.

Let me give you a few additional instructions on the

subject of what we call "cooperating witnesses."

The government frequently argues, as it may do, that it must rely on the testimony of witnesses who admit to participating in the alleged crimes at issue.  It asserts that it must take its witnesses as it finds them and frequently must use such testimony in a criminal prosecution because otherwise it would be difficult or impossible to detect and prosecute wrongdoers.  For these very reasons, the law allows the use of testimony from cooperating witnesses.  Indeed, it is the law in federal courts that the testimony of a single cooperating witness may be enough in itself for conviction, if the jury believes that the testimony establishes guilt beyond a reasonable doubt.

Cooperating witness testimony should be given such weight as it deserves in light of the facts and circumstances before you taking into account the witness' demeanor, candor, the strength and accuracy of the witness' recollection, the witness' background, any inconsistencies in a witness' testimony and the extent to which the testimony is or is not corroborated by other evidence in the case.

Because of the possible interest that a cooperator may have in testifying for the government, you should scrutinize the testimony with special care and caution.  You may consider the fact that a witness is a cooperator as bearing upon his credibility.  You may consider whether a witness, like any

I6FQSHU6                    Charge

other witness in this case, has an interest in the outcome of the case, and, if so, whether it has affected his testimony. It does not follow, however, that simply because a person has admitted to participating in one or more crimes, he is incapable of giving a truthful version of what happened.

You also heard testimony about a non-prosecution agreement between the government and one witness, Aleksandr Kutsenko. I caution you that it is of no concern of yours why the government made an agreement with a witness. The existence of such an agreement itself and its effect on the witness may be considered by you in determining credibility. Your sole concern is whether a witness has given truthful and accurate testimony here in the courtroom before you.

As with any witness, let me emphasize that the issue of credibility need not be decided in an all-or-nothing fashion. Even if you find that a witness testified falsely in one part, you may still accept his testimony in other parts or you may disregard all of it. That is a determination entirely for you, the jury.

Now, you've heard testimony of a member of law enforcement or members of law enforcement. The fact that a witness may be employed as a law enforcement official or employee of the United States Government does not mean that his or her testimony deserves more or less consideration or greater or lesser weight than that of any ordinary witness.

It is your decision after reviewing all of the evidence whether to accept or reject the testimony of a law enforcement or government employee witness as it is with every other type of witness, and to give that testimony the weight that you find it deserves.

Under our Constitution, a defendant has no obligation to testify or to present any evidence because it is the government's burden to prove a defendant guilty beyond a reasonable doubt.  The burden remains with the government throughout the entire trial and never shifts to a defendant.  A defendant is never required to prove that he is innocent.  The fact that defendant Khurtsidze presented evidence -- even if Shulaya did -- not never shifts the burden of proof away from the government.

In this case the defendants have chosen not to testify.  You must not attach any significance to the fact that either defendant did not testify.  I instruct you that no adverse inference against a defendant may be drawn by you because he did not take the witness stand, and you may not consider it in any way in your deliberations in the jury room.

Now, you have heard evidence during the trial that witnesses may have discussed the facts of the case and their testimony with lawyers before the witness appeared in court.

Although you may consider that fact when you are evaluating a witness' credibility, I instruct you that there is

I6FQSHU6                      Charge

nothing unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them.  Such consultation helps conserve your time and the Court's time.  In fact, it would be unusual for a lawyer to call a witness without such consultations.

The weight you give to the facts or the nature of the witness' preparation for his or her testimony and what inferences you draw from such preparation are completely matters within your discretion.

Now, you heard testimony from what we call expert witnesses.  Such a witness is permitted to express his or her opinions on matters about which he or she has specialized knowledge or training.  The parties present expert testimony to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing an expert's testimony, you may consider the expert's qualifications, his or her opinion, and his or her reasons for testifying, as well as all the other considerations that ordinarily apply, including all the other evidence in the case.  You may give expert testimony whatever weight, if any, that you find that it deserves in light of all the evidence in

I6FQSHU6                    Charge

the case.  However, you should not accept witness testimony simply because the witness is a expert, nor should you substitute such testimony for your own reason, judgment, and common sense.  The determination of the facts in this case rests solely with you.

Now, you may not draw any inference, favorable or unfavorable, towards the government or the defendant, either defendant, from the fact that certain persons are not named in the indictment or on trial here.

Whether a person should be named as a co-conspirator or indicted as a defendant is a matter within the sole discretion of the United States Attorney and the grand jury. You may not consider these issues in any way in reaching your verdict as to the defendants here on trial.

You have heard names and references to people during the course of the trial who did not appear here to testify.  I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses.  Therefore, you should not draw any inference or reach any conclusion as to what these persons would have testified to had they been called.  Their absence should not affect your judgment in any way.

Similarly, you heard references to audio recordings or portions of audio recordings that were not presented as exhibits or as English language translated transcriptions.  I

instruct you that each party had an equal opportunity, or lack of opportunity, to introduce any of these materials.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. As I previously instructed you, the government bears the burden of proof; the defendants do not bear the burden of proof.

You have heard reference through the questioning to the fact that certain investigative techniques were used and were not used by the government. There is no legal requirement, however, that the government prove its case through any particular means. While you are to carefully consider the evidence adduced by the government, or the lack of evidence, you are not to speculate why the government used the techniques that it did or why it did not use other techniques. Your concern is whether or not on the evidence, or lack of evidence, the government has proven a defendant's guilt beyond a reasonable doubt.

You have heard evidence in this case that the government's investigation involved the use of an undercover agent and an informant who participated in the investigation of the alleged offenses.

I instruct you that this type of undercover investigation is a legal law enforcement investigative

technique.  Whether you approve or disapprove of these sorts of investigations should not enter your deliberations.  You must, therefore, regardless of your personal opinions, give this evidence full consideration, along with all of the other evidence, or lack of evidence, in the case in determining whether the government has proven each defendant's guilt beyond a reasonable doubt.

Of course, as with all witnesses, it is up to you to determine the credibility of any such witness.  It is therefore your decision, after reviewing all the evidence, whether to accept or reject the testimony of the law enforcement or government employee witness, as it is with every other type of witness, and to give that testimony the weight that you find it deserves.

You have heard testimony about evidence seized in connection with certain searches conducted by law enforcement officers.  Evidence obtained from these searches was properly admitted in this case and may be properly considered by you. Such searches were entirely appropriate law enforcement actions.

Whether you approve or disapprove of how the evidence was obtained should not enter into your deliberations because I instruct you that the government's use of the evidence is entirely lawful.

You must, therefore, regardless of your personal

opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proven the defendant's guilt beyond a reasonable doubt.

Defendant Khurtsidze has called a witness who testified to his good reputation in the community and character.  This testimony is not to be taken by you as the witness' opinion as to whether Mr. Khurtsidze is guilty or not guilty.  That question is for you alone to determine.  You should, however, consider this character evidence together with all the other facts and all of the other evidence in the case in determining whether the defendant is guilty or not guilty of the charges.

Such character evidence alone may indicate to you that it is improbable that a person of good reputation would commit the offense charged.  In fact, character evidence, when considered with all the other evidence in the case, may create a reasonable doubt.  Accordingly, if, after considering the question of the defendant's good reputation, you find that a reasonable doubt has been created, you must acquit him of all the charges.

On the other hand, if, after considering all of the evidence, including that of the defendant's reputation, you are satisfied beyond a reasonable doubt that the defendant is guilty, you should not acquit the defendant merely because you

believe he is a person of good reputation.

You've heard tape recordings of telephone conversations. There is nothing illegal about the government's use of recordings in this case, and you may consider the conversations contained on the tape recordings along with all the other evidence in the case. Whether you approve or disapprove of the interception and recording of these conversations may not enter your deliberations.

You must, therefore, regardless of any personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proven beyond a reasonable doubt the guilt of a defendant.

During the trial the government introduced into evidence recordings in Russian and Georgian, as well as English language translations of those recordings. The transcripts of the recordings were also admitted into evidence.

Although some of you may know Russian or Georgian, it is important that all jurors consider the same evidence. Therefore, you must accept the English translation contained in the transcript and disregard any different meaning.

Some of the exhibits admitted into evidence include redactions of certain information. "Redacted" means that part of the document or audio recording was taken out. There is nothing unusual or improper about such redactions. You are to

concern yourself only with the part of the item that has been admitted into evidence.  You should not consider any possible reason why the other part of it had been deleted.

Proof of motive is not a necessary element of any of the crimes with which the defendants are here charged.  Proof of motive does not establish guilt, nor does the lack of proof of motive establish that a defendant is not guilty.  If the guilt of a defendant is shown beyond a reasonable doubt, it is immaterial what a defendant's motive for the crime or crimes may be, or whether a defendant's motive was shown at all.  The presence or absence of motive is, however, a circumstance which you may consider as bearing on the intent of a defendant.

Now, you have heard some evidence in the form of what are called "stipulations."  A stipulation of fact is an agreement among the parties that a certain fact is true.  You should regard such agreed fact as true.

A stipulation of testimony is an agreement among the parties, that, if called, a witness would give certain testimony.  You must accept as true the fact that the witness would have given the testimony.  However, it is for you to determine the effect or weight to give that testimony.

The government has offered evidence tending to show that on different occasions each defendant engaged in criminal conduct that is not charged in this case.  Let me remind you that the defendants are not on trial for committing acts that

are not charged in the indictment.  Accordingly, you may not consider this evidence as proof that a defendant has a criminal personality or bad character.  The evidence of the uncharged acts was admitted for much more limited purposes, and you may consider it only for those limited purposes.

Evidence of uncharged acts was offered to show the relationship between the witness and defendant, as well as intent, knowledge and lack of mistake.  Evidence of similar acts may not be considered by you or for any other purpose. Specifically, you may not use this evidence to conclude that because a defendant committed other acts, he must also have committed the act charged in the indictment.

You may not infer that any defendant was guilty of participating in criminal conduct merely from the fact that he associated with other people who were guilty of wrongdoing.

Now, for those of you who took notes during the course of the trial, you should not show or discuss your notes with any other juror during deliberations.  Any notes you have taken are to assist you and you alone.  The fact that a particular juror has taken notes entitles that juror's views notes to no greater weight than those of any other juror.

Finally, your notes are not to substitute for your recollection of the evidence in this case.  If you have any doubt as to any testimony, you may request that the official trial transcript that has been made of these proceedings be

read or otherwise provided to you.

The charges in the indictment are alleged to have occurred on various dates.  It is not necessary, however, for the government to prove that the alleged crimes were committed on exactly the dates set forth in the indictment.  The law requires only a substantial similarity between the dates and months alleged in the indictment and the dates and months established by the evidence.

Now, the defendants, Razhden Shulaya and Avtandil Khurtsidze, are charged in an indictment that contains five charges or counts.  Both defendants are charged in Count One and Count Five.  Defendant Shulaya alone is charged in Counts Two, Three and Four.  Each count charges a separate crime. Although there are certain elements in common to different counts, each defendant and each count must be considered separately.  You must return a separate verdict as to each count, and your verdict must be unanimous as to each count.

Count One charges that both defendants conspired together and/or with others to violate the racketeering laws of the United States, from at least in or about 2014, up to and including on or about June 6, 2017.

Count Two charges that Shulaya conspired with others to violate the federal law prohibiting the interstate transportation of stolen property, from at least in or about 2014, up to and including May 2017.

Count Three charges that Shulaya conspired with others to violate the federal law prohibiting the possession, receipt, or sale of stolen property that moved across state lines, from at least in or about 2014, up to and including in or about May 2017.

Count Four charges that Shulaya conspired with others to commit fraud in connection with identity documents, from at least in or about January 2017, up to and including May 2017.

And Count Five charges that both defendants conspired together and/or with others to commit wire fraud, from in or about September 2016, up to and including in or about May 2017.

Let's start our discussion with an overview of what constitutes a conspiracy. A conspiracy is a kind of criminal partnership -- a combination or agreement of two or more persons to join together to accomplish some unlawful purpose. In a moment, I will instruct you on how to decide whether a conspiracy exists, whether either defendant joined it, and how to decide what, if any, unlawful purpose (which I'm going to call "object") the conspiracy sought to achieve. Before we get there, I want to make sure you understand a few general concepts.

A conspiracy to violate a federal law -- that is, a conspiracy to accomplish some unlawful purpose or object deemed unlawful under federal law -- is itself a criminal offense. It does not matter if the conspiracy succeeds. A conspiracy is a

separate and distinct crime from the actual violation of any specific federal laws, which the law refers to as "substantive crimes."

We will discuss the elements of a conspiracy in a moment. But before doing so, it is important to consider the time period -- that is, "when" -- the charged conspiracies are alleged to have occurred:

The indictment asserts that the conspiracy charged in Count One existed from at least in or about 2014, up through and including on or about June 6, 2017.

The indictment asserts that the conspiracies charged in Counts Two and Three existed from at least in or about 2014, up through and including in or about May 2017.

The indictment asserts that the conspiracy charged in Count Four existed from at least in or about January 2017, up to and including in or about May 2017.

The indictment asserts that the conspiracy charged in Count Five existed from at least in or about September 2016, up to and including in or about May 2017.

I instruct you that it is not required that the government prove that a conspiracy started or ended within a specific time period alleged. It is sufficient for you to find that the charged conspiracy was formed at some point, and that it existed for some time within the period set forth in the indictment, whether or not it continued beyond that period.

Now, how do you determine whether a conspiracy existed?  Simply defined, a conspiracy is an agreement by two or more persons to violate the law.  Now, a conspiracy has sometimes been called a partnership for criminal purposes in which each partner becomes the agent of every other partner.

To establish the existence of a conspiracy, however, the government is not required to show that two or more people sat around a table and entered into a formal contract.  Indeed, it would be extraordinary if there was such a formal document or specific agreement.  From its very nature, a conspiracy is almost always characterized by secrecy and concealment.  It is sufficient if two or more persons in any manner, whether they say so directly or not, come to a common understanding to violate the law.  Express language or specific words are not required to indicate agreement to or membership in a conspiracy.

It is not necessary that a conspiracy actually succeed in its purpose for you to conclude that it existed.  If a conspiracy exists, even if it should fail in its purpose, it is still a crime.  In determining whether there has been an unlawful agreement, you may judge the acts and conduct of the alleged members of the conspiracy that are done to carry out an apparent criminal purpose.  The saying "actions speak louder than words" is applicable here.  Often, the only evidence that is available with respect to the existence of a conspiracy is

that of what may initially appear to be disconnected acts on the part of the alleged individual co-conspirators. Different conspirators may undertake different acts at different times.

So, you must first determine whether or not the proof established beyond a reasonable doubt the existence of the charged conspiracy. In considering this first element, you should consider all the evidence that has been admitted with respect to the conduct and statements of each alleged co-conspirator, or any lack of evidence, and any inferences that may reasonably be drawn from that conduct and those statements. If, upon consideration of all the evidence, direct and circumstantial, you find beyond a reasonable doubt that the minds of two or more of the co-conspirators met (we sometimes call this "a meeting of the minds) -- that is, that they agreed, as I have explained a conspiratorial agreement to you, to work together. Let me do that sentence again.

If, upon consideration of all the evidence, direct and circumstantial, you find beyond a reasonable doubt that the minds of two or more of the conspirators met (we sometimes call this "a meeting of the minds") -- that is, that they agreed, as I have explained a conspiratorial agreement to you, to work together in furtherance of the unlawful scheme alleged in the indictment -- then proof of the existence of a conspiracy is established.

For each conspiracy count if you find that the

conspiracy existed, you must then determine whether the defendant you are considering intentionally and knowingly became a member of that conspiracy.

This element has two pieces:  First, a determination as to whether that defendant joined the conspiracy; and, second, whether he did so knowingly and willfully.  Together this requires a determination as to whether the defendant agreed to participate in the conspiracy knowing its unlawful purpose and with the specific intention of furthering its objective.  "Unlawful" simply means contrary to law; that is, something which the law forbids.

Knowledge is a matter of inference from facts proved. A person acts "intentionally" and "knowingly" if he acts purposefully and deliberately and not because of mistake or accident, mere negligence or other innocent reason.  That is, the acts must be the product of the defendant's conscious objective.

If you find that the defendant -- strike that.

If you find that the government -- the government always bears the burden of proof.  If you find the government has proven beyond a reasonable doubt that a conspiracy existed (that is, the element we discussed a few moments ago) and that the defendant knowingly and willfully joined it, the extent of the defendant's participation has no bearing on whether or not he is guilty.  It does not matter whether the defendant's role

in the conspiracy may have been more limited in duration or limited and different in nature from the roles of other co-conspirators.  Each member of the conspiracy may perform separate and distinct acts and may perform them at different times.  Some co-conspirators may play major roles while others play minor roles in the scheme.  An equal role is not what the law requires.  In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.  All that matters is that he will knowingly and willfully participated in the conspiracy, aware of its illegal objectives, and intending to further those objectives.

I want to caution you, however, that a defendant's mere presence at the scene of an alleged crime does not by itself make him a member of the conspiracy.  Similarly, mere association with one or more members of the conspiracy, even coupled with knowledge that such other person is acting unlawfully, does not automatically make the defendant a member of a conspiracy.  Knowledge without agreement is insufficient. A person may know or be friends with a criminal without being a criminal himself.  Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish proof that a defendant joined a conspiracy.

Now, although mere association with co-conspirators is not enough, it is a fact that you may consider, among others,

to determine whether a defendant was a member of a conspiracy.
A defendant's association may establish his membership in a
conspiracy if all of the circumstances considered together show
that his association was shown to meant to advance the goal of
the conspiracy.  The government must not prove only that a
defendant may have associated with one or more members of a
conspiracy, but also that he knew about the conspiracy, and he
must have intended by his association to participate in the
conspiracy or to help it succeed.  In other words, association
itself may demonstrate membership in a conspiracy only if that
association is a functional part of a conspiracy.

I also want to caution you that mere knowledge or
acquiescence without participation in the unlawful plan is not
sufficient.  Moreover, merely taking acts that happen to
further the purposes or objects of the conspiracy without
knowledge or intent is not sufficient to make someone a member
of a conspiracy.  More is required under the law.  To meet its
burden of proof, the government must establish that the
defendant you are considering participated with knowledge of at
least some of the purposes or objectives of the conspiracy and
with the intention of aiding in the accomplishment of those
unlawful ends.

Once a person joins a conspiracy, that person remains
a member unless and until he withdraws from it completely.  In
order to withdraw from the conspiracy, a conspirator must show

that he took some affirmative act to disavow or defeat the purpose of the conspiracy.  He can do so either by informing law enforcement of the criminal activities of the conspiracy or by communicating his abandonment of the conspiracy in a manner reasonably calculated to reach co-conspirators.  Merely ceasing to play a part in the conspiracy is not sufficient by itself to establish withdrawal from the conspiracy.  Moreover, if after attempting to initially withdraw, a conspirator takes any consequent acts to promote the conspiracy or receives any additional benefits from the conspiracy, he cannot be considered to have withdrawn from the conspiracy.  A defendant has the burden of proving that he withdrew from the conspiracy by a preponderance of the evidence.  To prove something by a preponderance of the evidence means to prove that it is more likely true than not true.

If you find that a defendant at some point withdrew from the conspiracy, he is not responsible for the acts of his co-conspirators following his withdrawal.  However, such defendant still would have been part of the conspiracy until the point of withdrawal.  In other words, even if you conclude that a defendant withdrew from the conspiracy at a particular time, you may find him responsible for the actions of the conspiracy up until that time.

Further, I instruct you that a person acting as a government agent -- here there were two confidential sources --

I6FQSHU6                    Charge

cannot be a co-conspirator because he cannot truly agree to conspire.  However, the presence of a government agent does not destroy a conspiracy in which at least two other private individuals have agreed to engage in an unlawful venture.

I now want to talk with you about liability for acts and statements of co-conspirators.

Under the law, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.  Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed under the law to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements, and omissions.

If you find beyond a reasonable doubt that a defendant was a member of a conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy, may be considered against the defendant.  This is so even if such acts were done and statements were made in the defendant's absence and without his knowledge.

However, before you may consider those statements or acts of a co-conspirator in deciding the issue of each defendant's guilt, you must first determine that the acts and

statements were made during the existence and in furtherance of the unlawful scheme.  If the acts were done or the statements made by someone whom you do not find to have been a member of the charged conspiracy, or if they were not done or said in furtherance of the conspiracy, they may not be considered by you as evidence against a defendant.

Now, Count One of the indictment charges both defendants with participating in a conspiracy to violate the substantive RICO statute from in or about 2014 to on or about June 6, 2017.

In order to meet its burden of proving that either defendant is guilty of the racketeering conspiracy charged in Count One of the indictment, the government must establish beyond a reasonable doubt each of the following elements as to each defendant:

First, that at or about the time charged in Count One of the indictment, the conspiracy charged in the indictment existed; that is, that an agreement or understanding between two or more persons existed to conduct or participate in the conduct of a racketeering enterprise through a pattern of racketeering activity.

Second, that the racketeering enterprise or its activities would have affected, or in fact affected, interstate or foreign commerce.

Third, that the defendant knowingly and intentionally

joined the conspiracy.

Fourth, that the defendant knowingly and intentionally agreed with at least one other person that either he or a co-conspirator would participate, either directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as described in the indictment.  That is, that either the defendant or a co-conspirator did or would commit at least two acts of racketeering activity.

The first element the government must prove beyond a reasonable doubt is the existence of the conspiracy alleged in the indictment; that is, the agreement to conduct or participate in the conduct of a racketeering enterprise.  Under the racketeering statute, an enterprise includes any legal entity such as a partnership, corporation or association or a group of individuals who are associated in fact although not a legal entity.  The enterprise does not have to have a particular name, or for that matter, have any name at all, nor must it be registered or licensed as an enterprise.  It does not have to be a commonly recognized legal entity, such as a corporation, a trade union, a partnership or the like.

An enterprise may be a group of people informally associated together for a common purpose of engaging in a course of conduct.  This group may be organized for a legitimate and lawful purpose, or it may be organized for an

unlawful purpose.  In addition to having a common purpose, this group of people must have a core of personnel who function as a continuing unit.  Furthermore, the enterprise must continue to exist in substantially similar form through the period charged.  This does not mean that the membership must remain exactly identical, but the enterprise must have a recognizable core that continues through a substantial period during the time frame charged in the indictment.  The group must also have an ongoing organization or structure, formal or informal, to carry out its objectives.

Here, the indictment defines the charged RICO conspiracy in Count One as an agreement to participate in the conduct of the Shulaya enterprise.  This name is simply a form of reference adopted for the purpose of the indictment to describe the group of individuals who participated in the alleged racketeering conspiracy.

If the government proves beyond a reasonable doubt that there was an agreement to conduct or participate in the conduct of a group of people characterized by a common purpose or purposes, an ongoing formal or informal organization or structure, and core personnel who would function as a continuing unit during a substantial period within the time frame charged in the indictment, then an enterprise existed.

The second element the government must prove beyond a reasonable doubt with respect to Count One is that the

enterprise itself, or the racketeering activities of those associated with it, would have had or did have some effect on interstate or foreign commerce.  This effect on interstate commerce could have occurred in any way, and it need only have been minimal.

Interstate commerce includes the movement of goods, services, money and individuals between states.  You need not find a substantial effect on interstate commerce, nor is it necessary for you to find that the defendant knew the enterprise was engaged in interstate commerce, or that the effect on interstate commerce was or would have been adverse to commerce.

All that is necessary is that the activities of the enterprise affected or would not have affected interstate or foreign commerce in some minimal way.  It is sufficient, for example, that in the course of the racketeering activities, members of the enterprise used materials that had traveled in interstate commerce, or paid a foreign commercial website to host their gambling operations.

Finally,  the commerce affected or potentially affected need not be lawful.  Activities affecting or potentially affecting unlawful interstate commerce such as illegal gambling and the transmission of wagering information fall within the purview of the statute.

The third element the government must prove is that at

some time during the period charged in the indictment a defendant was a member of the charged conspiracy. It is not required that the government prove that a defendant was a member of the conspiracy for the entire time that the conspiracy existed. The government must also prove that a defendant's association with the enterprise was knowing; that is, made with knowledge of the existence of the criminal enterprise through a general awareness of its nature and scope.

Are you guys doing OK? All right. Because Joe is not here any more so you have to signal to me.

The government need not prove that a defendant agree with every other member of the enterprise, knew all the other members of the enterprise, or had full knowledge of all of the details of the enterprise. Let me do that again.

The government need not prove that a defendant agree with every other member of the enterprise, knew all the other members of the enterprise or had full knowledge of all of the details of the enterprise. However, in proving this element, the government must prove beyond a reasonable doubt that a defendant was connected to the enterprise in some meaningful way, and that he knew the general nature of the enterprise and knew that the enterprise existed beyond his individual role. If you find the government has proven this element beyond a reasonable doubt, then the third element is satisfied.

The fourth element the government must prove beyond a

reasonable doubt is that each defendant knowingly conspired or agreed to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. That is, the government must prove that each defendant agreed to participate in the enterprise with the intent that a member or members of the conspiracy would commit two or more acts of racketeering of the types specified in the indictment as part of a pattern of racketeering activity. The defendant himself need not agree that he personally would commit a racketeering act. You must be unanimous as to the type of racketeering act that the defendant intended someone would commit. You will recall that as this is a conspiracy charge, no specific acts need actually have been committed.

In a moment I will give you instructions regarding what it means to have a pattern of racketeering activity and the elements of each of the different types of racketeering offenses charged in the indictment. As I have told you, it is not necessary that a conspiracy actually succeed in its purpose for you to conclude that it existed. Therefore, to prove that a defendant is guilty of the crime charged in Count One, the government is not required to prove that the conspiracy achieved its objective. Because the agreement to commit a racketeering offense is the essence of a racketeering conspiracy offense, the government need only prove that if the conspiracy achieved its objective as contemplated, the

enterprise would be established, that its members would participate in conducting the affairs of the enterprise through a pattern of racketeering activity, and that those activities would affect interstate or foreign commerce.  Of course, proof that the object of the conspiracy was accomplished, if you find it was, may be the most persuasive evidence of the existence of the conspiracy.

A pattern of racketeering activity requires at least two acts of racketeering, the last of which occurred within ten years, excluding any period of imprisonment after the commission of a prior act of racketeering.  The acts required for forming a pattern of racketeering may not be isolated or disconnected but must be related to each other by a common scheme, plan or motive.  Thus, to establish an agreement that the enterprise would engaged in a pattern of racketeering activity, as alleged in Count One of the indictment, the government must prove three elements beyond a reasonable doubt.

First, let's talk about the requirement of two or more acts.  This requires that a defendant agree that a conspirator, which conclude the defendant himself, would intentionally commit, or cause, or aid and abet the commission of, two or more of the racketeering acts of the types alleged in the indictment.  At the end of this instruction, I will instruct you on the elements regarding each of the charged categories of racketeering activity.

Second, let's talk about the nexus or relatedness requirement. This requires that the racketeering actus have a nexus to the enterprise and the racketeering acts are related to one another. A racketeering act has a nexus to the enterprise if it has a meaningful connection to the enterprise. To be related, the racketeering act must have the same or similar purposes, results, participants, victim or methods of commission or be otherwise interrelated by distinguishing characteristics and not be merely isolated events. They must also amount to, or pose a threat of, continued criminal activity. Two racketeering acts may be related even though they are dissimilar or not directly related to each other, provided that the racketeering acts are related to the same enterprise.

For both nexus and relatedness purposes, the requisite relationship between the RICO enterprise and a predicate racketeering act may be established by evidence that a defendant was enabled to commit the racketeering act solely by virtue of his position in the enterprise or involvement in or control over its affairs, or by evidence that a defendant's position in the enterprise facilitated his commission of the racketeering act, or by evidence that the racketeering act benefited the enterprise, or by evidence that the racketeering act was authorized by the enterprise, or by evidence the racketeering act promoted or furthered the enterprise.

Third, let's talk about what we call the "continuity requirement."  To establish a pattern of racketeering activity, the government must prove that the racketeering acts themselves either extended over a substantial period of time or that they posed or would pose a threat of continuing criminal activity. The government need not prove such a threat of continuity by any mathematical formula or by any particular method of proof, but rather may prove it in a variety of ways.  For example, the threat of continued unlawful activity may be established when the evidence shows that the racketeering acts are part of a long-term association that exists for criminal purposes, or when the racketeering acts are shown to be the regular way of conducting the affairs of an enterprise.  Moreover, in determining whether government has proven the threat of continued unlawful activity, you are not limited to consideration of the specific racketeering acts that either of the defendants themselves are alleged to have committed; rather, in addition to considering such acts, you may also consider the nature of the enterprise and other unlawful activities of the enterprise and its members viewed in their entirety, including both charged and uncharged unlawful activities.

Although you need not decide whether a defendant agreed to the commission of any particular racketeering act in order to convict the defendant of the RICO conspiracy offense,

you must be unanimous as to which type or types of predicate racketeering activity a defendant agreed would be committed; for example, acts of extortion or attempted extortion, the conducting of an illegal gambling operation, the distribution of controlled substances, a scheme to commit wire fraud, or any combination thereof.

To meet its burden of proof under Count One, the government must establish that the defendant are you considering intended to further an endeavor which, if completed, would have satisfied all of the elements of a substantive racketeering offense. The government is not required to prove that either defendant personally committed or agreed to commit any act of racketeering, nor is it required to prove that any act of racketeering actually occurred. Rather, the government must prove that the defendant you are considering agreed to participate in the enterprise with the knowledge and intent that at least one member of the racketeering conspiracy, which could be the defendant himself, would commit at least two racketeering acts in the conduct of the affairs of the enterprise and those acts would constitute a pattern of racketeering activity as defined above.

An enterprise is not the same thing as a pattern of racketeering activity. To convict, the government must prove that if the conspiracy achieved its objective, there would be an enterprise and that the enterprise's affairs would be

conducted through a pattern of racketeering activity.  The enterprise in this case is alleged to be a group of individuals who associated together for the common purpose of engaging in a course of conduct.

The existence of the enterprise is proven by evidence of an ongoing organization, formal or informal, with a common purpose and by evidence that various core personnel of the group functioned as a continuing unit.

The proof used to establish a pattern of racketeering in a racketeering enterprise may be the same or overlapping. For example, if you find that an ongoing enterprise existed, the existence of this enterprise may help establish that the separate racketeering acts were part of a pattern of continuing criminal activity.  Nevertheless, you should bear in mind that proof of an enterprise does not necessarily establish proof of a pattern of racketeering activity, and vice versa.

For purposes of Count One, the indictment alleges that the following categories of criminal violations were committed or were intended to be committed as part of the RICO conspiracy; that is, they are the racketeering acts.

Acts and threats involving extortion in violation of New York State Penal Law;

Acts involving robbery in violation of New Jersey Code of Criminal Justice, certain sections that follow;

Acts indictable under Title 18, United States Code,

I6FQSHU6                    Charge

Section 1951 (relating to extortion);

Acts involving gambling, in violation of New York State Penal Law;

Acts indictable under Title 18, United States Code, Section 1955, (relating to the prohibition of illegal gambling businesses);

Acts indictable under Title 18, United States Code, Section 1343 for wire fraud;

Acts indictable under Title 18, United States Code, Section 2314, related to the interstate transportation of stolen property;

Acts indictable under Title 18, United States Code, Section 2315, relating to interstate receipt and possession of stolen property;

Acts indictable under Title 18, United States Code, Section 2342, relating to shipping, transporting, receiving, possessing, selling, distributing and purchasing contraband cigarettes;

Acts indictable under Title 18, United States Code, Section 1028, fraud and related activity in connection with identification documents;

Acts indictable under Title 18, United States Code, Section 1029, acts of device fraud;

And offenses involving the felonious trafficking of controlled substances in violation of Title 21, United States

I6FQSHU6                    Charge

Code, Sections 841, 843 and 846, relating to narcotics trafficking and use of wire facilities to further narcotics trafficking.

In a moment, I will instruct you on the substantive law of each of these offenses.  Again, the government must prove that within a ten-year period, excluding any period of incarceration, two acts and offenses in violation of any of these statutes were committed, or were intended to be committed, by any one or more of the defendants, or by a co-conspirator, as part of the charged RICO conspiracy.

You will also note that, for each of the charged categories of predicate offenses, the indictment charged the violation of more than one specific law.  I instruct you that in order to find that a given predicate offense was in fact an object of the charged RICO conspiracy, you need not find that the object of the conspiracy involved violations of both federal and state statutes or multiple state statutes.  Rather, you need only find that the object of the conspiracy involved the violation of at least one of the specified statutes.

Let's take a five minute break.  Get up walk around. Come back in five minutes.  We will come back and finish up. Thanks, folks.

(Recess)

THE COURT:  We will end at 5:00 today.  We will see how close we get.  It will be very close to finishing, but I

will take it step by step.

We are on page 66.

One of the categories of criminal violations alleged to have been intended or committed were acts involving conspiracy to commit extortion, attempted extortion and extortion in violation of New York State law.

To find that a person committed extortion under New York State law, the government must prove beyond a reasonable doubt that:

First, the individual took, obtained, or withheld property;

Second, that the individual obtained or withheld property from a person, and that the person was an owner thereof;

Third, that the individual obtained or withheld such property from the owner wrongfully;

Fourth, that the individual was aware that such taking obtaining, or withholding was wrongful;

Fifth, that the individual took, obtained, or withheld such property with intent to deprive another of such property or appropriate the same to himself or to a third person; and

Sixth, that the individual obtained such property by compelling or inducing such person to deliver such property to himself or to a third person by means of instilling a fear that, if such property was not so delivered, the actor or

another would cause physical injury to some person or damage to property in the future.

In relevant part, under New York Penal Law Section 105.10, a person has committed a crime "when, with intent that conduct constituting extortion be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct."

To prove that an individual violated this statute, the government must prove each of the following three elements beyond a reasonable doubt:

First, that the individual agreed with one or more persons to engage in or cause the performance of conduct constituting extortion;

Second, that the individual did so with the intent that such conduct be performed; and

Third, that the individual, or one or more persons with whom he had agreed to engage in or cause the performance of such conduct committed at least one alleged overt act in furtherance of the conspiracy.

"Intent" means conscious objective or purpose. Thus, a person acts with the intent that conduct constituting extortion be performed when his or her conscious objective or purpose is that such conduct be performed.

For this crime, the government must also prove that one of the conspirators committed an overt act in furtherance

of the conspiracy.  The agreement to engage in or cause the performance of a crime is not itself an overt act.  The overt act must be an independent act that tends to carry out the conspiracy.  The overt act can be, but need not be, the commission of the crime that was the object of the conspiracy.

In relevant part, under New York Penal Law Section 110.00, a person has committed a crime when "with intent to commit a crime, he engages in conduct which tends to affect the commission of such crime."

To prove that an individual violated this statute, the government must prove each of the following two elements beyond a reasonable doubt:

First, that the individual intended to commit the crime of extortion; and

Second, that the individual engaged in conduct which tended to affect the commission of that crime.

Intent has the same definition that I've already described to you.  Conduct which "tends to effect" the commission of a crime means conduct which comes dangerously close or very near to the completion of the intended crime.

If a person intends to commit a crime and engages in conduct that carries his or her purpose forward within dangerous proximity to the completion of the intended crime, he or she is guilty of an attempt to commit that crime.  It does not matter that the intended crime was not actually completed.

The person's conduct must be directed towards the accomplishment of the intended crime. It must go beyond planning and mere preparation, but it need not be the last act necessary to affect the actual commission of the intended crime. Rather, the conduct involved must go far enough that it comes dangerously close or very near to the completion of the intended crime.

The indictment also alleged that one of the categories of criminal violations that were committed or intended to be committed as part of the RICO conspiracy were acts involving extortion in violation of Title 18, U.S. Code, Section 1951. Title 18 U.S. Code, Section 1951, also known as the Hobbs Act, provides in relevant part that:

Whoever in any way or degree obstructs, delays or affects commerce or the movement of an article or commodity in commerce, by ... extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of the section is guilty of a crime.

The elements of a substantive crime of extortion are:

First, that an individual or a co-conspirator of the individual wrongfully obtained the property of another or attempted to do so;

Second, that the property was taken with the other person's consent but that the consent was compelled by the

wrongful use of actual or threatened force, violence or fear of injury;

Third, that as the result of the individual's actions, interstate commerce or an item moving in interstate commerce was delayed, obstructed or affected in any way or degree or would have been delayed, obstructed or affected in any way or degree if the defendant had successfully and fully completed his actions.

Now, let me explain these three elements in more detail.

The first element is that the person knowingly took or obtained, or attempted to take or obtain, the personal property of another or from the presence of another. The term "property" includes money, as well as tangible and intangible things and items of value.

The government must also show that the property was obtained or taken with the person's consent, but that the consent was compelled by the wrongful use of force, violence or fear of injury or economic harm, either immediately or in the future.

It is not necessary that force, violence and fear all were used or threatened. It is enough if any of them were used or threatened.

Now, let me turn for a moment to the concept of threat. Threats need not be direct. They may be veiled

threats made by suggestion, implication or inference, though such inference on the part of the person extorted must be reasonable. Whether an implied or veiled reference amounts to a threat is a matter for you to decide under all the circumstances.

In considering whether force, violence or fear was used or threatened, you should give those words their common and ordinary meaning and understand them as you normally would in conversation. The threatened violence does not have to be directed at the person whose property was taken. The use of a threat of force or violence might be aimed at a third person, or at causing economic rather than physical harm. A threat may be made verbally or by a physical gesture, or a threat may be veiled or implied. Whether a statement or physical gesture actually was a threat depends upon all the circumstances.

Fear exists if at least one victim experiences anxiety, concern, or worry over expected personal harm or loss or financial security. The existence of fear must be determined by the facts that existed at the time the property was taken. Your decision whether fear or injury has been used or threatened involves a decision about people's state of mind at the time the property was taken. It is obviously impossible to ascertain or prove directly what a person actually felt. You cannot look into a person's mind to see what his state of mind actually was, but a careful consideration of the

circumstances and the evidence should enable you to decide whether fear reasonably would have been the person's state of mind.

Fear of physical economic injury or personal harm may be found to be reasonable if, considering the demand for money, the person who would have made the demand, and the nature of the conduct, a reasonable person would get the message clearly. There need not be an explicit demand for money.  The demand may have been implicit in the defendant's conduct or other statements.

Looking at the situation and the actions of people involved may help you to determine what their state of mind was.  You can consider this kind of evidence in deciding whether property was obtained or sought through the use or threats of fear.

You have also heard testimony of a witness describing his state of mind; that is, how he felt at the time that he was asked to give up his property.  You should consider that testimony in deciding whether the property was obtained or south through the use of fear.  It is not necessary that the fear be a consequence of a direct threat.  It is sufficient that the surrounding circumstances render the person's fear reasonable.  You must find that a reasonable person would have been fearful in the circumstances.

If you decide that force or violence was used or

threatened to obtain the property, then it was wrongful.  You do not have to consider whether the person who took or tried to take the property believed that it was rightfully his.  Using force or violence or threats of force or violence to obtain property is wrong.  The extortion statute charged here is meant to punish any effort to obtain property by inherently wrongful means, such as force or threats of force or criminal prosecution, regardless of the defendant's claim or of right to the property.

As to the third element, I have already instructed you on what it means to affect interstate or foreign commerce, and you should follow my previous instructions as to this element.

The indictment also charges that one of the categories of criminal violations that were committed or intended to be committed as part of the RICO conspiracy was the operation of an illegal gambling business in violation of Title 18, U.S.C, section 1955.  That section provides:

That whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business has committed a crime.

An illegal gambling business is defined as a gambling business which is a violation of the law of the state in which it is conduct, involves five or more persons who conduct, finance, manage, supervise, direct, or own or all or part of such business; and has been or remains in substantially

continuous operation for a period in excess of 30 days or has a

gross revenue of $2,000 in any single day.

To prove an individual committed this offense, the

government must prove each of the following elements beyond a

reasonable doubt:

First, that the gambling business violated the laws of

the state in which it is conducted.  I will instruct you on the

state gambling laws of New York in a moment;

Second, that the gambling business was in

substantially continuous operation for a period of 30 days or

had a gross revenue of $2,000 in a single day.  The government

is not required to prove that the gambling business operated on

an everyday basis throughout the entire period.  Instead, the

government must prove that over some period in excess of 30

days, the gambling business was conducted with sufficient

regularity that it existed as an ongoing business rather than

as a casual non-business activity; and

Third, that five or more persons, including the

individual or one of his co-conspirators, knowingly conducted,

financed, managed, supervised, directed, or owned the gambling

business.  To conduct a gambling business means to perform any

act, function or duty that is necessary or helpful in the

regular operation of the business.  You may find that a person

conducted the gambling business even though he was a low-level

employee having no part in the management or control of the

business and no share in the profits.

Five or more people, including the individual or one of his co-conspirators, must have participated during the period you found that the gambling business was in substantially continuous operation. The government does not have to prove that all five were engaged at any particular time in conducting the business, as long as it proves that all five participated in the business during the period you identified.

The government does not have to prove that the individual or one of his co-conspirators knew that the gambling business was illegal.

As to the first element of this racketeering predicate, the government must establish that the gambling business violated the laws of the state in which it was conducted.

Under New York Penal Law Section 225.05, "A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity." Under New York Penal Law Section 225.00, gambling occurs "when a person stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." A "contest of chance" is any contest, game, gaming scheme, or gaming device in which the outcome depends in a

I6FQSHU6                        Charge

material degree on chance, even if the skill of the player is also a factor in the outcome. "Something of value" means money or property, something exchangeable for money or property or a credit good for property money or the extension of a service, entertainment or the privilege of playing a game.

In other words, New York law prohibits two types of; activities: The first type of prohibited behavior is advancing gambling activity, which is a violation of New York Penal Law Section 225.05. A person "advances" gambling activity when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity. Such conduct includes, but is not limited to, conduct directed toward the creation or establishment of a particular game, contest, scheme device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefore, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any of the other phases of its operations.

The second type of behavior prohibited by New York law is profiting from gambling activity, which is a violation of New York Penal Law section 225.00. A person profits from gambling activity when other than as a player, he accepts or receives money or other property pursuant to an agreement or

I6FQSHU6                         Charge

understanding with any person whereby he participates or is to participate in the proceeds of gambling activity.

The indictment also alleges that one of the categories of criminal violations that were committed or were intended to be committed as part of the RICO conspiracy included acts involving wire fraud in violation of Title 18, U.S.C., Section 1343.  This section provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice has committed a crime.

In order to prove a violation of Section 1343, the government must prove each of the following elements beyond a reasonable doubt:

First, that on or about the times alleged in the indictment, there was a scheme or artifice to defraud others of money or property by materially false or fraudulent pretenses, representations, or promises;

Second, that the individual knowingly and willfully devised or participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific

intent to defraud; and

Third, that in furtherance of that scheme, the individual used, or caused the use by others, of interstate or foreign wires, as specified in the indictment.

Let's turn to these elements.  First, to prove wire fraud, the government must prove that there was a scheme or artifice to defraud victims of money or property by means of false or fraudulent pretenses, representations or promises.

A "scheme or artifice" is simply a plan for the accomplishment of an objective.  "Fraud" and its verb "to defraud" are general terms that embrace all ingenious efforts and means that individuals devise to take unfair advantage of others.  The unfair advantage sought must involve money, property or other thing of value.  Thus, a scheme to defraud is simply a plan to deprive another of money or property by trick, deceit, exception or swindle.

The scheme to defraud must occur by certain means. Here, the law requires that means involve fraudulent representations or fraudulent representations or fraudulent promises.  Let me explain what fraudulent pretense means.  It's a general terms.  The term fraudulent, like the term fraud I described above, includes all possible means or ways by which a person seeks to gain some unfair advantage over another person. Here, again, that unfair advantage must involve money, property, or any other thing of value.  The word "pretense"

adds something to that.  It requires that the fraud be by an act or statement that conceals the truth or contains an intentional misrepresentation or false suggestion.  It must have been done or made falsely and with an intent to deceive, and it must relate to a material fact or matter.  In other words, it cannot relate simply to something no one cared about. A material fact is one which would reasonably be expected to be of concern or importance to a reasonable and prudent person. In addition, it must matter in a pecuniary or monetary way. Actual reliance by a person on the concealment of the truth, intentional misrepresentation, or false suggestion is not required.

It is also not necessary that the government prove that any defendant actually realized any gain from the scheme, nor is it required that the intended victim was actually harmed or in fact suffered any loss.  In addition, if a defendant believes that no harm will ultimately occur to the victim he is defrauded, that is not an defense.

A scheme to defraud need not be shown by direct evidence, but might be established by circumstantial evidence.

The second element of wire fraud that the government must establish is that the defendant you are considering agreed to participate in, or that he devised, the fraudulent scheme knowingly, willfully, and with a specific intent to defraud.

The words "participated" and "devised" are words that

your are familiar with, and I therefore do not need to spend much time defining them for you.  To participate in a scheme to defraud means to associate oneself with it with a view and intent toward making it succeed.  To devise a scheme to defraud is to concoct or plan it.  While a mere onlooker is not a participant in a scheme to defraud, it is not necessary that a participant be someone who personally and visibly executes the scheme to defraud.

In order to satisfy this element, it is not necessary for the government to establish that either defendant himself originated, came up with the idea for, or was the first or only person to pursue the scheme to defraud.  It is sufficient if you find that a scheme to defraud existed, even if someone else originated it, and that the defendant, while aware of the scheme's existence, knowingly agreed to participate in it.

It is also not required that either defendant participate in or have knowledge of all the operations of the scheme.  The guilt of a defendant is not governed by the extent of that defendant's participation.

It is also not necessary that a defendant have participated in the alleged scheme from the beginning.  A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of the details, and acts in a way to intentionally further the unlawful goals, becomes a member of the scheme and is legally

responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter.

Moreover, even if a defendant participated in the scheme to a lesser degree than others, he is nevertheless equally guilty so long as that defendant became a member of the scheme to defraud with knowledge of its general scope and purpose.

As I have previously noted, before each defendant may be found to have engaged in fraud, he must also be shown to have acted knowingly and willfully and with specific intent to defraud.

"Knowingly" means to act voluntarily and deliberately rather than mistakenly or inadvertently.

"Willfully" means to act knowingly and purposefully, with an intent to do something that the law forbids; that is to say, with a bad purpose to either disobey or disregard the law. It is not necessary that a defendant knew that he was violating a particular law.  A defendant need only have been aware of the generally unlawful nature of his acts.

A defendant acts with specific intent to defraud if he engages or participates in a scheme to defraud or to obtain money by materially false or fraudulent pretenses representations or promises with some realization of the scheme's fraudulent or deceptive character, and with an

I6FQSHU6                    Charge

intention to be involved in the scheme and to help it succeed with the purpose of causing harm to a victim.

The question of whether a person acted knowingly, willfully, and with specific intent to defraud is a question of fact for you to determine like any other fact question.  This question involves one's state of mind.  Science has not yet devised a manner of looking into a person's mind and knowing what that person is thinking.  However, you have before you the evidence of certain acts, conversations and statements alleged to involve a defendant and others.  It is up to you to weigh this and all evidence, and to decide whether to accept or reject it.  The point is, the ultimate facts of knowledge and criminal intent may or may not be established by words and conduct and all the surrounding circumstances as well as the rational or logical inferences that may be drawn from the words and conduct.  It is for you to determine whether the government has established beyond a reasonable doubt such knowledge and intent on the part of the defendant.

Now, the third and final element of wire fraud is specific to the manner in which at least one act to further the fraud was conducted.

Specifically, the government must establish that interstate wire facilities were used in furtherance of the scheme to defraud.  What are wires as I am using the term here?  Wires include use of the internet or cell phones to

communicate.  Wires include all manner of cell phone, telephone and internet communications, such as telephone calls, text messages, emails and chat messages, and also include money transfers made by wire.  The wire communication must travel interstate; that is, the use of the wire facilities must pass between two or more states or from outside the United States into the United States, or vice versa.  However, if you find that the wire communication was reasonably foreseeable, and that the interstate wire use charged the indictment took place, this element is satisfied even if it was not foreseeable that the wire communication would cross state or national lines.  It is not necessary for either defendant to directly or personally use any wire facility as long as such use is reasonably foreseeable in the execution of the alleged scheme to defraud in which a defendant is accused of participating.

In this regard, it would be sufficient to establish this element of the crime if the evidence justifies a finding that a defendant caused the wires to be used by others.  When one does an act with knowledge that the use of the wire will follow in the ordinary course of business, or where such use of the wires can reasonably be foreseen even though not actually intended, then under the law, he has caused the wires to be used.  Incidentally, this wire use requirement is satisfied even if the wire use was done by a person with no knowledge of the fraudulent scheme, including a victim of the alleged fraud.

The use of the wire need not itself be fraudulent. Stated another way, whatever wire is used -- whether it be a communication like a phone call or a text message, an email or a bank wire transfer -- need not itself contain any fraudulent representation or even any request for money. It is sufficient if the wires were simply used in some way to further or assist in carrying out the scheme to defraud.

To prove wire fraud, the government must establish beyond a reasonable doubt the use of the wires as charged in the indictment. However, the government does not have to prove -- let me do that again.

However, the government does not have to prove that the wire was used on the exact date or dates charged in the indictment. It is sufficient if the evidence establishes beyond a reasonable doubt that the wire was used on a date reasonably near the date or dates alleged in the indictment.

The indictment also alleges that one of the categories of criminal violations that were committed or were intended to be committed as part of the RICO conspiracy included acts involving wire fraud in violation of Title 18 U.S.C. 2314.

That section in pertinent part provides:

Whoever transports, transmits or transfers in interstate or foreign commerce, any goods, wares, merchandise, securities or money of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud, shall be

guilty of a crime.

To prove an individual committed this crime, the government must establish beyond a reasonable doubt each of the following elements:

First, that the goods, wares, merchandise, securities or money were stolen, converted or taken by fraud;

Second, that the person transported, transmitted, or transferred, or caused to be transported or transmitted the property in interstate or foreign commerce;

Third, that at the time of the transportation or transmission, the person knew the property was stolen, converted, or taken by fraud; and

Fourth, that the value of the property was at least $5,000.

The first element the government must prove beyond a reasonable doubt is that the property described in the indictment was stolen, converted or taken by fraud. The first thing you must determine is whether the property described in the indictment constituted goods, wares or merchandise, or whether it is a security or money. Goods, wares or merchandise means personal property that has some sort of tangible existence and that is ordinarily a subject of commerce.

Next, you must determine whether the property described in the indictment was stolen, converted or taken by fraud. The term "stolen" refers to the taking of any goods,

I6FQSHU6                              Charge

wares, merchandise, securities or money with the intent to

deprive the owner of the use or benefits of ownership.

The phrase "converted" means to take goods, wares,

merchandise, security or money for one's own use by any

dishonest or illegal means.  For example, if a person has

received money in exchange for specific services and he does

not perform those service and instead retains the money for his

own use, he has converted the money.

(Continued on next page)

THE COURT:  The term "taken by fraud" refers to goods, wares, merchandise, securities, or money taken from its owner, through misrepresentations or deceit, with the intent to deprive the owner of the use or benefits of ownership.

For the purposes of this case, it is not necessary that you know, or are able to determine, who stole, converted, or fraudulently obtained the property.  While you must decide beyond a reasonable doubt that the particular property was stolen, you do not have to determine who stole it, or that the individual knew who stole it.  The government need not prove that the individual personally stole the property from the owner.  However, you must determine whether the individual intentionally deprived the owner of this property of the rights and benefits of ownership, without the owner's consent.  In considering whether the defendant acted "intentionally," you should give the word its ordinary meaning of acting deliberately, or purposely, as opposed to acting by mistake or carelessness.

Any illegal or dishonest misrepresentation or taking of property that deprives the owner of his property without his consent is considered "stealing, conversion, or taking by fraud."  The property does not have to be taken permanently, and the misrepresentation or taking does not have to result in monetary loss to the owner.  What you must decide, and what the government must prove beyond a reasonable doubt, is whether, at

I6fWshu7                        Charge

the time the individual acquired possession of the property, he intended to take it for his own use, and if so, whether he did so without the permission of the owner.

The second element the government must prove beyond a reasonable doubt is that the property was transported or transmitted or transferred in interstate commerce.

Simply stated, the phrase "transported in interstate commerce" means that the stolen goods, wares, merchandise, securities, or money moved from one state to another, or between the United States and a foreign country.  For example, if a person has driven merchandise from one state to another, mailed a bank check to another state, or wired funds from a bank in one state to a bank in another state, he has transported or transmitted goods, wares, merchandise, securities, or money from one state to another.

If you find that the property was stolen in one state and was in the defendant's possession in another state, then you may -- but need not -- infer that the property has traveled in interstate commerce.

An individual need not have intended or known of the property's transport in interstate commerce.  Nor is it required that the individual actually have physically transported the property across state lines.  The government satisfies its burden of proving transportation in interstate commerce if it proves beyond a reasonable doubt that the

defendant caused the property's transport across state lines, or performed a substantial step in furtherance of its journey. For example, if the government shows that the individual cashed a stolen check at an out-of-state bank and the check was then mailed across state lines to the original bank in accordance with normal banking practices, then you may find the individual caused the transportation of stolen property in interstate commerce.

The third element the government must prove beyond a reasonable doubt is that each defendant knew at the time of its interstate transport that the property was stolen, converted, or taken by fraud.

In deciding whether a defendant knew that the property was stolen, converted, or taken by fraud at the time it was transported between states, you must focus on his actual knowledge at that time.

Your decision whether the person acted knowingly at the time the stolen property was transported involves a decision about the person's state of mind at the time the journey through interstate commerce occurred. I have instructed you on what knowingly means, and you should apply that instruction here.

The fourth element the government must prove beyond a reasonable doubt is that the property had a value of at least $5,000.

I6fWshu7                        Charge

In determining the value of the property, you may look at the face, or par, value of the property, or its market value -- that is, the amount of money the property could be sold for in the open market -- whichever is greatest.  You should consider the total value of all the property referred to in each count of the indictment, but you must consider each count separately.  If you find that the value of the property referred to in any count or predicate of the indictment is less than $5,000, then the government has not established the element.

It does not matter if you find the individual actually received less than $5,000 for the goods, wares, or merchandise, or if the securities or other financial instruments were nonnegotiable -- that is, they could not be redeemed or traded.  If the evidence shows, and you find beyond a reasonable doubt, that the property's total face, par, or market value was $5,000, then this element of the offense is satisfied.

The indictment also alleges that one of the categories of criminal violations that were committed or were intended to be committed as part of the RICO conspiracy included acts in violation of Title 18, United States Code, Section 2315.  That section, in pertinent part, provides:

Whoever receive, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

or accepts as security for a loan any goods, wares, or

merchandise, or securities of the value of $500 or more, which

have crossed a state or United States boundary after being

stolen, unlawfully converted, or taken, knowing the same to

have been stolen, unlawfully converted, or taken shall be

guilty of a crime.

In order to meet its burden of proof, the government

must establish beyond a reasonable doubt each of the following

elements:

First, that the goods, wares, merchandise, securities,

or money were stolen, converted, or taken;

Second, that after the property had been stolen,

converted, or taken, it crossed a boundary of a state or of the

United States;

Third, that the defendant received, possessed,

concealed, stored, bartered, sold, or disposed of the property;

Fourth, that the defendant knew that the property had

been stolen, converted, or unlawfully taken; and

Fifth, that the value of the property was at least

$5,000.  The first, fourth, and fifth elements are the same as

for the transportation of stolen property offense, for which I

have already instructed you.

The second element the government must prove beyond a

reasonable doubt is that after the property had been stolen,

converted, or taken, it crossed a boundary of a state or of the

United States.

A person need not have intended or known of the property's interstate movement. Nor is it necessary that the person actually, physically have moved the property across state lines. The government satisfies its burden of proving interstate movement in interstate commerce if it proves beyond a reasonable doubt that the person sold or received the property after it had moved across a state line or the United States border.

The third element the government must prove beyond a reasonable doubt is that the person received, possessed, concealed, stored, bartered, sold, or disposed of the property.

In considering whether a person received, concealed, stored, bartered, sold, or disposed of the property, you should give those words their common and ordinary meaning, and understanding them as they are used in their everyday sense. The government does not have to show that a defendant gained any personal benefit, or that the property was sold or disposed of for a profit. For example, a person may have "received" property simply by physically taking possession of the property, or exerting control over it. A person may have "disposed" of the property by abandoning it.

Whether a person received, possessed, stored, bartered, sold, or disposed of the property is a question for you to determine from the surrounding facts and circumstances.

The indictment also alleges that one of the categories of criminal violations that were committed or were intended to be committed as part of the RICO conspiracy was acts involving the trafficking of contraband cigarettes, in violation of Title 18, United States Code, Section 2342.  Section 2342 provides:

It shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes.

To prove that an individual violated this statute, the government must prove each of the following elements beyond a reasonable doubt:

First, that the individual shipped, transported, received, possessed, sold, distributed, or purchased contraband cigarettes, as defined in Title 18, United States Code, Sections 2341(1) and (2).  The words "shipped," "transported," "received," "possessed," "sold," "distributed," and "purchased" have their ordinary meaning;

Second, that the individual acted knowingly.

Contraband cigarettes are defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable state or local cigarette taxes in the state or locality where such cigarettes are found, if the state or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which

I6fWshu7                        Charge

are in the possession of any person" other than certain enumerated exemptions that are not applicable here.

With respect to the portion of the definition of "contraband cigarettes" concerning whether the state or locality in which the cigarettes are found requires that cigarettes bear a tax stamp, I instruct you that New York State Tax Law Section 471 provides as follows:

There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax...such tax on cigarettes shall be at the rate of $4.35 for each 20 cigarettes or fraction thereof, provided, however, that if a package of cigarettes contains more than 20 cigarettes, the rate of tax on the cigarettes in such package in excess of 20 shall be $1.08-3/4 cents for each five cigarettes or fraction thereof.  Such tax is intended to be imposed upon only one sale of the same package of cigarettes.

It is intended that the ultimate incidence of and liability for the tax shall be upon the consumer, and that any agent or dealer who shall pay the tax to the commissioner shall collect the tax from the purchaser or consumer.  Except as hereinafter provided, the tax shall be advanced and paid by the agent.  The agent shall be liable for the collection and payment of the tax on cigarettes imposed by this article and

I6fWshu7                    Charge

shall pay the tax to the commissioner by purchasing, under such regulations as he or she shall prescribe, adhesive stamps of such designs and denominations as he or she shall prescribe. The tax on cigarettes may also be paid by or through the use of metering machines if the commissioner so prescribes.  Agents, located within or without the state, shall purchase stamps and affix such stamps in the manner prescribed to packages of cigarettes to be sold within the state, in which case any dealer subsequently receiving such stamped packages of cigarettes will not be required to purchase and affix stamps on such packages of cigarettes.

The indictment also alleges that one of the categories of criminal violations that were committed or were intended to be committed as part of the RICO conspiracy included acts involving fraud relating to identification documents, in violation of Title 18, United States Code, Section 1028.

The relevant statute provides:

Whoever...knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of federal law, or that constitutes a felony under any applicable state or local law... and the production, transfer, possession, or use prohibited by this section is in or affects interstate commerce or foreign commerce, including

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I6fWshu7                        Charge

the transfer of a document by electronic means.

In order to prove this predicate offense, the government must prove each of the following elements beyond a reasonable doubt:

First, that the item referred to in the indictment is a means of identification of another person, as I will define that term for you;

Second, that each defendant used, transferred, possessed that means of identification;

Third, that each defendant acted knowingly and without lawful authority;

Fourth, that each defendant acted with the intent to commit, or to aid and abet, or in connection with an unlawful activity that violates federal or state law; and

Fifth that each defendant's conduct was in or affecting interstate commerce.

With respect to the first element of this predicate offense, the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any name or a unique electronic identification number, address, or routing code.

With respect to the second element of this predicate offense, to "use" a means of identification is to present, display, certify, or otherwise employ the document in any

manner so that it would be accepted as identification.  To transfer a means of identification means simply to turn over possession or control.  The government does not have to prove that a defendant received any compensation in return for the means of identification.  To possess something means to have it within a person's control.  This does not necessarily mean that the person must hold it physically; that is, have actual possession of it.  As long as the means of identification was within the defendant's control, he possessed it.  If you find that the defendant either had actual possession of the means of identification, or that he had the power and intention to exercise control over it, even though it was not in his physical possession, you may find that the government has proven possession.  The law also recognizes that possession may be sole or joint.  If one person alone possesses something, that is sole possession.  However, it is possible that more than one person may have the power and intention to exercise control over a means of identification.  That is called joint possession.  If you find that the defendant had such power and intention, then he possessed the means of identification even if he possessed it jointly with another person.

With respect to the third element, the government must prove that the defendant was not authorized to use, transfer, or possess the means of identification, and that the defendant used, transferred, or possessed the means of identification

knowingly.  An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake or some other innocent reason.

With respect to the fourth element, the government must prove beyond a reasonable doubt that each defendant used, transferred, or possessed a means of identification of another person with the intent to commit, or to aid and abet, or in connection with, an unlawful activity that violates federal or state law.

In this case, the government has alleged that each defendant acted with the intent to commit wire fraud, which I have already defined above.  To establish this element, the government may prove that each defendant used the means of identification with the intent to commit wire fraud, or to aid and abet the commission of wire fraud.  As it applies to this predicate offense, to aid and abet means that each defendant used the means of identification with the intent to associate himself in some way with the crime of wire fraud and that he intended to participate in that crime by doing some act to help make that crime succeed.

Alternatively, the government may establish this element by proving that the defendant acted "in connection with" the commission of wire fraud -- that is, that defendant knowingly facilitated the commission of wire fraud by providing others with stolen bank or credit card account numbers.

With respect to the fifth element, the government must prove beyond a reasonable doubt that each defendant's use, transfer, or possession of a means of identification of another person was in or affecting interstate commerce.  Interstate commerce simply means the movement of goods, services, money and individuals between any two or more states or between the United States and a foreign country.  To satisfy this element, the government must prove that a defendant's conduct affected interstate commerce in any way, no matter how minimal.  You do not have to find that each defendant's conduct actually affected interstate commerce if you find that his conduct would have affected interstate commerce if he had successfully and fully completed his actions.  Also, it is not necessary that each means of identification separately affect interstate commerce as long as you find that the defendant's possession of the means of identification actually or potentially affected interstate commerce in some way.  Finally, the government is not required to prove that a defendant knew he was affecting interstate commerce.

The indictment also alleges that one of the categories of criminal violations that were committed or were intended to be committed as part of the RICO conspiracy included acts involving access device fraud, in violation of Title 18, United States Code, Section 1029.

The relevant statute provides:

Whoever knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period; or... effects transactions, with one or more access devices issued to another person or persons, to receive payment or any other thing of value, during any one-year period, the aggregate value of which is equal to or greater than $1,000;... shall, if the offense affects interstate or foreign commerce, be guilty of a crime.

In order to prove the defendant guilty of the charge in the indictment, the government must prove each of the following elements beyond a reasonable doubt:

First, that the instrument alleged by the government to have been used in connection with this predicate offense -- namely, stolen credit or debit cards -- are access devices as I will explain the term to you in a moment;

Second, that the defendant trafficked in, used, or attempted to traffic in or use, one or more unauthorized devices during any one-year period, and in so doing obtained anything of value amounting to $1,000 or more; or that the defendant used one or more access devices issued to another person or persons during any one-year period, and in so doing obtained anything of value amounting to $1,000 or more;

Third, that the defendant acted knowingly, willfully and with intent to defraud; and

Fourth, that interstate or foreign commerce was affected by the defendant's actions.

The first element the government must prove beyond a reasonable doubt is that a credit card or debit card is an access device. According to the statute, an access device is defined to mean:

Any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by paper instrument.

The following items were specifically considered by the Congress to fall within this definition: credit cards, debit cards, account numbers, whether assigned or not, and combinations of these and other methods of obtaining money, goods and services. If you find beyond a reasonable doubt that the device was, e.g., a credit or debit card which could be used alone or together with another access device to obtain something of value, then this element has been satisfied.

As stated above, the government may prove either or both of two objects with respect to the second element of this predicate offense. First, the government may prove this predicate offense on the ground that the defendant trafficked in, used, or attempted to traffic in or use, one or more

I6fWshu7                         Charge

unauthorized access devices during any one-year period, and in so doing obtained anything of value amounting to $1,000 or more.

An access device is unauthorized if it is lost, stolen, expired, revoked, or canceled.  An access device can also be unauthorized if the defendant obtained it with intent to defraud, as I will define that phrase in a moment.

The term "traffic in" means to transfer, or otherwise dispose of something, to someone else.  It also means to obtain control of something with the intent of transferring it to someone else.  In plain language, it means to buy and sell, to deal as a supplier or middleman, or simply to pass along.

The term "use" has its everyday meaning.  Thus, if you find that a defendant employed an access device to obtain money or goods, or if goods or money were obtained by means of an unauthorized access device, this portion of the element should be satisfied.

The government must also prove that a defendant obtained anything of value worth at least $1,000 during a one-year period.  In connection with this portion of this element, the government must prove that a defendant received at least $1,000 worth of goods, services or money during a 12-month period.  In this regard, no one item need be worth $1,000 and no item should be disregarded in determining whether the $1,000 threshold is satisfied merely because the value of a

particular item is small.  The $1,000 threshold can be satisfied by any number of small or large transactions with one or more unauthorized access devices, provided first, that the total value of goods, services or money adds up to at least $1,000; and second, that the $1,000 was obtained during a 12-month period.

In addition, or alternatively, the government may prove this predicate offense on the ground that the defendant used one or more access devices issued to another person or persons during any one-year period, and in so doing obtained anything of value amounting to $1,000 or more.  My instructions as to the meaning of "use" and obtaining anything of value worth at least $1,000 during a one-year period, as set forth above, apply equally to this object of this predicate offense.

The third element that the government must establish beyond a reasonable doubt is that each defendant acted knowingly and with intent to defraud.  "knowingly" means to act voluntarily and deliberately rather than mistakenly or inadvertently.

As I instructed you earlier with respect to wire fraud, to act with intent to defraud means to act willfully and with the intent to deceive, for the purpose of causing some loss to another.  To act willfully means to act knowingly and purposely, with an intent to do something the law forbids; that is to say, with a bad purpose either to disobey or disregard

the law.

The question of whether a person acted knowingly and with intent to defraud is a question of fact for you to determine, like any other fact question. This question involves one's state of mind.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent. Such direct proof is not required.

The ultimate facts of knowledge and intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestation, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

Circumstantial evidence, if believed, is of no less value than direct evidence. In either case, the essential elements of the crime charged must be established beyond a reasonable doubt.

Since an essential element of the crime charged is intent to defraud, it follows that good faith on the part of a defendant is a complete defense to a charge of credit card fraud. If the defendant actually believed that the access devices were legitimate, and took reasonable steps to check out

that belief, then the defendant acted in good faith.  A defendant, however, has no burden to establish a defense of good faith.  The burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt.

In considering whether or not a defendant acted in good faith, you are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith.  No amount of honest belief on the part of a defendant that the scheme will somehow work out in the end will excuse fraudulent actions or false representations by him to obtain a credit card or other access device with intent to defraud.

As a practical matter, then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his conduct was calculated to deceive, and nonetheless, he undertook the activity for the purpose of causing some loss to another.

The fourth and final element that the government must prove beyond a reasonable doubt is that the defendant's behavior alleged in the indictment affected interstate or foreign commerce.  My earlier discussion of affecting interstate commerce, as it applied to the predicate offense under Title 18, United States Code, Section 1028, applies

I6fWshu7                        Charge

equally to this predicate offense.

The indictment also alleges that a category of criminal violations that were committed or were intended to be committed as part of the RICO conspiracy were acts involving the distribution of a controlled substance in violation of federal law.

Title 21, United States Code, Section 846 makes it a separate crime for an individual to conspire with others to violate the narcotics laws of the United States.  To be guilty of narcotics conspiracy, the government must prove:

First, that the narcotics conspiracy actually existed -- i.e. there was, in fact, an agreement or understanding to violate those provisions of the law that make it illegal to distribute narcotics, or to possess narcotics with the intent to distribute them;

Second, a person intentionally and knowingly became a member of the narcotics conspiracy -- that is, he knowingly associated himself with the narcotics conspiracy, and participated in the conspiracy to distribute or possess with the intent to distribute narcotics.  I have already explained the federal law of conspiracy, and you should apply that law here.

Under Title 21, United States Code, Section 841, it is unlawful for any person knowingly or intentionally "to manufacture, distribute, or dispense, or possess with intent to

manufacture, distribute, or dispense, a controlled substance."
I instruct you, as a matter of law, that cocaine is a
controlled substance under the federal statute.

The elements of distributing or possessing with the
intent to distribute narcotics are:

First, that a person or a coconspirator distributed a
controlled substance, or possessed a controlled substance with
the intent to distribute it;

Second, that he did so intentionally and knowingly;
and

Third, that the substance involved was, in fact, a
controlled substance.

In determining whether the defendant agreed as part of
the RICO conspiracy that he or a coconspirator would commit
acts involving the distribution of a controlled substance, you
may apply the aiding and abetting instructions I gave you
earlier.  Thus, you may find that the RICO conspiracy involved
the distribution of controlled substances because you find that
a defendant agreed that either he or a coconspirator would
personally distribute drugs or possess them with intent to
distribute, or because you find that he agreed that he or a
coconspirator would assist a third party in doing so.

As used here, "distribute" means the actual
constructive, or attempted transfer of a controlled substance
"To distribute" simply means to deliver or to hand something

over to another person or to cause something to be delivered or handed to another person.  Distribution does not require a sale, but a sale is one of the ways that a controlled substance can be distributed.

"Possession" can either be actual or constructive. Actual possession is what most of us think of as possession; that is, having physical custody or control of an object.  By way of example, I possess this pen.  Constructive possession is the ability to exercise substantial control over an object that is not in a person's physical custody and the intent to exercise such control.  For example, if your friend borrows your car, you can direct him to deliver the car to the garage. In that instance, although you do not have actual possession of the car, you have constructive possession because you have the ability to direct the actions of your friend, who actually possesses the car.  The law recognizes that more than one person can possess an object at the same time.

A person possesses "with intent to distribute" a controlled substance if the person has possession of a controlled substance, either actual or constructive, and intends to "distribute" it to another person or persons.  As I explained, distribute simply means to transfer the item to another person.

It is not necessary for the government to prove that members of the conspiracy actually distributed controlled

I6fWshu7                          Charge

substances or possessed controlled substances with intent to distribute them to find that this element has been proven; rather, the government need only prove, beyond a reasonable doubt, that a goal of the conspiracy was to distribute controlled substances or to possess controlled substances with the intent to distribute them.

An act is done "knowingly" and "intentionally" if it is done deliberately and purposely; that is, the individual's acts must have been the product of the individual's conscious objective, rather than the product of a mistake or accident, or mere negligence, or some other innocent reason.

Counts Two and Three allege that Razhden Shulaya conspired to violate federal law.  The relevant statute on this subject is Title 18, United States Code, Section 371.  It provides:

If two or more persons conspire...to commit any offense against the unite stayed...and one or more such persons do not act to effect the object of the conspiracy, each is guilty of an offense against the United States.

In order to satisfy its burden of proof, the government must establish each of the following four essential elements beyond a reasonable doubt:

First, that two or more persons entered the unlawful agreement charged in the relevant count of the indictment;

Second, that the defendant knowingly and willfully

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

became a member of the conspiracy;

Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the relevant count of the indictment; and

Fourth, that the overt act or acts which you find to have been committed were committed to further some objective of the conspiracy.

I have already instructed you on the nature of a conspiracy, what it means for a conspiracy to exist, and what it means to knowingly and willfully become a member of a conspiracy. Follow my earlier instructions as to these topics.

The third element that the government must prove beyond a reasonable doubt, to establish the offense of conspiracy, is that at least one of the overt acts charged in the indictment was knowingly committed by at least one of the coconspirators, at or about the time and place alleged.

As to Count Two, the indictment charges that the following overt acts were committed in the Southern District of New York.

As to Count Three, the indictment charges that the following overt acts were committed in the Southern District of New York.

You know what we're going to do? We're going to stop right here, ladies and gentlemen, and take our break for the afternoon. I realized there's a typographical error. We're

I6fWshu7

not going to finish today anyway, but we're close.  You're going to end up, probably within the hour when you get here on Monday, I'll be able to finish this and turn the case over to you.  Everybody, including the alternates will all come back on Monday, and we will go through the remainder of the jury instructions.

Let me tell the alternates because you're probably very curious at this point as to what your role is, when we're done with giving the jury instructions, at that point in time you will be allowed to go home or wherever you want to go, back to your job, but you won't be dismissed formally from the jury and you won't be able to talk about the case, because it happens frequently that we have to call on the alternates.  We've had situations where literally right after the jury charge somebody gets a stomach virus, or literally somebody gets a phone call and they've got to leave and we have to then call the alternate up, and we call you in order, and say, Hey, can you come in?

Actually I've used as many as three alternates during jury deliberations.  That's usually during flu season or something.  The alternates are still part of this.  It's not over until it's over.  I want to get you fully charged along with everybody else, and then we'll give you special instructions on Monday and have a phone number where we can get a hold of you right away.  But the 12 will be the ones who will

I6fWshu7

go in and start talking about the case and will be the ones to deliberate on the case.  Unless you're called, you won't be part of that.

Now, nobody should talk about this case with each other or with anybody else over the weekend, because you're not fully charged yet.  After you're fully charged I will then explicitly tell you to go into the jury room and talk amongst yourselves and still not talk to anybody else until you have reached a verdict.

Right now, I'm going to let you go until Monday. We'll see you Monday morning at 9:30.  We'll continue.  We'll be done shortly, and you will get the case on Monday.  We'll have lunch for you also on Monday.

You can leave that there or put it in the jury room. Don't take it home with you but either here or the jury room as you like.

Thanks very much, folks.  See you on Monday.

(Jury not present)

THE COURT:  All right.  Ladies and gentlemen, we're very close to the end but I see a typographical error here on page 117.

I would ask that the parties confer on what the insertion should be.  It comes out of the indictment.  It's not hard.  We've already all known that the indictment was going to be inserted here, so there's no basis to suggest that the jury

instructions weren't complete.  They obviously are complete.  They include the indictment.  The jury is going to get the indictment, as we've already discussed and mentioned at the beginning.  It's simply a matter of taking the indictment, I think, and helpfully referencing exactly what we should include in the words on page 117 when we're talking about the overt acts of Count Two and the overt acts of Count Three.

If the parties and the government could confer and have something for me in writing on Monday morning, that would be terrific.

MR. THOMAS:  Yes, your Honor.

THE COURT:  Is there anything to this point that anybody believes that they need to raise with regard to the Court's instructions?

MR. THOMAS:  Not from the government.

MR. WOMBLE:  No.

MS. LOUIS-JEUNE:  No, your Honor.

THE COURT:  All right.  Terrific.

We only have to get together at 9:30 so long as you're in agreement on the insertion on page 117.  Just be here five minutes before 9:30, just to be in place.  We'll bring the jury out, and then hopefully we'll get the jury the case right away.

Anything else we need to go over?  Any logistics with regard to the exhibits or anything else?

MR. THOMAS:  Not from the government.

I6fWshu7

THE COURT:  All right.  You can leave everything here. There's no reason for you to move it all.  Monday I will start having matters in the courtroom, but even then you can still have things here.  The jury will take priority and this case will take absolute priority over anything else I manage to squeeze in around you.

See you folks Monday morning.

(Adjourned to June 18, 2018, at 9:30 a.m.)